1                    UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF KANSAS
2

3   UNITED STATES OF AMERICA,         Docket No. 16-20032-JAR

4        Plaintiff,                   Kansas City, Kansas
                                      Date:  08/09/2016
5   v.

6   LORENZO BLACK,
    KARL CARTER,
7   ANTHON AIONO,
    ALICIA TACKETT,
8   CATHERINE ROWLETTE,
    DAVID BISHOP,
9
         Defendants.
10  ....................

11
                         TRANSCRIPT OF
12    AMENDED MOTION FOR RETURN OF PROPERTY PURSUANT TO
          FEDERAL RULES OF CRIMINAL PROCEDURE 4(g)
13                      (Doc. #85)
          BEFORE THE HONORABLE JULIE A. ROBINSON
14                UNITED STATES DISTRICT JUDGE

15  APPEARANCES:
    For the Government:  Ms. Debra L. Barnett
16                       United States Attorney's Office
                         301 North Main Street
17                       Suite 1200
                         Wichita, Kansas 67202-4812
18
                         Mr. Duston J. Slinkard
19                       United States Attorney's Office
                         444 Southeast Quincy
20                       Room 290
                         Topeka, Kansas 66683-3592
21
    For the Defendant Lorenzo Black:
22                       Mr. John Jenab
                         Jenab Law Firm, P.A.
23                       110 South Cherry Street
                         Suite 103
24                       Olathe, Kansas 66061

25  (Appearances continued on next page).

```
 1     APPEARANCES:

 2     (Continued)

 3     For the Defendant Karl Carter:

 4                         Mr. David J. Guastello
                           The Guastello Law Firm, LLC
 5                         4010 Washington Street
                           Suite 501
 6                         Kansas City, Missouri 64111

 7     For the Defendant Anthon Aiono:
                           Mr. Jason P. Hoffman
 8                         Hoffman & Hoffman
                           CoreFirst Bank & Trust Building
 9                         100 East Ninth Street
                           Third Floor East
10                         Topeka, Kansas 66612

11     For the Defendant Alicia Tackett:
                           (Appeared not)
12
       For the Defendant Catherine Rowlette:
13                         Mr. Michael M. Jackson
                           Attorney at Law
14                         727 South Kansas Avenue
                           Suite 2
15                         Topeka, Kansas 66603

16     For the Defendant David Bishop:
                           (Appeared not)
17
       For the Movant Federal Public Defender:
18                         Ms. Melody Brannon
                           Mr. Kirk C. Redmond
19                         117 Southwest Sixth Street
                           Suite 200
20                         Topeka, Kansas 66603

21

22
       Court Reporter:     Kelli Stewart, RPR, CRR, RMR
23                         Official Court Reporter
                           259 U.S. Courthouse
24                         500 State Avenue
                           Kansas City, Kansas 66101
25
```

```
 1                        I N D E X

 2

 3   Defendant's Witnesses:                              Page

 4   ZAY THOMPSON
        Direct Examination By Ms. Brannon              16
 5
     STATEMENT BY MS. JACQUELYN ROKUSEK                  31
 6      Questions by Ms. Brannon                        43
        Questions by Ms. Barnett                        49
 7
     MICHELLE JENSEN-SCHUBERT
 8      Direct Examination By Ms. Brannon              53

 9   RICHARD NEY
        Direct Examination By Ms. Brannon              58
10      Cross Examination By Ms. Barnett               73
        Redirect Examination By Ms. Brannon            78
11
     QUESTIONING OF MR. RANDY RATHBUN
12      Questions by Mr. Redmond                        82
        Questions Ms. Barnett                           88
13
     PROFESSOR PETER JOY
14      Direct Examination By Mr. Redmond              91

15

                        E X H I B I T S
16
        Defendant's
17      Exhibits              Offered           Received

18         401                  89                 90
           402                  89                 90
19         403                  89                 90
           404                  89                 90
20         405                  89                 90
           406                  89                 90
21         407                  89                 90
           408                  89                 90
22         409                  89                 90
           410                  89                 90
23         411                  89                 90
           412                  89                 90
24

25
```

1

2                          E X H I B I T S

3                            (Continued)

4        Defendant's
         Exhibits                 Offered              Received
5
              413                    89                   90
6             414                    89                   90
              415                    89                   90
7             416                    89                   90
              417                    89                   90
8             418                    89                   90
              419                    89                   90
9             420                    89                   90
              421                    89                   90
10            422                    89                   90
              423                    89                   90
11            424                    89                   90
              425                    89                   90
12            426                    89                   90
              427                    89                   90
13            428                    89                   90
              429                    89                   90
14            430                    89                   90
              431                    89                   90
15            432                    89                   90
              433                    89                   90
16            434                    30                   30
              435                    30                   30
17            436                    30                   30
              437                    30                   30
18            438                    30                   30
              439                    30                   30
19            440                    30                   30
              441                    30                   30
20            442                    30                   30
              443                    30                   30
21            444                    30                   30
              445                    30                   30
22            446                    30                   30
              447                    30                   30
23            448                    30                   30

24

25

1              (1:34 p.m., proceedings commenced).

2              THE COURT:  All right.  You can be seated.

3    All right.  We're here in United States versus Lorenzo

4    Black, et al.  The case number is 16-20032.  Your

5    appearances.

6              MS. BARNETT:  Debra Barnett, Assistant

7    United States Attorney, appearing on behalf of the

8    United States of America.  Also with me at counsel's

9    table is Duston Slinkard, Assistant United States

10   Attorney.  And then also joining us at the table is

11   Emily Metzger, Assistant United States Attorney.

12             THE COURT:  All right.

13             MR. JENAB:  Your Honor, Lorenzo Black is

14   present in person with counsel, John Jenab.

15             MR. GUASTELLO:  May it please the Court.

16   Mr. Carter appears in person and in custody with

17   counsel, David Guastello.

18             MR. HOFFMAN:  Mr. Aiono appears not but

19   through counsel, Jason Hoffman, Your Honor.

20             MR. JACKSON:  If it please the Court.  Your

21   Honor, Catherine Rowlette appears in person and by

22   counsel, Mike Jackson.

23             MS. BRANNON:  Your Honor, Melody Brannon and

24   Kirk Redmond appear on behalf of Jermaine Rayton.  Also

25   in Brenda Wood's case I filed a motion because-- to

1    participate in this hearing on her behalf because she

2    has overlapping issues.  Both Mr. Rayton and Ms. Wood

3    would waive their appearance.

4            THE COURT:  What's Mr. Rayton's first name

5    again?

6            MS. BRANNON:  Jermaine.

7            THE COURT:  Jermaine Rayton.

8            MS. BRANNON:  And he's actually in BOP

9    custody now.

10           THE COURT:  All right.  And then I think Ms.

11   Ambrosio - could I see the notice, Bonnie - Ms. Ambrosio

12   has indicated that this doesn't pertain to her client.

13   She's never been in custody at CCA, so she's not here.

14   And then Ms. Dodge on behalf of Mr. Bishop could not be

15   here, but has joined in the motions and asked for leave

16   to perhaps have a hearing at a later date if she finds

17   that necessary.

18           All right.  So we are here on the amended

19   motion of the Federal Public Defender for return of

20   property.  And I think it was amended to attach a

21   transcript from a hearing that we had in this case, a

22   status conference and discovery hearing that we had in

23   this case last week or perhaps the week before.

24           So are you ready to proceed?

25           MS. BRANNON:  Your Honor, if we may just

1    give a little bit of context to the Court about what's

2    developed in the last week and why there are so many

3    defense lawyers here perhaps.

4          Last week we discovered that the United

5    States Attorney's Office as part of the Black case had

6    subpoenaed from CCA all external and internal videotape

7    for a period from July of 2015 until April of 2016.  We

8    have that subpoena marked and to be offered into

9    evidence.

10          That videotape includes video of all

11   attorney-client meetings in that time, not just

12   pertaining to Mr. Black, but every attorney-client

13   meeting that occurred at CCA in that 10-month period,

14   whether they're FPD, CJA, or retained.  We understand

15   that the videotape-- or the video was there.  We don't

16   know that there's audio.  We know that there's a

17   capacity for audio.

18          This is why it's a problem, Judge.  When we

19   go to CCA, every attorney that meets there had an

20   expectation of privacy.  We expected that those meetings

21   with our clients were confidential.  We expected that

22   those meetings with our clients were privileged.  That's

23   always how it has been.  That's what we understood from

24   CCA.  And that was, in fact, not the case.  CCA since I

25   believe 2008 has recorded every attorney-client meeting

1    at their facility.

2            Now, I take that back, because I believe

3    there are ten meeting rooms and I think two of them are

4    not videotaped, but the other ones are.  And so if there

5    was a camera available to CCA, it was on and being

6    recorded.  Notice to the defense counsel was never given

7    of this from CCA.  The fact that the United States

8    Attorney has available to it this sort of legal

9    communication was never made known to the defense.  We

10   only found out about it because it came out in the

11   Lorenzo Black case.

12           It's another problem because we don't know

13   if and when they've done it in any other case that the

14   defense has had with a client at CCA.  So we'd like to

15   present evidence regarding this.

16           It came to light last week when Jackie

17   Rokusek was summoned to the U.S. Attorney's Office.  And

18   she was told that - by I believe Erin Tomasic and Kim

19   Flannigan - that they had videotape of her meeting with

20   her client in another case, that their investigator was

21   going to review it, that they intended to review it.

22   And it was going to provide them with a basis to have

23   her conflicted off the case.

24           And so Ms. Rokusek asked for an opportunity

25   to view it a few days later.  That was made available to

 1    her.  She confirmed that there is a videotape of her

 2    meeting with a client.  She confirmed that she was able

 3    to view other attorney-client visitation that was going

 4    on during this time.

 5         The other problem that we have in this case

 6    - and there are a lot of them - but the other problem is

 7    not only does the U.S. Attorney have these, they were

 8    ready to disseminate them to all of the defendants in

 9    this case so far.  We know from what they told the Court

10    that they intend to add more defendants.  I think the

11    numbers were-- there may be up to 90 other inmates

12    involved.  There may be up to 60 people outside.  We

13    don't know how many of them would be indicted in this

14    case.  All of them, all of those defendants, all of

15    those counsel would be given videotape or video of every

16    attorney-client meeting that happened at CCA in those

17    ten months.

18         So when I meet with my client who has an

19    interest in this, Ms. Wood, who has nothing to do with

20    this investigation, nothing to do with these

21    indictments, when I meet with her, what I review, what I

22    do with her, all of that would be available to every

23    other defense attorney that represents anybody related

24    to this case.  That's why we're here.  We want to figure

25    out what to do about this.

1          I think at the end of this hearing, which I

2    don't expect to be particularly adversarial, I think the

3    parties are going to propose to the Court appointing an

4    outside special master to investigate this.  I think we

5    will have some protective orders that we will ask the

6    Court to consider, including taking into custody the

7    video and any copies of the video that are now in the

8    United States Attorney's possession to preserve them, to

9    preserve the data that is on them.  There will be other

10   matters that we would ask the Court to take up in the

11   protective orders.

12          And finally, we will be asking the Court,

13   and I think the government joins in this, for an order

14   that all federal pretrial detainees will only be housed

15   at facilities that do not record attorney-client

16   communications, legal communications.  And so that's

17   kind of an overview of the evidence and the context that

18   we have for the Court today.

19          THE COURT:  Well, I'm a little unclear about

20   a couple of things that you said, and I suppose I can

21   wait to hear the evidence on this.  But as far as the

22   recordings that you say have been occurring as far back

23   as 2008 and as they pertain to this case that we're here

24   today on from July of 2015 to April of 2016, you've

25   expressed concern that-- that the defense was not on

1  notice that the United States Attorney's Office had

2  access to this sort of information.

3       What I-- I guess what I'd like to focus on

4  is, is it-- do you have evidence that the United States

5  Attorney's Office has been getting access to this kind

6  of information outside the context of this case?

7  Because, of course, the context of this case has to do

8  with alleged transactions and contraband at CCA.  And

9  when we were having this discovery conference last week,

10 the week before, whenever it was, I was trying to get

11 some sense of how-- how the defense might go about

12 discovering what they needed to discover in this huge

13 volume of recordings.

14      And so we had this whole-- if you read the

15 transcript, this back and forth about, you know,

16 presumably most detainees are going to be housed in

17 their pod most of the time and counsel can see what they

18 were doing while they were there.  But as they moved

19 around the facility to medical or otherwise, would their

20 movements be recorded?  And then there was a suggestion

21 that there are, you know, at least video-recordings,

22 recordings, something, as they moved around to meet with

23 their attorneys.  And that this-- whatever their

24 movements were, all of the videos were-- were produced

25 or were going to be produced to the defense.

1    So my question is:  Are the concerns because

2    of this huge volume of discovery in this case or do you

3    have some-- some indication that the U.S. Attorney's

4    Office has discovered tapes in unrelated cases for

5    unrelated cases?  Is it just all about what's happened

6    in this case and discovering the whole body of

7    recordings?

8    MS. BRANNON:  There are two problems.  The

9    first is that CCA is recording this in the first place.

10   Not monitoring, but recording.  That right there is a

11   violation, we believe, of the attorney-client privilege

12   of the legal communications going on in that room.  Just

13   that they're recorded.  They keep it for a number of

14   days.  We don't know how long.  We've heard from 30 to

15   120 days.

16   We do not know when-- if or when the U.S.

17   Attorney has asked for those recordings in other cases.

18   What we do know is they asked for it in this case.  And

19   we were not aware, No. 1, that the recordings existed

20   ever, and No. 2, that the government had such ready and

21   easy access to them.

22   So the fact is, we don't know.  And we think

23   that that would be one of the things for a special

24   master to investigate.  Whether this was a routine

25   practice in Kansas City, Kansas, to do that and whether

1    it's been determined or used in any case.

2            We have evidence today about how CCA handles

3    those subpoenas and how they handle these requests.  But

4    the point is, we're never given notice.  We're never

5    given notice of the recordings.  We're never given

6    notice of the subpoenas.  It's by happen chance in this

7    case because the U.S. Attorney was actually using the

8    videotapes against counsel and against defendants that

9    it really came to light and began to develop.  That's

10   the evidence that we believe the Court will hear.  So

11   that's the issue with CCA.

12           The issue in this case is that they have ten

13   months of attorney-client legal communications videoed

14   in those rooms that the U.S. Attorney has in their

15   possession that until now they could've reviewed, they

16   could've used in any case.  Any attorney in their office

17   would've had access to it in any case, including-- and

18   this is no accusation in my case.  But, for example, in

19   Brenda Wood, if there was something about that case that

20   the U.S. Attorney wanted to use in that case, they have

21   possession of this now.  They don't even have to go.  So

22   it's preserved and in their custody.  That's of great

23   concern to every lawyer in here.

24           The other part of that is that not only do

25   they have it and were they ready to review it and were

1    they-- they were ready to use it in their case, they

2    were ready to disseminate that to every other attorney

3    in that case or in any cases coming up.

4         So what the evidence will be today, Your

5    Honor, is we've got some evidence sort of laying out

6    what is going on at CCA, what the rooms are about,

7    issues of security.  Ms. Rokusek is going to make a

8    statement to the Court explaining how she came to know

9    that they had possession of this, that they knew they

10   had possession.  This was not inadvertent.  They had

11   indexed it, they were-- had identified it, they were

12   using it in their case.  This was not an inadvertent

13   seizure by the government.

14        We are going to ask that at some point Ms.

15   Rokusek, with protective orders from the Court, will

16   show the Court exactly what is on those tapes and how

17   she could access every other attorney-client visit that

18   is on those recordings.  We will present evidence to

19   explain why, even if it is video communication, why that

20   is a great threat to us, why that is a violation of the

21   attorney-client privilege.

22        We will present evidence how this U.S.

23   Attorney access to confidential privileged information

24   between attorney-clients should not and is not, by DOJ

25   standards or other standards, that accessible.  We will

1    present evidence about why this is a constitutional and

2    these are ethical violations against our clients and

3    against the attorneys by the U.S. Attorney's Office and

4    by CCA.

5              I don't know if that answers the Court's

6    questions or clarifies.

7              THE COURT:  Somewhat.  But let's proceed

8    with the evidence.

9              MS. BRANNON:  Yes, Your Honor.

10              THE COURT:  Ms. Barnett, or anyone at your

11    table, do you want to make any opening statement?

12              MS. BARNETT:  Your Honor, I think the only

13    thing that I would say to the Court at this point is

14    that we do have the-- what we'll call the original copy

15    of the videotaped footage that was provided by CCA here

16    with us today, as well as a copy of that that was made.

17    We are prepared today to turn those items over to the

18    Court.

19              We agree that a special master should be

20    appointed to review those items and determine whether or

21    not they contain attorney-client privileged material,

22    because we feel that that determination needs to be made

23    before then we can adequately respond to and address to

24    the Court the other issues that are raised by the

25    Federal Public Defender's Office and the other defense

1    attorneys in this case.  Thank you.

2             THE COURT:  All right.  Thank you.  All

3    right.  Ms. Brannon.

4             MS. BRANNON:  Your Honor, if I may approach.

5    I have copies of the exhibits that we have today.

6             Your Honor, we call Zay Thompson to the

7    stand.

8                         ZAY THOMPSON,

9    called as a witness on behalf of the Defendant, having

10   first been duly sworn, testified as follows:

11                    DIRECT EXAMINATION

12   BY MS. BRANNON:

13   Q.   Please state your name for the record, please.

14   A.   Zay Thompson.

15   Q.   And, Mr. Thompson, what do you do for a living?

16   A.   I'm an investigator with the Federal Public

17   Defender's Office here in Kansas City.

18   Q.   And how long have you been doing that?

19   A.   Since-- I've been with the Federal Public

20   Defender since 2009.  I've been up here since 2012.

21   Q.   How long have you been an investigator?

22   A.   Since 2000.

23   Q.   All right.  As part of your job as an

24   investigator, do you go to CCA routinely?

25   A.   Yes, I do.

1    Q.   And can you describe where that is?

2    A.   It's in Leavenworth, Kansas.

3    Q.   All right.  Did you go there this week?

4    A.   Yes, I did.

5    Q.   On I believe was it yesterday?

6    A.   I went yesterday, yeah.

7    Q.   Yesterday.

8    A.   Uh-huh.

9    Q.   What did you do there yesterday?

10   A.   I took photos and video of the professional

11   visitation rooms.

12   Q.   And who else was with you?

13   A.   David Magariel.

14   Q.   That's how you say his name.

15   A.   Good.  Glad I got that right.

16   Q.   Were there any-- anyone from CCA or the marshals

17   office with you?

18   A.   Yes.  The chief of security, Roger Moore, was

19   there.  The warden was there for part of the time.

20   Craig from the U.S. Marshal's Office, a couple other

21   people I don't know.

22   Q.   And what were you able to do while you were

23   there?

24   A.   I inspected all of the professional visitation

25   rooms, took pictures of the cameras and the intercom

1    systems, and took some pictures of the rooms and the

2    hallways and took video of all of that.  And also tested

3    the intercoms to see if they were all working.

4        Q.  How long did it take you to do that?

5        A.  We were there for about an hour, hour-and-a-half.

6        Q.  How many visitation rooms are there?

7        A.  There are nine.

8        Q.  In the course of your work, have you been in all

9    of them for attorney-client visits?

10        A.  Yes.

11        Q.  While you were in there, did you have an

12    expectation that those were confidential communications?

13        A.  Yes.

14        Q.  But you knew that there were cameras in those

15    rooms?

16        A.  In some of the rooms, yeah.

17        Q.  Some of those rooms?

18        A.  Uh-huh.

19        Q.  You took-- you mentioned you took some videos--

20        A.  I did, yeah.

21        Q.  -- is that right?

22            MS. BRANNON:  If it's all right with the

23    Court, we'd like to go through a couple of those videos

24    just to set the context.

25            THE COURT:  That's fine.  Are those marked

16-20032-JAR    USA v. Lorenzo Black, et al.    08.09.16    19

1  for-- as exhibits?

2          MS. BRANNON:  They are not, Your Honor.  We

3  thought-- we have photographs that basically capture

4  what's in the videotapes, but it's a little bit easier

5  to understand what's going on by videotape.  We've made

6  all of them available to the U.S. Attorney's Office.

7          THE COURT:  All right.  So I-- I think that

8  the entire set of videotapes were-- I don't know if

9  they're audio and video, but the tape-recordings that

10 Ms. Barnett has indicated they have, the so-called

11 original set and the copies, need to be made part of the

12 record under seal at this point.  So I think essentially

13 what you're going to be playing are excerpts of

14 something that's under seal.  Or no, this is-- oh, no.

15 I'm sorry.  This is created differently.

16         MS. BRANNON:  Yeah.  This is just a tour

17 sort of to let the Court know where the cameras are.

18         THE COURT:  Demonstratively, okay.  That's

19 fine.

20         MS. BRANNON:  Exactly.  And we certainly can

21 mark and put into evidence these videos.  We have them

22 on a jump drive, I believe.

23         THE COURT:  I'll leave that up to you.  If

24 you just want to use it for demonstrative purposes,

25 that's fine, too.

16-20032-JAR    USA v. Lorenzo Black, et al.    08.09.16    20

```
 1              MS. BRANNON:  All right.  Thank you, Judge.

 2      Q.  (BY MS. BRANNON)  All right.  What's the first

 3  one that we have here?

 4      A.  It's all on one video file and I have it divided

 5  up, so...

 6              MS. BRANNON:  And if it's acceptable with

 7  the Court, I'm just going to ask Mr. Thompson to sort of

 8  narrate as he's going through the video.

 9              THE COURT:  That's fine.

10              (Video was played).

11      A.  So this is Room 107A.  It's one of the first

12  rooms you encounter when you come into CCA.  And there's

13  no cameras in this room.  There's two intercom systems.

14      Q.  (BY MS. BRANNON)  Do they both work?

15      A.  Yes.

16      Q.  Okay.  Are those phones used as part of

17  attorney-client communications?

18      A.  I've never used them.

19      Q.  And when you're there, you and the client are

20  placed into that room together for a contact visit; is

21  that correct?

22      A.  Correct, yeah.  These are contact visit rooms.  I

23  just wanted to get all the-- every corner of the room to

24  show that there's no camera there.

25              And then this is one of the secure hallways.  It
```

1   has three rooms, Rooms 4 through 6.  And there is a

2   camera pointing to the east.

3        And this is a little intersection hallway that

4   connects that first hallway to the visitation area and

5   to a back hallway that has three more rooms.  There's no

6   cameras in this intersection hallway.

7   Q.  So looking down that hallway, is there a camera

8   that you saw that would monitor what happens in that

9   hallway?

10  A.  No.  The-- there's no camera.  That's an

11  intersection hallway and then there's no camera in that

12  back hallway.  And the video will go down there here in

13  a minute.

14       So what's up on the wall are lights over every

15  room.

16  Q.  What do those lights do?

17  A.  You can push a button in the room and it lights

18  up.  And then when a guard walks by and sees a light on,

19  they can come check on you.  And then they push a button

20  and turn the light off when they've checked.  So I-- I

21  got both corners of that hallway.  This is the-- this is

22  looking the other direction.  And there's no cameras in

23  that hallway at all.

24  Q.  In any of the rooms, the monitors, the audio

25  boxes, or the lights, are they labeled in any way?

1      A.  Some of the intercoms say "Push for Service,"

2  something like that.  But they don't-- the light button

3  doesn't say what it does.

4          This is Room 6.  Just an example of one of the

5  rooms.  It's a bigger room and it does have a camera in

6  it.  It's got two intercoms and a light switch.  And one

7  of the-- the intercom on the left doesn't work at all.

8  Chief Moore explained that.  And it's not marked that it

9  doesn't work.

10         Yeah, you can see the camera in the back corner

11  over the door.

12     Q.  Are you able to tell whether they are fixed

13  cameras or whether they can--

14     A.  No, they had a dark dome around them, so I

15  couldn't tell what the actual camera was doing.

16     Q.  All right.  Is there more video that you wanted

17  to go through?

18     A.  No.

19     Q.  Okay.  So you said there are nine total rooms and

20  seven of them have video cameras?

21     A.  That's correct, yeah.

22     Q.  Do all of them have some sort of intercom system?

23     A.  Yes.

24     Q.  And you mentioned that some of them have rooms

25  where the intercoms don't work.  All of them have some--

1    one intercom that works; is that right?

2        A.   Yeah, that's correct.  And then some have another

3    one that doesn't work in there.  And it's not marked

4    which one works or doesn't work.

5        Q.   All right.

6            MS. BRANNON:  If I could have just one

7    moment, Your Honor.

8        Q.   (BY MS. BRANNON)  All right.  You took a series

9    of photographs; is that right?

10       A.   Yeah, that's correct.

11       Q.   Okay.  If we can go to the first one, which I

12   believe is--

13       A.   It should be 401 on there.

14       Q.   You took-- okay.  Very good.  Can you describe

15   that photograph?

16       A.   Yeah.  These diagrams of the facility are hanging

17   in the hallways and it's for fire evacuation purposes so

18   any visitors know how to get out.  So I took a picture

19   of it because it helps just explain where all the rooms

20   are at so I wouldn't have to draw it myself.

21       Q.   I see I think six attorney rooms--

22       A.   Yeah.

23       Q.   -- on this.

24       A.   These are-- the hallway where I took the most

25   video, the-- the hallway on-- on the top of the diagram

1    there with three rooms coming off of it, that one has a

2    camera.  Then you have the-- the little intersection

3    between the hallways and then the back hallway with the

4    three rooms.  And neither the intersection nor the back

5    hallway have cameras.  And then the-- the little dark

6    lines coming out show the doors and show them opening.

7       Q.  So can you indicate the three attorney rooms that

8    are not reflected on this chart, where they would be in

9    relation to the others?

10      A.  Yeah.  So there's a long hallway to the right and

11   with a door in the middle of it.  The very right-hand

12   side of the-- the diagram.  And that's 107A.  And then

13   you go down in the down-- in the right-hand corner at

14   the bottom, you go through those doors and then there's

15   a long hallway with a control center there and then the

16   other two rooms, 107B and 107.  And so those aren't

17   shown on the diagram.  And they would be off the diagram

18   to the right at the bottom.

19      Q.  The photographs that we have pulled to introduce

20   into evidence, they reflect every room that you went

21   into?

22      A.  Yes, that's correct.

23      Q.  And they reflect all of the cameras in those

24   rooms?

25      A.  Yes, if they had cameras.

1    Q.  If they had cameras.  And they reflect all of the

2   audio communication devices in those rooms?

3    A.  That's correct.

4    Q.  Was there any signage outside these rooms saying

5   that there was any recording going on?

6    A.  No, there wasn't.

7    Q.  Did you see any signage at all while you were at

8   CCA or have you ever noticed any saying that legal

9   communications or attorney-client visitations were being

10  recorded?

11   A.  No, I haven't.

12   Q.  Did you have an opportunity to do some

13  investigation just online about CCA?

14   A.  Yeah, I checked out their website.

15   Q.  And what did you find on the website?

16   A.  There were several places where CCA's website

17  said that clients are provided-- that inmates are

18  provided with confidential access to their attorneys.

19   Q.  Was there anything on their website that

20  indicated there was any recording?

21   A.  No, there wasn't.

22   Q.  Okay.  I'm going to refer you to Defendant's

23  Exhibit 435.

24         MS. BRANNON:  If I may approach Mr.

25  Thompson, Your Honor.

1           THE COURT:  Yes.

2      Q.  (BY MS. BRANNON)  Is that a copy of what you

3  pulled off of the website?

4      A.  Yes.

5      Q.  And does it include the representations from CCA

6  that you just talked about?

7      A.  Yes.  On Page 2, it says, "Access to the court

8  system and confidential contact with their attorneys."

9      Q.  Have you found in your research and investigation

10  of this case anything that publicly notifies any

11  attorneys or anyone associated with attorneys, such as

12  investigators, that these visitation rooms are recorded?

13     A.  No.  Nothing public.

14     Q.  Now, as part of this, did you call CCA and just

15  ask?

16     A.  Yes, I did.

17     Q.  And when was that?

18     A.  Could I refer to my report?

19     Q.  Sure.

20     A.  I believe it was-- I believe it was 8-5, but I'm

21  not sure.

22     Q.  And this has been marked as Exhibit 434.

23     A.  Okay.  So I-- I called on August 4th this year

24  and I called the chief securities office.  He was on

25  leave.  I talked to his administrative assistant, Betty

1    Rumas, and she talked to Sergeant Wayne Bigelow.  Wayne

2    said that the visitation rooms were not subject to video

3    or audio-recording.  I called back to make sure that

4    they knew I was talking about the legal visitation

5    rooms, and they confirmed that those are not subject to

6    video and audio-recording.

7         So then on the next day, on the 5th, I called

8    back to CCA and spoke directly with Sergeant Bigelow,

9    thinking maybe, you know, wires got crossed, it was a

10   game of telephone or something since I hadn't talked to

11   him directly.  I told him that we received information

12   that the attorney rooms were actually recorded and asked

13   him about that.  He again said that they weren't and--

14   but asked the maintenance supervisor, who then corrected

15   him and said that six of the attorney rooms had video

16   cameras in them, that CCA does record the video footage

17   but not the audio footage.  And they keep the

18   video-recordings for 30 days, and they've been doing

19   this since 2008.

20   Q.   Before you called them back on that Friday, did

21   you have other conflicting information about whether

22   they were recording or not?

23   A.   Yes.  We-- I-- I saw an e-mail from the U.S.

24   Marshals in Missouri who said that CCA-- that CCA told

25   them that they are video-recording the legal visitation

1  rooms.

2    Q.  And could you identify each of those exhibits

3  that I've just handed you?

4    A.  Yeah.  443 is an e-mail that's from Debra Barnett

5  of the U.S. Attorney's Office saying that U.S. Marshal

6  Deputy Troy Oberly agreed to find out what's going on at

7  CCA.  That the visitation rooms have a panic button in

8  order to contact Control if there's an issue and the

9  attorney or client needs help.  If the panic button is

10  activated, there's a camera in the visitation room that

11  Control can activate to see what's going on in the room.

12  There's no recording function associated with this

13  camera or panic button.  And there's-- she reiterates

14  there's no way to record visual or audio with this

15  camera.  And then goes on to explain why the panic

16  button was installed.

17    Q.  So at that point you had called CCA and they had

18  said that there was no recording and we had this

19  particular e-mail assuring that there was no recording?

20    A.  That's correct.

21    Q.  And then the next exhibit that you have, the

22  Western District e-mail, that-- where was that in the

23  timeline of these exhibits that we're talking about?

24    A.  So the e-mail from Deb Barnett is 2:51 p.m. on

25  August 4th.  And there's an e-mail from Scott Seeling at

1    3:37 on August 4th.  And that's Defendant's Exhibit 441.

2    Q.  And what information do we get from Scott Seeling

3    about CCA recording?

4    A.  He said that attorney visits were not

5    audio-recorded, they were video-recorded.  Attorney

6    phone calls were not recorded.  Video-conferences, they

7    don't do video-conferencing with the federal defender.

8    And then let's see-- actually, I'm sorry, that's

9    Caldwell County, let me go down to CCA.  He gave a

10   variety of information about different facilities in

11   Missouri.  CCA attorney visits not audio-recorded,

12   attorney visits are video-recorded, phone calls not

13   recorded.  What the attorney--

14             THE COURT:  Can you slow down, please,

15   because I'm not finding-- this is Exhibit 441?

16             THE WITNESS:  444.

17   A.  Video-conference with attorneys not recorded.

18   Q.  (BY MS. BRANNON)  Going back to Exhibit 434,

19   which is your investigative report, did you also survey

20   the other facilities in Kansas that hold pretrial

21   detainees, federal pretrial detainees.

22   A.  Yes.  I called Atchison jail, Leavenworth jail,

23   and Wyandotte jail.  And Atchison and Leavenworth do

24   record-- video-record the attorney rooms.  Wyandotte

25   does not.  Atchison and Leavenworth do keep the

1   recording for a period of time, and Wyandotte said they

2   don't because it's attorney-- attorneys meeting with

3   their clients.

4     Q.  In all of this investigation when you were

5   talking to any facility, did you distinguish in your

6   questioning between mere monitoring by video and actual

7   recording?

8     A.  Yes.

9         MS. BRANNON:  Your Honor, we would go ahead

10  and move for admission, in fact, of all the exhibits

11  before the Court.  We've reviewed them with the

12  government, I believe they have no objection.

13        THE COURT:  That's Exhibits 434 through 448?

14        MS. BRANNON:  Yes.  And we will also provide

15  the Court with hard copies of the photographs that Mr.

16  Thompson reviewed.

17        THE COURT:  All right.  Exhibits 4-- 434

18  through 448 admitted.

19        MS. BRANNON:  We have no further questions

20  for Mr. Thompson.

21        MS. BARNETT:  I have no cross examination,

22  Your Honor.

23        THE COURT:  All right.  You can step down,

24  Mr. Thompson.  All right.  You can call your next

25  witness.

 1          MS. BRANNON:  Your Honor, we'd call Jackie

 2   Rokusek.  And while she's coming forward, Your Honor, in

 3   talking with the U.S. Attorney's Office, because she's,

 4   in fact, an officer of the court, I think we've agreed

 5   to offer and ask the Court to allow her to make a

 6   statement.  If we have follow-up questions, we can

 7   certainly let the Court know.  We've also-- I think Ms.

 8   Rokusek can address any concerns about privileged

 9   information as part of her statement, but we've reviewed

10   it and I-- I think we've resolved most of those issues.

11          THE COURT:  All right.  No objection to that

12   procedure?

13          MS. BARNETT:  No objection, Your Honor.

14          THE COURT:  All right.  That's fine.

15          STATEMENT BY MS. JACQUELYN ROKUSEK

16          MS. ROKUSEK:  Judge, as an initial matter,

17   obviously I will be testifying to matters that pertain

18   to a client of mine, actually several clients of mine,

19   Richard Dertinger and Petsamai Phommaseng, and would ask

20   that the Court order that my testimony be allowed today

21   without creating a conflict of interest.

22          There's also the videotape that we're asking

23   to review with the Court in chambers, and I would ask

24   that the Court order that we review that for the limited

25   purpose of showing the Court what is on that video,

1    again, without creating conflicts on the case.

2                THE COURT:  All right.  So the videotape has

3    to do with you visiting one or both of these clients?

4                MS. ROKUSEK:  Correct.

5                THE COURT:  I will review-- review those in

6    camera.  And then you're asking that your statement not

7    be deemed to place you in a conflict of interest with

8    respect to representation of-- of either client?

9                MS. ROKUSEK:  Correct, Your Honor.

10               THE COURT:  All right.  I'm not entirely

11   clear the nature of your statement and how that would

12   impact the conflict.  But for now, that's fine, you can

13   proceed.

14               MS. ROKUSEK:  Okay.  Your Honor, the way

15   that this initiated was on August 2nd of 2016, in the

16   morning, I received a phone call from Special Assistant

17   United States Attorney Erin Tomasic.  Ms. Tomasic

18   indicated that Kim Flannigan had been e-mailing me for

19   the past three days, she inquired of whether I had taken

20   some extended leave of absence because I hadn't

21   responded to their e-mails.

22               I indicated to them that I had not received

23   any e-mails, and she indicated to me that she was cc'd

24   on them, so she knows that I did, and that they needed

25   to meet with me on either August 2nd or August 3rd

1    pertaining to the Richard Dertinger case.  I asked them

2    what this meeting would be about.  They indicated it

3    needed to be in their office and that they weren't going

4    to disclose what it was about over the phone.

5            Mid-morning that day, I received a phone

6    call from a co-defendant on the Dertinger case, William

7    Session, who provided me with some information that led

8    me to believe that perhaps I should go to this meeting

9    at 3:00 that we had scheduled at the U.S. Attorney's

10   Office to figure out what was happening on the Dertinger

11   case.

12           At 3:00 I met with Kim Flannigan and Erin

13   Tomasic at the U.S. Attorney's Office in the large

14   conference room.  I was told that they were holding this

15   meeting at-- at the U.S. Attorney's Office instead--

16   instead of filing a motion to ask to have me withdrawn

17   from the Dertinger case due to an alleged conflict of

18   interest that I had on the case based on information

19   they had in their possession at that time.

20           They indicated that they wanted to do this

21   because Erin Tomasic said that I had perceived some of

22   her actions in the past as something that was intended

23   to have me conflicted off the case, such as when they

24   were alleging that my fee may have been improper--

25   improperly taken in the Dertinger case.

1           I asked them what this was regarding.  They

2   told me that there were two proffers that they had

3   received on another case, the Black case, the case

4   we're-- that is before the Court at this time.  They

5   told me that in one of the proffers an individual had

6   told them that I had provided a-- a report from another

7   case to my client.  That Court [sic] was subject to a

8   protective order and that my client had provided

9   information allegedly to other people in the pod, which

10  had jeopardized their investigation in the Black case

11  and that they intended to pursue an obstruction charge.

12          The second defendant allegedly proffered

13  that I had reviewed in-house proffers and shared that

14  information with my client, Richard Dertinger, who had

15  then shared information at the-- with others in the pod.

16  I confirmed with them that, in fact, I hadn't reviewed

17  the proffers in-house yet.  I had been reviewing the

18  other volumes of discovery we had been provided.

19          They acknowledged that, in fact, they

20  reviewed not only my visitation log at CCA but also the

21  in-house proffer log and, in fact, I had not reviewed

22  the in-house proffers as of that time, but they had

23  reason to believe that it would-- it would create a

24  conflict of interest under Rule 3.7, and that I should

25  contact Stan Hazlett to discuss that and let them know

 1   within a week as to whether or not I intended to

 2   withdraw.

 3           At the-- near the conclusion of this

 4   conversation, I was informed by Ms. Flannigan that they

 5   had a case agent on the case who was reviewing

 6   attorney-client meetings from CCA to determine whether

 7   or not this document had been provided to Richard

 8   Dertinger, which I told them it had not.

 9           I left there and contacted Laura Shaneyfelt

10   to talk about the fact that I believed now, in fact, we

11   had attorney-client privileged meetings which had been

12   recorded.  I confirmed that by contacting--

13           THE COURT:  If I could stop you just for

14   clarification.  So what was represented to you was that

15   an investigator on behalf of the U.S. Attorney's Office

16   was reviewing your contacts with Mr. Dertinger.

17           MS. ROKUSEK:  Dertinger, uh-huh.

18           THE COURT:  I mean, were they specific logs,

19   recordings, what was told to you at that point?

20           MS. ROKUSEK:  That the case agent was

21   reviewing the videos to determine whether or not I had

22   provided the document and that all he had seen so far

23   was me walking down the hall.  That was the-- what they

24   had told me, but that he would be reviewing those.

25           I then followed up and e-mailed both of them

1   back, indicating that I would like to review the videos

2   myself before making any decision on how to proceed with

3   the case, because I wanted to confirm whether, in fact,

4   they had attorney-client meetings videotaped from CCA.

5           It was August 3rd, 2016, Ms. Flannigan then

6   responded, asking me why it is-- telling me I didn't

7   have to respond, but why would I need to see that before

8   I made a decision?  And I told her I just-- I wanted to

9   see the videos.

10          I then received an e-mail from Erin Tomasic

11  indicating that I could come up and review those, that

12  they would be made available to me.  I received a

13  separate e-mail from Ms. Flannigan indicating that

14  because I had a deadline on another case, she was urging

15  me to come up right away and review those videos.

16          I then told them that I had a plea on

17  August 4th, which would've been the next day, at 9:30 in

18  front of Judge Murguia, that I was available to review

19  the videos after that time.  I came up to court to do

20  the change of plea hearing at-- during the change of

21  plea hearing, there was an e-mail sent to me from Ms.

22  Tomasic indicating that Pauletta Boyd, who was-- who's

23  the IT person in the office, could not be located, that

24  the agent was on vacation, and that no one else in the

25  office knew how to operate the system.  And, therefore,

 1    I would have to wait until another date to review the

 2    video.

 3              I then told them that I would be in the

 4    courthouse.  I gave them my cell phone number and told

 5    them to contact me when they located Ms. Boyd and that I

 6    would come at that time.  I later received a phone call

 7    and an e-mail from Ms. Tomasic indicating that they

 8    didn't believe she was there that day, they didn't know

 9    where she was, and that I would have to come back at

10    another time.

11              The very next day, on August 5th, I

12    contacted them again.  Ms. Boyd was in the office.  I

13    went up to the U.S. Attorney's Office at approximately

14    2:00 in the afternoon, 2:15, with Michael Bussell, who's

15    my private investigator on the Richard Dertinger case.

16    At the same time in the lobby, Shazzie Naseem was

17    present.  He was also there to review the videos on that

18    date, but I had already made the appointment to view

19    those, and so Mr. Bussell and I went into the conference

20    room at the U.S. Attorney's Office.

21              Ms. Boyd showed us how to use the system,

22    which is designed-- I had pulled my logs from CCA to

23    determine when I visited my client, so I knew what dates

24    and what time I would've been in the facility.  I then

25    was-- we were then shown how to use the system.  And we

1    would go to the date in question and the time in

2    question.  And you could pull up multiple panels, if you

3    will, or windows to look at different visitation rooms

4    or different locations within the facility, whatever you

5    were looking at.

6              We were provided an index by Ms. Boyd, which

7    was left in the room.  That there were six boxes and she

8    showed us the boxes.  And the boxes, they're like a

9    large VCR box, but they're metal.  You place it into a

10   white box, which is on the prosecution table, the

11   reader.  And then once it's in the reader, you can pull

12   up information.

13             And on the index of the six boxes, the first

14   box contained information that didn't pertain to

15   attorneys, as did the second, third, and fourth.  The

16   fifth box had one attorney room and then the sixth box

17   had Attorney Room and then Attorney Room 1 through 6.

18   We chose that box based on the limited amount of time we

19   had in the courthouse to review the video.

20             We were able to ascertain where on the

21   system my visitation occurred.  And we opened up several

22   windows so we could try to look at several at a time.

23   We were able to view visits with two of my clients at

24   the same time.  And then inadvertently, the-- once you

25   watch the video for a period of time, it stops, you must

1    then - it's complicated - but go to another-- click on

2    another icon, which will take you back, and then you

3    restart it where it picks up.

4              At one point, we inadvertently hit the wrong

5    date and we were watching somebody else entirely

6    different.  It wasn't my client, it wasn't the room we

7    were in.  It was another attorney-client meeting room.

8    So I could've watched anybody that was in the facility

9    at any time which is contained on Box 6.

10             The video itself is in color.  The-- the one

11   room we were in had pan, tilt, and zoom functions.  So

12   we could zoom in, zoom back, move around the room.  But

13   at-- the room we were in was the larger room at the far

14   end of the hallway, which was described on the exhibit.

15   I was on one end of the table, my client was on the

16   other end of the table, and Mr. Bussell was in the

17   middle of the two of us at the table.  And you could see

18   everything in the room, what you were wearing, who was

19   in the room, it-- it was very good quality.

20             THE COURT:  Could you-- could the camera

21   train on people's faces and could it also train on

22   documents that were being shown or shared or-- assuming

23   there were any?

24             MS. ROKUSEK:  You can.  When we did use the

25   zoom function, it was somewhat pixelated, which, of

1  course, can be I'm sure sent off and-- and fixed.  But

2  it wasn't pixelated when it wasn't zoomed all the way

3  in.  If you tried to zoom all the way in, you could not

4  do so based on the pixelation.  But I can tell you that

5  I could tell that certain documents were Excel

6  spreadsheets.  I could tell that certain documents were

7  reports.  And you could see everything else in the room

8  very clearly.

9        It became very obvious to me at that point

10  what had occurred, so I then responded back to the U.S.

11  Attorney's Office in an e-mail, asked that no staff

12  member, attorney, agent of the government be allowed to

13  view, edit, or otherwise have access to those videos

14  until a decision was made by the Court.  And there--

15  there was an agreement that they would not review those.

16        I was made aware at a later date that a case

17  agent did have a copy of the videos himself.  The U.S.

18  Attorney has-- has indicated that they asked that agent

19  not to review that as well, but that those particular

20  copies were not held in the vault that the U.S. Attorney

21  agreed to hold the in-house copy in during that same

22  time frame.

23        I don't know the full extent of what was

24  reviewed by the U.S. Attorney's Office, but I know that

25  they knew it existed.  That apparently someone was

 1    reviewing it to-- to determine what happened during an--

 2    an attorney-client meeting between my client and I.  It

 3    was the first time that I was made aware of it was in

 4    early August.  And further, I-- I felt like it was used

 5    to leverage a conflict of interest and have me removed

 6    from a case.

 7            It was for those reasons that I brought it

 8    to the attention of Ms. Shaneyfelt and, ultimately, it

 9    became before the Court.

10            THE COURT:  And again, this is in a case

11    totally unrelated to this case, the Lorenzo Black case?

12            MS. ROKUSEK:  My client's name is-- is

13    listed on the indictment as an unindicted

14    co-conspirator.

15            THE COURT:  And you represent that client.

16    Is that a case in front of Judge Murguia that has

17    charges that are similar to the charges in this case?

18            MS. ROKUSEK:  My client, in front of Judge

19    Murguia, he is indicted on a marijuana conspiracy case.

20            THE COURT:  It's not having to do with

21    contraband at CCA, it's a-- it's a--

22            MS. ROKUSEK:  No.  But he is-- what I can

23    inform the Court is that I was told by Ms. Flannigan

24    prior to his plea that he was-- that they had

25    information that he had been distributing K2 and that he

1   had better stop.

2        Later, I was informed that they intended--

3   they weren't certain whether he would be indicted in

4   this case or not, in the Black case, that that decision

5   had not yet been made, but they did intend to use

6   information from that investigation to pursue

7   obstruction.  Whether it's a new charge or an

8   obstruction on the sentencing, I'm not certain.  And so

9   I've been-- I've been given access to the discoverable

10  material because of their intent to use it to enhance my

11  client's sentence.

12        THE COURT:  And the first time you had

13  contact from the U.S. Attorney's Office about the

14  situation with this client concerning-- I mean, that at

15  all talked about your visitations with him and

16  recordings or whatever was August 2nd or was it earlier

17  than that?

18        MS. ROKUSEK:  Technically it was earlier.

19  Ms. Flannigan sent an e-mail to an iCloud account that

20  I-- I don't know where that-- I don't know if that's

21  something that is on my phone or something, but it's

22  not-- it's not my ECF e-mail.  It's not an e-mail system

23  that I even use.

24        So there were-- there were two or three

25  e-mails, Ms. Tomasic said three, Ms. Flannigan said two

1    e-mails, had been sent to me on the Thursday prior and

2    the Friday prior and then that same-- it must've been

3    Thursday, Friday, Monday.  And they finally called me on

4    Tuesday because I had not received any e-mails from

5    them.

6              THE COURT:  All right.  Are there any

7    questions?

8              MS. BRANNON:  May I approach Ms. Rokusek?

9    Would you please go through those exhibits and describe

10   them and their significance to you?

11             MS. ROKUSEK:  Defendant's Exhibit No. 441 is

12   an e-mail that's from Kim Flannigan in the U.S.

13   Attorney's Office indicating to me-- and I'll back up.

14   Oh, I'll start-- I'll start from when the e-mails

15   initiated.

16             At 11:47 a.m. on August 3rd, 2016, I

17   e-mailed both Kim Flannigan and Erin Tomasic, indicating

18   that I wanted to contemplate how to move forward

19   regarding the potential conflict of interest discussed

20   at their office on the day prior.  Particularly as it

21   related to reviewing the video visits between Mr.

22   Dertinger and myself at CCA.  And I asked for an

23   opportunity to review that video footage before making

24   any final decisions, and I asked them if that could

25   happen within the next few days.

1          I did receive a response at 5:41 p.m. from

2    Ms. Tomasic on August 3rd, same date, indicating that it

3    was available in-house anytime that I wanted to view it.

4    The agent had looked through the video for my visits and

5    said he has to locate the time and date of the visits

6    but hadn't paired them up to the video yet.  And she

7    also indicated that the agent was on vacation this week

8    and was preparing for a hearing the next week, and it

9    may take him a while to pull the video for me.

10          At 6:10 on the same date, August 3rd, Ms.

11   Flannigan e-mailed me and stated that she knew I had a

12   deadline on my other case and indicated that she thought

13   I should try to come over and find the video myself.

14          Defendant's Exhibit 442 is another e-mail

15   exchange between the parties, first initiated on August

16   4th at 6:52 p.m., where I reached out to both Ms.

17   Tomasic and Ms. Flannigan indicating to them that I was

18   asserting the attorney-client privilege, as I had never

19   waived it due to the fact that I had never known that I

20   was being recorded while visiting my clients at CCA.

21   And this is the e-mail where I asked that they refrain

22   from reviewing the videos and prevent anyone else, to

23   include staff, case agents, or other agents of the

24   government, from reviewing the video before I had an

25   opportunity to review them and to make a decision

1    regarding any dissemination of the videos.

2             I received the response from the U.S.

3    Attorney's Office the next morning at 9:19. Ms. Tomasic

4    indicated that she understood the position and didn't

5    intend to review it until the matter was resolved and

6    that she would instruct all pertinent parties, to

7    include the case agent.

8             And then again, she clarified at 9:33, just

9    a few-- or a few minutes later, that they intended to

10   continue to review the CCA footage, but the agent and

11   staff will refrain from viewing any video depicting

12   attorney-client exchanges if any such videos exist.

13            Defendant's Exhibit 439 is a copy of the

14   index that was provided when I was present with Mr.

15   Bussell at the video viewing room at the U.S. Attorney's

16   Office. And highlighted on this defendant's exhibit are

17   the attorney rooms. DVR No. 5 has a Low Custody

18   Attorney, and then DVR No. 6 has Attorney Room and then

19   Attorney Room 4, 5, 6, 7, 8, and 9.

20            The other DVRs are of other areas located

21   within CCA.

22            MS. BRANNON: And, Ms. Rokusek, those

23   highlights were not on the index you saw in their

24   office?

25            MS. ROKUSEK: No.

 1           MS. BRANNON:  That's what we did.  Right?

 2           MS. ROKUSEK:  Correct.  The highlights were

 3   not on that.

 4           MS. BRANNON:  And I-- I don't know if you

 5   can-- what number are you looking at?

 6           MS. ROKUSEK:  Oh, Defendant's Exhibit

 7   No. 440 is a document which was provided by the U.S.

 8   Attorney's Office on today's date indicating that the

 9   index was created by Pauletta Boyd with the U.S.

10   Attorney's Office on June 10th, 2016 at 12:24:48 and

11   later modified on August 8th, 2006 at 4:58:45.

12           And I would note that, for the Court, that

13   in looking at the actual video itself, if you were

14   looking at that, you wouldn't know that was an

15   attorney-client room unless you were actually looking to

16   see what was going on in the room because, otherwise,

17   when the room is empty it's just a table and some chairs

18   that you're looking at.  So someone would actually have

19   to look at this to determine what it's actually

20   depicting in order to make the index.

21           MS. BRANNON:  There's not a caption saying

22   this is an attorney-client visitation room?

23           MS. ROKUSEK:  No.

24           MS. BRANNON:  If I could just have a couple

25   of follow-up questions.  The iCloud e-mails that they

1    referenced, did you ever locate those or did they ever

2    provide those to you?

3            MS. ROKUSEK:  One was forwarded to me from

4    Ms. Flannigan, which is how I determined it was an

5    iCloud account.  I have an iCloud-- something on my

6    phone.  I've looked in it.  I didn't receive those

7    e-mails from them, I don't know why.  But I don't use

8    that e-mail, so...

9            MS. BRANNON:  And just to be clear, was it

10   your understanding from Ms. Tomasic and from Ms.

11   Flannigan that they intended to view the video and to

12   look for a particular document that you were handing a

13   client?

14           MS. ROKUSEK:  By-- if by "they" you mean an

15   agent working for them, yes, their case agent.

16           MS. BRANNON:  Their case agent.  And to look

17   for a specific action on your part in handing a document

18   to your client?

19           MS. ROKUSEK:  Correct.

20           MS. BRANNON:  Do you have any information

21   that the videos that were made available to you were

22   limited to defendants either in this case or in a

23   related case?

24           MS. ROKUSEK:  I have no idea who they were

25   made available to.

1          MS. BRANNON:  When you were able to open up

2    the video, was there-- I think you mentioned, but

3    there's a further index of dates once you go into the

4    video; is that right?

5          MS. ROKUSEK:  Yes.  And it-- it's not the

6    most user-friendly process.  But once you open it,

7    because-- and without Mr. Bussell, I may have never

8    found it myself.  But once you open it, you can look for

9    a date and a time that is close enough that you know

10   you're going to be present in the room and you can go to

11   it and wait until your client enters the room.  But

12   there-- it's always being taped.  So some of the rooms

13   are empty until someone enters them, or you can just

14   watch someone sitting there waiting for an attorney to

15   appear or waiting for a guard to take them out.

16         MS. BRANNON:  Just to give context to these

17   logs, these visitation logs, what happens when you call

18   to ask to see a client at CCA?

19         MS. ROKUSEK:  They note what date and time

20   you intend to meet with your client and then you check

21   in when you arrive, and they know that.  And you check

22   out when you leave, and they know that.

23         MS. BRANNON:  And was that the log that they

24   were comparing against the videos to determine which

25   ones were yours?

```
1              MS. ROKUSEK:  That's the log we used.

2              MS. BRANNON:  Okay.

3              MS. ROKUSEK:  We brought our own log of my

4    visits that I obtained from CCA.  It would've been very

5    easy for the case agent to do the same, because I was

6    told by the prosecutors that, in fact, they had already

7    pulled my logs to note when I had visited my client.

8              MS. BRANNON:  All right.  Thank you.

9              MS. BARNETT:  Ms. Rokusek, when you said

10   that the case agent was looking for you handing a

11   document, you've mentioned that a prosecutor said that,

12   do you remember who specifically said that?

13             MS. ROKUSEK:  Ms. Flannigan is the one that

14   told me that the agent was looking at the video.

15             MS. BARNETT:  And with regard to the videos,

16   I believe that you indicated or said that you had opened

17   up two of them, one with you and your client, and then

18   one where another person was sitting there; is that

19   correct?

20             MS. ROKUSEK:  We actually opened up more

21   than two at a time.  You can open up I think 16 at a

22   time and drag and drop into the windows to watch more

23   than one room at a time.  So we actually opened up more,

24   because we had a very limited amount of time before we

25   were going to have to leave the building.  It was Friday
```

1    afternoon and it was nearing 5:00.  So we were able to

2    watch visits with one of-- one of my clients.

3              And the reason that happened is because when

4    we pulled the log, we actually visited another client

5    prior to meeting with the client in question.  So when

6    you go up there, they may have somebody else in place

7    first if you're meeting with more than one client.  So I

8    met with that client first.  And so when we opened up

9    that date and time, he was the person in the room.

10             When we opened up the next one, my other

11   client was in the room waiting for us.  And then we--

12   when we finished the first visit, we were moved to a

13   different room and he was moved to meet with us.

14   Inadvertently, in going back we hit a wrong date and

15   opened up a different room with somebody else's client

16   sitting in there.  So I could've opened up any window of

17   any room from the dates in question and watched anyone's

18   attorney-client meetings had we chosen to do so.

19             MS. BARNETT:  But with regard to the ones

20   that you opened up, there was no audio associated with

21   them.  Correct?

22             MS. ROKUSEK:  Not that we were able to--

23   there is an audio button.  When we clicked on it,

24   nothing happened.

25             MS. BARNETT:  And did you click on it with

1    regard to your clients?

2                MS. ROKUSEK:  Yes.

3                MS. BARNETT:  You didn't click on it with

4    regard to anybody else's clients?

5                MS. ROKUSEK:  We didn't even watch the

6    videos regarding anyone else's clients once we figured

7    out it wasn't a client of mine.

8                MS. BARNETT:  Now, when Judge Robinson had

9    asked you earlier in your testimony about the case agent

10   and reviewing the videos, you had mentioned that you

11   were told that the case agent saw you walking down a

12   hall.  Who said that to you?

13               MS. ROKUSEK:  I believe-- I believe, and

14   don't quote me, but I believe it was Ms. Flannigan as

15   well.  If not, it was Ms. Tomasic.  But I believe it was

16   Ms. Flannigan.

17               MS. BARNETT:  But there was no indication

18   that your client was with you as you were walking down

19   the hall.  Correct?

20               MS. ROKUSEK:  Well, typically your client

21   wouldn't be with you walking down the hall.

22               MS. BARNETT:  Okay.  You don't--

23               MS. ROKUSEK:  They don't let us walk our

24   clients around, so no.

25               MS. BARNETT:  You don't meet with your

1   clients in the hallways at CCA, do you?

2           MS. ROKUSEK:  I do not.  But I meet with

3   them in rooms where I was videotaped.

4           MS. BARNETT:  Okay.  Thank you.  I have no

5   further questions, Your Honor.  Thank you.

6           THE COURT:  Thank you, Ms. Rokusek.

7           MS. ROKUSEK:  Thank you.

8           MS. BRANNON:  Your Honor, we also have Mr.

9   Bussell here, and we have an affidavit in evidence from

10  him.  I don't know that there's any need to call him to

11  testify.  We asked him to be here because I think, as

12  Ms. Rokusek indicated, he is the one that is more-- can

13  manipulate the videotape that they saw and can show how

14  it zooms and so forth.  So we wanted him to be available

15  when the Court wants to review that with the two of

16  them.  I don't know if the Court wants to do that and--

17  take a break and do that now or wait until the end of

18  the hearing, but that's why we wanted him to be

19  available.

20          THE COURT:  Okay.  How-- how much-- how much

21  longer a hearing are you anticipating with your other

22  evidence?

23          MS. BRANNON:  Judge, we have a custodian

24  from-- of records from CCA, which I think will be very

25  short.  We have two witnesses by Skype.  And then Mr.

1    Ney is present here.  So we think cumulatively that

2    testimony would take about an hour, hour and 15 minutes.

3              THE COURT:  All right.  Why don't we go for

4    say another 20 minutes, we'll take a break.  I'm

5    inclined to look at those at the end, unless Mr. Bussell

6    needs to leave for some purpose.

7              MS. BRANNON:  All right.

8              THE COURT:  Okay.

9              MICHELLE JENSEN-SCHUBERT,

10   called as a witness on behalf of the Defendant, having

11   been first duly sworn, testified as follows:

12                    DIRECT EXAMINATION

13   BY MS. BRANNON:

14     Q.  Please state your name for the record.

15     A.  Michelle Jensen-Schubert.

16     Q.  And what do you do for a living?

17     A.  I work at CCA.  I'm the inmate records clerk.

18     Q.  Did you receive a subpoena from us?

19     A.  Yes, yesterday.

20     Q.  Okay.  And on that subpoena, what records did you

21   gather together to bring to us today?

22     A.  I gathered three individual files that I copied.

23     Q.  Uh-huh.

24     A.  And then I also received some of our policies

25   that you requested.

16-20032-JAR    USA v. Lorenzo Black, et al.    08.09.16    54

1    Q.   Why was it that you gathered those particular

2  inmate files?

3    A.   Because normally when I receive a subpoena, it is

4  for inmate records' files.

5    Q.   All right.  And you understood from our subpoena

6  we were looking for subpoenas or records requests from

7  the government; is that right?

8    A.   I was unclear on that.

9    Q.   Okay.  If you receive a subpoena related

10 specifically to an inmate at CCA, what do you do with

11 that subpoena?

12   A.   I store it in their file.  Or if I get it

13 electronically through e-mail, I have a folder in my

14 e-mail that I put it to.

15   Q.   So it would be a-- in both possibly?

16   A.   Correct.

17   Q.   Did you look through-- well, first of all, can

18 you say the names of the inmates on those files?

19   A.   Ms. Rowlette.  I can't think.  Mr. Bishop and--

20   Q.   Mr. Black?

21   A.   Yes.

22   Q.   All right.  Did you look through those inmate

23 files for us today?

24   A.   Yes.

25   Q.   Did you find any subpoenas--

1      A.  No.

2      Q.  -- anywhere in their inmate files?

3      A.  No.

4      Q.  All right.  If a subpoena or a records request is

5   received by CCA that is not particular to an inmate, do

6   you know what happens to it?

7      A.  It goes to whoever it needs to go to.  If it's

8   for video, it would go to that person.

9      Q.  There's no central repository at CCA that you

10  know of--

11     A.  No.

12     Q.  -- that all records requests go to?

13     A.  No.

14     Q.  All right.  Would you ever provide records or

15  video or anything else just upon request?

16     A.  No.

17     Q.  Would there be an exception for the marshal's

18  office?

19     A.  Yes.

20     Q.  And what is that exception?

21     A.  Because we have a contract with the marshals and

22  that is their property.

23     Q.  All right.  Do you know-- well, you've heard the

24  testimony here about video.  Do you know how that was

25  provided to the U.S. Attorney's Office?

1    A.  I do not.

2    Q.  You had no involvement in that at all?

3    A.  No.

4         MS. BRANNON:  Okay.  Thank you very much.

5    We have no further questions.

6         MS. BARNETT:  Nothing else, Your Honor.

7    Thank you.

8         THE COURT:  All right.  You can step down.

9         MS. BRANNON:  Your Honor, in looking at the

10   exhibits that have been admitted before the Court, 438

11   is a grand jury subpoena which is, in fact, the subpoena

12   that led these videos to be provided to the U.S.

13   Attorney's Office.  It's-- was I believe issued three

14   days after the complaint was filed in this case and

15   spans, as we mentioned, from July to-- of last year to I

16   believe April of this year.

17        THE COURT:  So it's for-- this says July,

18   2014 through April 12, 2016.

19        MS. BRANNON:  I misspoke, that's right.

20        THE COURT:  All video footage or still

21   images currently retained by the CCA depicting any

22   internal or external surveillance video or still image

23   taken between those dates at the CCA facility in

24   Leavenworth, Kansas.

25        Do you know what-- how they distinguish -

1  maybe I should've asked this witness - internal and

2  external surveillance, or is somebody going to testify

3  to that?

4           MS. BRANNON:  I don't know that someone is

5  going to testify.  I can say that there are yards

6  outside of CCA where they go for exercise and other

7  things, and I assume that's what external is.

8           Also, when you get to CCA, if you're a legal

9  visitor, you-- and I don't know if the Court has been

10  there, but there is one gate that you go through first.

11  They open that and close it behind you.  There's a

12  second gate that you go through, they open and close

13  that.  And then you go into the lobby.  I believe there

14  are cameras out at that area, the gate area, that would

15  record who's going in or out.

16           Those are the external cameras that I would

17  contemplate.  But no, we don't have any specific

18  testimony as to that.  I'm sure we could get it for the

19  Court.

20           THE COURT:  Okay.  That's fine.

21           MS. BRANNON:  The other thing on the exhibit

22  list relevant to this last witness is 436, which are the

23  CCA policies that were produced by the 17(c) subpoena.

24  I think those policies-- we're not going to go through

25  those line-by-line here today, Your Honor, but I think

1    those policies address when recordings of attorney

2    visitation, attorney-client visitation rooms can be

3    made, who was authorized to make them, when they can

4    make audio-recordings I believe is in there as well.

5                THE COURT:  Okay.

6                MS. BRANNON:  Your Honor, next we'll call

7    Richard Ney to testify, please.

8                        RICHARD NEY,

9    called as a witness on behalf of the Defendant, having

10    first been duly sworn, testified as follows:

11                    DIRECT EXAMINATION

12    BY MS. BRANNON:

13    Q.  Would you state your name for the record, please.

14    A.  Richard Ney, N-E-Y.

15    Q.  And, Mr. Ney, what do you do for a living?

16    A.  I'm an attorney in private practice in Wichita,

17    Kansas.

18    Q.  Can you describe the nature of your practice?

19    A.  It's criminal defense.

20    Q.  And in-- how long have you been practicing?

21    A.  Practicing law, 38 years.

22    Q.  Can you give a quick overview of what you've done

23    in those 38 years?

24    A.  Certainly.  I was a first assistant and then

25    chief public defender in Vermillion County, Illinois.  I

1    worked briefly with the Vermont Defender General's

2    Office.  I established and ran the Public Defender's

3    Office in Wichita for eight years.  I was then appointed

4    chief federal public defender for the District of

5    Hawaii.  Two years later we added Guam to that.  So I

6    was chief federal defender for Hawaii and Guam for three

7    years.  And then in the last 20 years, I've been in

8    private practice in Wichita.  And I should say for six

9    years I served as a federal resource counsel with the

10   Death Penalty Project.

11       Q.  Have you heard the testimony presented here

12   today?

13       A.  I have.

14       Q.  Have you reviewed the pleadings that have been

15   filed in this matter?

16       A.  I have done so.

17       Q.  All right.  Let's talk a little bit about what

18   you've done in your experience in visiting with clients.

19   Have you ever been to CCA?

20       A.  I have not.

21       Q.  Okay.  Have you been to other facilities to visit

22   your clients in custody?

23       A.  Very many, yes.

24       Q.  In those facilities, describe what your

25   understanding or expectation was regarding your legal

 1   visitation with your client.

 2       A.   Certainly.  In the various prisons and jails that

 3   I visited, there is rarely cameras.

 4       Q.   Uh-huh.

 5       A.   I-- I certainly look for that when I meet with a

 6   client.  If there are cameras, I find out very quickly

 7   whether those are just for safety monitoring or they're

 8   there for recording.

 9       Q.   What's the difference to you there?

10       A.   A great difference.  There's a difference between

11   a guard occasionally looking in to see that everything

12   is going all right in a visitation and there's no harm

13   to either individual, as opposed to a recording of my

14   visitation with a client, which is in my belief

15   privileged.  And it could be kept and used by

16   prosecutors or-- or agents at a later time.

17       Q.   Have you in your experience had to take steps to

18   ensure that there was not recording going on in

19   attorney-client visitation?

20       A.   Yes.

21       Q.   And what was that?

22       A.   Well, it-- I have, for example, when responding

23   to a jail situation where my client is being interviewed

24   and I've asked-- been asked to come in, obviously I

25   believe that those rooms are monitored, I ask to be

1    removed to another room so I can consult with my client,

2    as opposed to where the interview was taking place.

3        In various situations I've asked jails if

4    recordings are going on, to be assured they're not.

5        When I was federal defender in Hawaii, we had an

6    interesting situation that many of our clients-- because

7    there was no federal detention center in Hawaii, many of

8    our federal clients were on the mainland in Alameda

9    County.  We set up a closed-circuit situation where we

10   could talk to the client, this was back in 1991 through

11   '96, we could talk to the client through closed-circuit

12   in California.  This was through the GSA.  And we took

13   many steps to make sure that these communications were

14   not recorded, could not be monitored on either end.

15   Q.  You heard Ms. Rokusek describe her situation.

16   Has anything like that ever happened to you?

17   A.  No, it has not.  I have never found that I have

18   been recorded when I visited a client.

19   Q.  Not only not recorded, but have you ever had an

20   experience of a U.S. Attorney having access to

21   attorney-client communication?

22   A.  Of that sort-- of that sort, no.  I certainly had

23   situations where prosecutors got privileged material

24   that I've litigated, but not of this sort.

25   Q.  What exactly-- well, let's talk about this aspect

1  of it.  The evidence is that right now we know there are

2  video-recordings, but we're not sure about audio.  If it

3  were such that these recordings were limited to video,

4  is that still a problem?

5      A.  It's a huge problem as far as I'm concerned.

6      Q.  How so?

7      A.  Well, the video as been described by counsel is

8  pretty good quality, it's--

9      Q.  Uh-huh.

10     A.  You can zoom in on it.  What would stop anybody

11 from hiring a lip reader or, if they have that capacity

12 themselves, reading the lips of the individuals and

13 gaining the information that was passed from lawyer to

14 client.  Certainly, and it's not just the government, if

15 co-counsel-- or if a co-defendant's counsel are

16 receiving these videos, would they not be obligated to

17 try and learn what is on them?

18     I'm defense counsel and I see a video of someone

19 who's an informant against my client, wouldn't I love to

20 know what's going on there and don't I have an

21 obligation, if I can reasonably find out what that

22 individual is saying, to find out.  A lip reader would

23 do that.  I mean, and that's not far-fetched.

24     I'm a baseball fan and every time the catcher

25 goes to the mound, the pitcher and catcher cover their

1    mouths with their gloves.  Why?  Because television is

2    there and their conversation could be found.

3           But there's a number of other problems as well.

4    Let's suppose I'm doing a-- there's a non-verbal

5    communication.  If I'm doing a self-defense case, let's

6    say, and my client is showing me how the assault took

7    place, are we talking about that and acting it out,

8    that's certainly something that a prosecutor would have

9    access to and I-- and I assume would love to have.

10          Again, the quality here, as been described, you

11   could see the documents both counsel and his client are

12   reviewing.  I've been in a number of trials where

13   prosecutors ask the defendant, "Look, you went over

14   material with your attorney, did you not?  Did you not

15   see the photographs," et cetera.  Certainly that would

16   be fodder for that, and fodder for impeachment if the

17   client said no.  They'd say, "Well, let's go to the

18   videotape and look."

19          There's a number of-- even relationships between

20   attorneys and clients.  I mean, you can watch a

21   videotape of someone and understand whether they're

22   having a good conversation or an unpleasant

23   conversation.  A prosecutor would have the ability to

24   see if my client and I are getting along or not getting

25   along.

1        Competency issues.  If I raise an issue that my

2   client is incompetent to stand trial, let's go to the

3   videotape.  Look, he's talking with you, he's doing

4   this.  Again, which would go into the issue and a

5   violation of the lawyer/client privilege in-- in my

6   belief.

7     Q.  Same thing perhaps with whether the client is

8   literate or not?

9     A.  Certainly.  Or speaks English.  Again, if-- to

10   show the attorney-client communication, just not the--

11   the content of it, but the quality of it.  And in

12   post-conviction obviously, you could-- only the

13   imagination would stop at how that could be used in a

14   2254 or 2255 proceeding.

15     Q.  Who else do you consider to be a member of the

16   legal team that is within this privileged, confidential

17   communication with a client?

18     A.  Well, certainly investigators.  In capital cases,

19   mitigation specialists, anybody who's working for the

20   defense, experts in certain situations.  In capital

21   cases, many times I will be on a team and we hire an

22   expert who is only an advisory expert, like mental

23   health expert, not to testify but to give us advice.

24   That person would certainly be a part of the team.

25   Paralegals, the list goes on and on.

1    Q.  Let's talk about experts for just a minute,

2  because there are all sorts of experts.  But based on

3  this, for example, a psychological expert, there's

4  psychological testing that goes on between the expert

5  and the client.  Right?

6    A.  Certainly.

7    Q.  And that includes things on paper and things that

8  they're presented to look at?

9    A.  Not just on paper.

10    Q.  Uh-huh.

11    A.  A couple of the experts I use use laptop

12  computers, have permission to take those in.  And

13  certainly those screens would be visible to these

14  cameras, or at least it seems like they would.

15    Q.  There are also psychological tests that require a

16  client to either handle something or look at photographs

17  and respond; is that right?

18    A.  Right.

19    Q.  Okay.  When-- in your experience, whether we're

20  in state or federal, capital or not, when we ask to have

21  an expert meet with a client, do we do that ex-parte?

22    A.  We do.

23    Q.  And if the U.S. Attorney was made privy to a

24  visit with a particular expert that had been ex-parte,

25  are there times that they could identify what kind of

1    expert it was?

2       A.   Not only identify the expert, identify the tests

3    that were being done, even have their own expert review

4    the testing.  As you said, there's manipulative testing

5    that can be seen in how a client would do that.

6          I recently had a case in-- it was a state court

7    case out of Johnson County, my expert was going to be

8    placed in a room with cameras.

9       Q.   Uh-huh.

10      A.   And we specifically made an arrangement that that

11   not be done for these reasons.

12      Q.   Let's talk about what obligations one would have

13   if they-- if you inadvertently came into what you could

14   identify as privileged material.

15      A.   Yes.

16      Q.   What are the obligations of an attorney?

17      A.   I've litigated this issue and it's-- I think the

18   law is clear that if I were-- as a defense attorney or

19   prosecutor, if I have something in our hands that we

20   should not have, our obligation is to-- immediately to

21   alert the other side and the Court.  To hold onto that

22   information, to use that information in any way I think

23   is a violation of ethics and - and certainly by a

24   prosecutor - violates the client's Sixth Amendment right

25   to private consultation with his attorney.

1    Q.  There are times, in fact, that a prosecutor may

2    have reason to have access to privileged or confidential

3    information, at least under the law.  The law might

4    recognize that; is that right?

5    A.  There are limited times, yes.

6    Q.  What's your experience with that?

7    A.  Well, one of the things is the SAMs.

8    Q.  Can you say what SAMs is?

9    A.  Sure.  Special administrative management.  In

10   1995 I think the first SAMs Act was passed.  It was

11   beefed up after 2001.  I haven't personally tried cases,

12   but I've been involved with trial teams as federal death

13   penalty resource counsel in teams that have had SAMs

14   restrictions.

15        SAMs can be a whole range of things.  But Part D

16   of the SAMs regulation allows certain intrusion into the

17   attorney-client process.  It can be such as limiting who

18   can see the client, that investigators cannot come in

19   for some reason, or paralegals.  It can also extend to

20   attorneys.

21        The most extreme cases where there are terrorist

22   suspects, attorneys' conversation with the clients can

23   be monitored.  But that requires an act by the Attorney

24   General.  A prosecutor, a line prosecutor or a U.S.

25   Attorney cannot do it.  The Attorney General has to

1   issue that order and, more importantly, the counsel

2   involved has to be informed.  And that can be litigated

3   before the Court.  I've been privy to several cases

4   where there's been litigation on SAMs regulations.

5       Q.   Uh-huh.

6       A.   Or SAM impositions before the Court.

7       Q.   Let's talk for a moment about phone calls that

8   hasn't been brought up so much here.  But if the

9   government were to have access and listen to recorded

10  attorney-client phone calls, what is the significance of

11  that to you?

12      A.   Well, it's tremendously significant.  Phone calls

13  between attorney and client have traditionally been held

14  to be privileged.  There's a great import for attorneys

15  to make sure their clients are talking with them on a

16  secure line.  I think-- I think that's required.  For--

17  for the government to have those calls under-- except in

18  the most exceptional circumstances unless, for example,

19  I and my client are plotting a crime, that may do away

20  with the exception.  But beyond that, I-- I cannot see a

21  difference.

22          Because, understand, we're talking about people

23  that can't come to my office, that I can't have a

24  conversation with in privacy that I've arranged.  It has

25  to be through a telephone, which is run by the-- the

1    government or the-- the correctional facility, or in a

2    visitation room.  Again, run by the correctional

3    facility.  And we, as attorneys, rely on those to be

4    private.  We can't have them brought to our office to

5    make sure of that.

6        Q.  So in our situation right now where we know that

7    CCA has or is recording our meetings with our-- our

8    clients, what is our obligation as their attorney?  Can

9    we meet with them in that situation?

10       A.  Well, I mean, it really proposes a dilemma.  Do

11   you not meet with your client or do you meet with them?

12   I think that first you have to litigate that issue.  But

13   secondly, if I were talking to my client in CCA today,

14   I'd file an objection.  And then when I'm talking to my

15   client, he and I would be holding this in front of our

16   face when we talked.

17       Q.  Would you have an obligation to tell the client

18   that it was no longer confidential or privileged?

19       A.  Absolutely.  And certainly having a file in front

20   of your face while you talk to your client and for him

21   to have a file in front of his face certainly I think

22   harms the lawyer/client relationship.

23       Q.  Just to be clear; from what you know in this

24   case, the recording by CCA of the meetings between the

25   legal team and a client is a violation of the

1    confidentiality and privilege that is expected of that

2    communication?

3        A.   In my year-- 38 years of practice and running

4    offices and dealing with public defenders and defense

5    counsel, I believe absolutely it is.  Even if there is

6    no sound, as I said, there's nothing that-- the

7    non-verbal statements and then the ability to read lips

8    certainly violate that privilege to an incredible

9    extent.

10       Q.   Again, limiting this to the video without

11   audio-recording of these meetings and the production of

12   that to the U.S. Attorney's Office, can you talk about

13   the constitutional implications?

14       A.   I-- yes.  I-- I think it violates the Sixth

15   Amendment.  There are a number of cases-- in fact, I'm

16   litigating a case before the Kansas Supreme Court right

17   now on a violation, not this, but the prosecutor coming

18   into possession of a defense investigator's notes.  I'm

19   litigating that now as a violation of the Sixth

20   Amendment.  It-- when that came to our-- light in the

21   Douglas County case, we moved to have the prosecutor

22   recused.  The judge refused.  But that is an issue on

23   the appeal of that case.

24            I don't think there can be a more important issue

25   than a prosecutor interfering with the confidential

1    relationship, attorney and client.

2    Q.  Let's talk for a moment about the effect on the

3    client who has expected the confidentiality and

4    privilege of this communication and that has been

5    stripped away.  Can you talk about the attorney-client

6    relationship and how that might be affected?

7    A.  I can.  There is no question that if I've told my

8    client, you know, "What you say to me is privileged, you

9    know, it's between you and I."  And then, "Oh, sorry.  I

10   just found out everything we have done here has been

11   recorded," at least on a video-recording, I mean, that's

12   a great breach of faith.

13       But even entering a relationship and saying,

14   "Everything we say is going to be recorded by these

15   cameras, you know, hold your hand over your mouth or

16   hold something over your mouth," that is not the way for

17   ideal client relationships.  Obviously appointed

18   attorneys, public defenders, and retained counsel even,

19   have a difficult road to hoe here to gain a client's

20   confidence.  In this kind of-- you know, in serious

21   cases, in capital cases, to put this barrier in between

22   the lawyer and client I think is a disaster.

23   Q.  Can you think of any other particular problems

24   that would attend the situation that is before us?

25   A.  Well, again, the-- the ability for the

1    information, especially co-counsel-- or co-defendants'

2    counsel, excuse me, to get this information I think is a

3    huge problem.  Even if the prosecutor says, "Well, I'm

4    not, you know, going to have lips read," again, what

5    is-- what is the duty on me as-- as another defendant's

6    counsel to do it if I know there's important information

7    there just staring me in the face?  I think that's a

8    huge issue.

9         But I think we're-- it's a point where we're

10   going down this slope.  If-- if the attorney-client

11   room, the one place in the world I can meet with a

12   client, is not secure from government intrusion and

13   recording, then what does attorney-client privilege

14   mean?  It's a slope.  Then why-- then why not the phone

15   calls and why not anything else and why can't they be

16   recorded?  I mean, it's stunning to me, if you think

17   about it.  Even under SAMs restrictions, even in

18   Guantanamo, I know lawyers have represented people in

19   Guantanamo, they're not being recorded.  They may be

20   being monitored by outside individuals, but recordings

21   aren't being made.

22        MS. BRANNON:  If I could have just one

23   moment, Your Honor.  Thank you, Mr. Ney.

24        THE COURT:  Any questions?

25        MS. BARNETT:  Yes, Your Honor.

 1          THE COURT:  All right.  I-- I had one
 2  question.
 3          THE WITNESS:  Yes, Your Honor.
 4          THE COURT:  You talked about-- and I know
 5  you're not familiar with CCA.  But just as a general
 6  proposition, when you have experts go see your clients
 7  there in custody, that would include polygraphers.
 8  Correct?
 9          THE WITNESS:  It would.
10          THE COURT:  And so are those the rooms that
11  polygraphers use if you want to have your client
12  polygraphed?
13          THE WITNESS:  I'm assuming.  But again, what
14  I have done-- I have made sure whenever I've sent an
15  expert or anyone in that it's in a private setting, that
16  there is not either audio or video-recording, yes.
17          THE COURT:  All right.  Ms. Barnett.
18          MS. BARNETT:  Thank you, Your Honor.
19                   CROSS EXAMINATION
20  BY MS. BARNETT:
21     Q.  Good afternoon, Mr. Ney.
22     A.  Ms. Barnett.
23     Q.  You had started out with your testimony talking
24  about how, and I think you've kind of ended it here on
25  the same note, that if you go into a facility, you're

 1   paying attention as to whether or not there are cameras

 2   or there's some type of monitoring device in the room.

 3   Correct?

 4       A.   I am.

 5       Q.   And if you see something that you think might

 6   indicate that somebody could be listening or could be

 7   watching what you or your client are doing or saying in

 8   that room, you make an inquiry, don't you?

 9       A.   I probably would.  In this case, obviously if I

10   had looked at the website, apparently the website says

11   I'm not being recorded.  If I had asked even their

12   security people, I would've been told no.  But yes, if I

13   have questions, I do inquire.

14       Q.   So if you go in and you see these big, you know,

15   I'm going to call it a bubble, a partial bubble in the

16   middle of the room or even up in the corner like that

17   over there, a camera, you're going to ask about it.

18   Correct?

19       A.   That's always been my policy.  I've been in jails

20   across the country with federal capital defendants and I

21   always ask starting out if I see a camera, "Tell me

22   about this."  But I rely on what is being told to me,

23   too.

24       Q.   Likewise, if I were to tell you that at CCA there

25   are, in fact, two interview rooms where there are no

1    cameras, there's no monitoring, there's no videotaping

2    or recording of any sort, if you were aware of that,

3    would you have asked to meet with your clients in those

4    rooms?

5        A.   If I were given the choice of, yes, you're going

6    to be recorded here and not here, I guess I wouldn't

7    understand why there's a difference, but yes, I would.

8        Q.   Okay.   So that is something that you pay

9    attention to when you're meeting with your clients or in

10   custody?

11       A.   I do.   But certainly like every other-- once I

12   understand what's going on or not-- supposedly not going

13   on, I rely on that for the foreseeable future.

14       Q.   Now, during your testimony you also talked about

15   the video that's been described by counsel.   Were you

16   referring to Ms. Rokusek's testimony earlier?

17       A.   I was.

18       Q.   Have you had any other descriptions of what might

19   be on these DVRs or these videos given to you by anyone

20   else?

21       A.   Just what was in the pleadings and what I heard

22   in court today.

23       Q.   So you haven't actually seen them yourself?

24       A.   I have not.

25       Q.   And so when you talk about what might be on them,

1   it's really just based on what you've heard, it's not

2   based on anything you've seen at all.  Correct?

3      A.  That's correct.

4      Q.  And so then you went on in your testimony, you

5   talked about that there are a number of problems

6   associated with watching an attorney-client interview or

7   encounter, meaning the non-verbal communication, the

8   material going over, the relationship.  Do you kind of

9   recall that line of testimony?

10     A.  I do.

11     Q.  You don't know if any of that type of

12  communication is contained on these recordings, do you?

13     A.  I don't.  But over a space of time with hundreds

14  of attorneys, I assume there are situations like that.

15  But I have not seen the recordings, no.

16     Q.  And even with regard to the space in time and

17  hundreds of attorney, you don't even know how many

18  attorneys or their clients and their meetings are

19  actually contained on these videos, do you?

20     A.  I do not.  But one is one too many, in my

21  opinion.

22     Q.  Well, so it would be important then, if such

23  evidence came to light, to hand that evidence over to a

24  special master, an independent third party, to review it

25  and determine exactly what's on it, wouldn't it?

1    A.  I would say no.  I think if a prosecutor, in my

2    opinion, sees that, they raise their hands and say, "Oh,

3    my," and tells counsel and the Court and gets rid of it

4    immediately.  I-- again, I-- I can't see, especially if

5    it's not a security issue, I can't see the import of

6    that information unless it's to be used against the

7    defendant in some way, as it-- as it apparently was

8    here.

9    Q.  Well, you have no evidence that it was used

10   against a defense attorney or defendant, do you?

11   A.  Just counsel's testimony that it was used to

12   attempt to get her off the case.

13   Q.  Counsel's testimony was that a case agent had

14   seen her walking in a hallway.  Do you recall hearing

15   that?

16   A.  Well, yes.  I-- I do recall hearing that.

17   Q.  Okay.  Now, going to when you were talking about

18   experts and visiting in a facility with a client, a

19   hypothetical client and the use of a laptop.  Screens

20   would be visible you said.  But without seeing actually

21   where the cameras are at in these rooms or what's

22   contained on the videotape, you don't know whether or

23   not there were any laptops that were presented, whether

24   there were any screens that were seen or anything of

25   that nature, do you?

1    A.  No, I don't.

2    Q.  And with regard to the psychological examinations

3    or the polygraph examination, as the judge has recently

4    asked you about, you again don't know whether any of

5    those types of contacts are contained on these

6    videotapes, do you?

7    A.  I don't.  But over the years, I assume that

8    happened.  I can only assume.

9    Q.  And it would be just an assumption, wouldn't it,

10   Mr. Ney?

11   A.  It would.

12           MS. BARNETT:  May I have just a moment,

13   please, Your Honor?

14           THE COURT:  Yes.

15           MS. BARNETT:  I have nothing else.  Thank

16   you, Mr. Ney.

17           THE WITNESS:  Thank you.

18                   REDIRECT EXAMINATION

19   BY MS. BRANNON:

20   Q.  Mr. Ney, if a jail tells you those

21   attorney-client visitations are not recorded, do you

22   rely on that?

23   A.  Of course.  I-- I have to, because I assume

24   they're telling me the truth.  I cannot do an

25   independent investigation unless I litigate the issue.

1    Q.  And referring to Defendant's Exhibit 435, if that

2    jail publicly says that attorney-client visitations are

3    confidential, do you rely on that?

4    A.  I rely on it, one, because they've told me, and

5    two, because I believe-- I guess I would believe that no

6    jail is going to record attorney-client conversations.

7    Q.  And referring to Defendant's Exhibit No. 443, if

8    the U.S. Marshal tells you that these are not recorded,

9    would you rely on that?

10   A.  I would rely on that.

11   Q.  And referring to the same exhibit.  If the U.S.

12   Attorney's Office tells you that it's not recorded,

13   would you rely on that?

14   A.  Absolutely.  Because my experience is I have

15   never been in a institution which tells me that they're

16   going to record my visit with my client.  So certainly

17   I'd rely on that being the case.

18   Q.  So if you have the institution telling you

19   directly it's not recorded, if they publicly say it's

20   not recorded, if the U.S. Marshal says it's not

21   recorded, and the U.S. Attorney's Office says in writing

22   it is not recorded, do you feel that you have any

23   obligation to research further or question further, or

24   are you going to rely on what-- those four sources?

25   A.  No. 1, I'm going to rely on it.  And two, I'm

1   going to rely on it because it's stunning to me it ever

2   would be recorded.  It just hasn't been my experience in

3   over 38 years that attorney-client meetings are

4   recorded.  I mean, the opposite is true.

5        I have-- in a police interrogation setting, I

6   certainly have my antenna up and I move the

7   interrogation-- the conference.  But in a prison or a

8   jail, interview rooms specifically set aside for

9   attorneys, I have no belief that there's a recording

10  device going, unless I'm told otherwise.

11  Q.  And so if the jail-- if the jail says it's not

12  recorded, if they publicly say it's not recorded, if the

13  U.S. Marshal is telling you it's not recorded, and the

14  U.S. Attorney is telling you it's not recorded, would

15  you have any reason to think that the U.S. Attorney

16  would have recordings of your meetings with your client?

17  A.  No reason--

18          MS. BARNETT:  Objection, asked and answered,

19  Your Honor.

20          THE COURT:  I think it's a different

21  question.

22  A.  No reason at all.

23          MS. BRANNON:  Thank you.

24          THE COURT:  All right.  Anything more?

25          MS. BARNETT:  No, Your Honor.

 1          THE COURT:  All right.  Mr. Ney, you can be

 2  excused.

 3          THE WITNESS:  Thank you, Your Honor.

 4          THE COURT:  Let's take a break until 3:30.

 5  And I think you said you have a couple more witnesses by

 6  Skype?

 7          MS. BRANNON:  Yes, Your Honor, if I can.  We

 8  have two witnesses by Skype.  There's one other matter

 9  the Court brought up.  I would like to say that if

10  there's a polygrapher, those meetings do happen in the

11  rooms, there are no place else for those meetings to

12  take place.  If we bring a polygrapher, it is in those

13  attorney-client rooms.  Further, we understand-- we

14  haven't done this, but sometimes there are debriefings

15  by police officers at CCA, and we believe those are

16  conducted in those rooms as well.  And we--

17          THE COURT:  Debriefings of cooperators?

18          MS. BRANNON:  Yes.  We just wanted to put

19  that on the record as well.

20          THE COURT:  All right.  I understand.  All

21  right.  We'll be in recess until 3:30.

22          (Recess).

23          THE COURT:  All right.  You can be seated.

24  All right.  Ms. Brannon, Mr. Redmond.

25          MR. REDMOND:  Thank you, Your Honor.  We'd

1    call Randy Rathbun.  It's over a Skype connection.  If

2    there's any problems with the sound, just let me know.

3                QUESTIONING OF MR. RANDY RATHBUN

4                MR. REDMOND:  All right.  Mr. Rathbun, are

5    you there?

6                MR. RATHBUN:  Yeah.

7                MR. REDMOND:  Can you-- can you hear us?

8                MR. RATHBUN:  I can.  Can you hear me?

9                MR. REDMOND:  Yes, sir.  There's a lot of

10   folks in this room.  Can you familiarize us with your

11   professional history?

12               MR. RATHBUN:  I graduated law school in '78.

13   Went to work for Curfman, Brainerd, Harris, Bell,

14   Weigand & Depew.  Worked for them for two years, which I

15   did mostly-- I did not-- there's 22 members in that firm

16   and nobody wanted to do appointment work, and there was

17   no public defender at that point.  So I did everybody's

18   criminal appointments.  So I did mostly defense work for

19   the first-- criminal defense work for the first couple

20   of years.

21               And then I left with a couple of partners

22   and practiced with Depew & Gillen, which became Depew,

23   Gillen & Rathburn, which is now Depew, Gillen, Rathbun &

24   McInteer ever since, except for three years in which I

25   was U.S. Attorney from August of '93 to January of '96.

1           MR. REDMOND:  What courthouse were you based

2    out of?

3           MR. RATHBUN:  Well, actually I was-- I live

4    in Wichita, so I spent most of the time in the Wichita

5    office, but I tried to get around to all of the offices.

6           MR. REDMOND:  As part of your role as U.S.

7    Attorney, you had to become familiar with DOJ policy; is

8    that fair to say?

9           MR. RATHBUN:  I did.  I got to know the U.S.

10   Attorney's manual maybe better than I would like.

11          MR. REDMOND:  And during that time, did any

12   of the training that you received and the materials that

13   you reviewed relate to protection of the attorney-client

14   privilege?

15          MR. RATHBUN:  I don't know that I can say

16   that.  I know that the U.S. Attorney's Office is-- is

17   very good about training U.S. Attorneys.  So I'm certain

18   that we spent time on the Sixth Amendment.  So I can't

19   imagine that I did not receive training on that.  I was

20   also blessed to be on the Attorney General's Advisory

21   Committee, and we spent a lot of time talking about

22   those sorts of issues.

23          MR. REDMOND:  Okay.  And we won't go into

24   the specifics of that policy, but can you generally

25   describe the Department of Justice's attitude toward the

1    attorney-client privilege?

2            MR. RATHBUN:  Well, you know, the-- the

3    thing that I always emphasize is our job is to make

4    certain that all the amendments to the Constitution are

5    enforced, including the Sixth Amendment.  And I-- I felt

6    strongly about that and still do feel strongly about it.

7    And I'm-- so I certainly believe that that was just as

8    important as any of the other amendments that we had to

9    protect.

10            MR. REDMOND:  Were you-- did you believe

11    yourself able to subpoena material that contained

12    material protected by the attorney-client privilege?

13            MR. RATHBUN:  There's procedure to do that.

14    You have to go to the DAG.  You have to make a showing

15    somehow that there's a conspiracy involving with the

16    attorney and-- but obviously I couldn't-- (reporter

17    interruption).

18            THE COURT:  We're having trouble hearing,

19    including the court reporter, who's the most important

20    person.  Can we plug it into a microphone?

21            COURTROOM DEPUTY:  You have to have that--

22    the sound will come in our speakers, but it can't do it

23    over here, I just found out.

24            THE COURT:  Just a minute, Mr. Rathbun.

25            (The technical issue was corrected).

 1              MR. REDMOND:  All right.  Randy, can you say

 2    something to test things for the court reporter?

 3              MR. RATHBUN:  Sure.  Testing 1, 2.  Check 1,

 4    2.

 5              MR. REDMOND:  Is that better?  Okay.  Thank

 6    you very much.

 7              So if-- you said that you'd have to go to

 8    the DAG.  Can you explain what the DAG is?

 9              MR. RATHBUN:  The Deputy Attorney General.

10              MR. REDMOND:  So the second in command for

11    the entire U.S. Department of Justice?

12              MR. RATHBUN:  Yes.

13              MR. REDMOND:  And that's whose permission

14    you would need to retain privileged information?

15              MR. RATHBUN:  Yes.

16              MR. REDMOND:  Okay.  If you-- maybe you can

17    speak from experience here.  If you accidentally came

18    into the possession of potentially privileged materials,

19    what would you do?  Would that change the calculus?  Do

20    you still have to go to the DAG?

21              MR. RATHBUN:  You know, I-- I probably ought

22    to back up and say that I-- I had an open file discovery

23    policy.  And I always thought that we needed to share,

24    and so that kind of maybe colors my opinion.  But

25    certainly to the extent that if we ever came into-- into

1    access of attorney-client privileged information,

2    obviously we would've notified the Court.

3              The-- the closest thing I could think is

4    perhaps overheard conversations, I had a little bit of

5    experience with this, overheard conversations with

6    defense counsel.  The U.S. Attorney's Office manual

7    requires you to notify the Court and obviously defense

8    counsel that you've overheard those conversations.

9              MR. REDMOND:  Okay.  And so-- and is that

10   true of all attorney-client privileged communications?

11   There's a duty to notify the Court if you come into

12   possession of them?

13             MR. RATHBUN:  Certainly.

14             MR. REDMOND:  Okay.  What were-- what was

15   the detention facility in Wichita when you were U.S.

16   Attorney?

17             MR. RATHBUN:  Oh.  You realize that's 20

18   years ago.  I think we had-- there was some people

19   detained in Harvey County, Sumner County, and over in El

20   Dorado.

21             MR. REDMOND:  Okay.  And in your knowledge,

22   did any of those facilities record the visits between

23   attorneys and their clients?

24             MR. RATHBUN:  You know, I have to tell you,

25   I was never over there.  But I certainly wouldn't have

1    had any idea that that was going on, and-- and I

2    would've taken a dim view of it.

3            MR. REDMOND:  If you-- if there had been a

4    recording made of an attorney-client visit, you would've

5    notified the Court and talked to the DAG; is that fair

6    to say?

7            MR. RATHBUN:  You know, it depends on-- I--

8    I don't have much background about what actually went on

9    here.  I-- I made the unfortunate mistake of answering

10   my phone Saturday morning when Laura Shaneyfelt called,

11   and so I don't have a whole lot of background.

12           But based upon what I know of it in terms of

13   the camera would've allowed anybody to watch to

14   distinguish between Excel spreadsheets and pictures and

15   things like that, that would obviously concern me.  And

16   it would concern me for a couple of reasons.  It would

17   concern me for Sixth Amendment reasons.  And I had

18   some-- I had some great assistants working, and I'd be

19   nervous about OPR problems.  And so I would've been all

20   over that.

21           MR. REDMOND:  Okay.  And you have not been

22   able to be present for the testimony this afternoon, so

23   allow me to ask this question in a hypothetical form.

24           First, assume that there's a video that

25   shows an attorney meeting with a client.  Okay?  And

1    also that you can see the documents that are being

2    passed back and forth and that you can roughly identify

3    some of those documents as spreadsheets or photographs.

4    You can see how the client would react to some of those

5    documents being passed back and forth.  Is that video,

6    in your opinion, covered by the attorney-client

7    privilege?

8              MR. RATHBUN:  First, that never happened to

9    me.  And secondly, if it had, I would've called the DAG

10   immediately because I'm afraid that that would be

11   attorney-client privilege, or at least close enough that

12   I would-- I would've been on the phone immediately with

13   the Deputy Attorney General.

14             MR. REDMOND:  Just one moment, Your Honor.

15             Just to clarify the record on one point.

16   Could you explain what OPR is?

17             MR. RATHBUN:  Office of Professional

18   Responsibility.

19             MR. REDMOND:  All right.  Mr. Rathbun,

20   that's all the questions that I have.  Thank you very

21   much for making the time.

22             MR. RATHBUN:  You bet.

23             THE COURT:  All right.  Any questions?

24             MS. BARNETT:  Just very briefly, Your Honor.

25             Mr. Rathbun, you haven't seen any of the

 1    videotaped materials that were obtained from CCA in this

 2    case, have you?

 3                MR. RATHBUN:  I have not.

 4                MS. BARNETT:  You're not aware of what is

 5    contained on any of those tapes, are you?

 6                MR. RATHBUN:  I have no idea.

 7                MS. BARNETT:  Thank you, sir.  I have no

 8    further questions, Your Honor.

 9                MR. REDMOND:  Nothing based on that, Your

10    Honor.

11                THE COURT:  All right.  Thank you, Mr.

12    Rathbun.

13                MR. REDMOND:  Your Honor, we need to make

14    the next Skype linkup, it may take just a second.

15                THE COURT:  Okay.

16                MR. REDMOND:  If you don't mind, I would

17    like to move for the admission of the still photographs

18    that were shown during Mr. Thompson's testimony.  The--

19    the exhibit lists them as Exhibits 401 to 403.  If I

20    could approach.

21                THE COURT:  Yes.  Exhibits 401, 402, and 403

22    admitted.

23                MR. REDMOND:  And inclusive up to--

24                THE COURT:  Or no, I'm sorry, this is many

25    more than this.  It's through 433?

16-20032-JAR    USA v. Lorenzo Black, et al.    08.09.16    90

1              MR. REDMOND:  To 433, I'm sorry.

2              THE COURT:  Okay.  401 through 433 admitted.

3              MR. REDMOND:  Your Honor.

4              THE COURT:  Yes.

5              MR. REDMOND:  As much as everybody enjoys

6    testimony over Skype, this isn't working very well.  We

7    propose that we proceed by telephone, if that's okay

8    with the Court.

9              THE COURT:  Who is this?

10             MR. REDMOND:  This is Professor Peter Joy

11   from the University of Washington in St. Louis.

12             THE COURT:  All right.  Is there any

13   objection to swearing him over the telephone call?

14             MS. BARNETT:  No, Your Honor.

15             THE COURT:  All right.  It's Professor Joy?

16             MR. REDMOND:  Professor Joy, yes, Your

17   Honor.  His CV is Exhibit 448?  448.

18             THE COURT:  All right.  Proceed.

19             (A phone connection was established).

20             THE WITNESS:  This is Peter Joy.

21             MR. REDMOND:  Hi, Professor, this is Kirk

22   Redmond and a courtroom full of folks.

23             THE WITNESS:  Yes.

24             MR. REDMOND:  Professor, we are having

25   problems with the Skype linkup, would you be willing to

1    testify via telephone call?

2              THE WITNESS:  Sure.

3              MR. REDMOND:  Okay.  Thank you very much.

4    You're going to be sworn in now.

5                    PROFESSOR PETER JOY,

6    called as a witness on behalf of the Defendant, having

7    been first duly sworn, testified as follows:

8                    DIRECT EXAMINATION

9    BY MR. REDMOND:

10   Q.  Professor, could you spell your name for the

11   record and introduce yourself?

12   A.  Yes.  My name is Peter Joy.  P-E-T-E-R.  J-O-Y.

13   I'm a lawyer admitted to practice in the state of

14   Missouri and Ohio.  I'm on inactive status in the

15   District of Columbia.  I'm also a law professor and I

16   teach at Washington University in St. Louis.

17   Q.  What do you teach, Professor?

18   A.  Well, I teach a number of courses.  I teach a

19   course called Legal Profession, which is the basic legal

20   ethics or professional responsibility course.  I teach

21   Trial Practice and Procedure, and I also teach in a

22   criminal justice clinic, where I go to court with

23   students.  We partner with the state public defender

24   office on matters in state court at the trial level.

25              I also have taught, but I haven't taught it now

1    in some years, a Comparative Legal Ethics seminar, which

2    looks at various legal ethics issues from a U.S.

3    perspective and then also from a perspective in other

4    countries.

5        Q.  Do you read-- do you write on professional--

6    excuse me.  Do you write on professional responsibility?

7        A.  Yes, I do.  Most of that writing is at the

8    intersection of legal ethics and criminal law or

9    criminal procedure.

10       Q.  Okay.  In your scholarship and from your

11   knowledge of the law, could you give the Court sort of a

12   working definition of the attorney-client privilege?

13       A.  Attorney-client privilege is a communication

14   between attorneys and their clients or those working on

15   behalf of attorneys in-- someone that might be an agent

16   in order to obtain legal assistance.  So the key things

17   are it's between these privileged persons, it's a

18   communication, sharing of information in order to obtain

19   legal assistance.

20       Q.  So it's in service of the Sixth Amendment right

21   to counsel?

22       A.  I'm sorry, I didn't quite hear you.  Could you

23   speak a little bit louder?

24       Q.  I certainly can.  I was in the wrong place.

25       A.  Oh, okay.  Thank you.

1    Q.  So the-- is there a relationship then between the

2    attorney-client privilege and the Sixth Amendment to the

3    federal constitution?

4    A.  Yes, there is.  I-- it's well-recognized that

5    attorneys, both criminal-- and I'll just focus on

6    criminal law here.  That defense attorneys need to have

7    full disclosure of the facts to be able to be effective.

8    And so if you can't have confidential communications,

9    which would include attorney-client communications, it

10   would make it impossible to render effective assistance

11   of counsel, which would thereby be a denial of the Sixth

12   Amendment right to effective assistance of counsel.

13   Q.  Is that true even if you're in jail waiting for

14   your trial?

15   A.  Yes, it's absolutely true.  Whether a person is

16   in jail or on bail, unable to meet in an attorney's

17   office, you need to be able to have confidential

18   meetings in order to adequately prepare a defense.

19   Q.  Okay.  Now, Professor, I'm not going to ask you

20   about any of the facts that have been developed here

21   today because you were not-- you were not able to be

22   present.  So we're going to talk about these things in

23   sort of a hypothetical way.

24        What is the impact of recording simply visually

25   an attorney-client privilege on the-- I'm sorry,

1   recording a legal visitation on the attorney-client

2   privilege?

3       A.   Well, it-- it intrudes on the meeting between the

4   client and the lawyer.  And so it has an effect of

5   tampering down that full and frank discussion.  It would

6   be, you know, an extra pair of eyes or several pairs of

7   eyes in observing what's going on.  How the lawyer and

8   client are interacting to provide information that may

9   be-- possibly be useful for a prosecutor.

10      Q.   You said usable to a prosecutor, but what if it's

11  only a visual recording?

12      A.   Well-- well, I mean, lots of things can be

13  disclosed simply by a visual recording.  So, for

14  example, you could have a defendant who is acting out

15  something, like pointing their finger as though they're

16  shooting a gun.  And if there's a case involving a

17  shooting, that might be some indicia of-- of like how

18  something was done, almost like an admission, you know.

19  Or maybe putting their finger across their throat and if

20  there was somebody who had their throat cut.  So the

21  acting out of things.

22          Also visual recordings sometimes, depending on

23  the camera angle and what-- what it shows, sometimes you

24  could actually make out words that are being spoken.  Or

25  if there were papers being passed between the attorney

1  and the client or papers being reviewed between the

2  attorney and-- and the client, depending, again, on the

3  camera, it might show actually the written words.  So it

4  would be revealing the communications that are going on

5  between the client and the attorney.

6      Q.  Has the Kansas Supreme Court actually spoken to

7  this issue?

8      A.  Yes, they have.

9      Q.  Could you tell us about that case?

10      A.  Well, it's a case that I was unfamiliar with

11  until I read the pleading that was filed in this matter,

12  but it's *Case versus Andrews,* it's a Kansas Supreme

13  Court case.  And it's one that talked about the

14  intrusion, the visual surveillance on attorney-client

15  conferences.  And there, the Supreme Court found that it

16  was not justified and that the state hadn't proved a

17  compelling state interest.  And this was an unreasonable

18  interference that deprived the-- in that case the

19  petitioner, the criminal defendant, his Sixth Amendment

20  right to effective assistance of counsel.

21      Q.  Had there been audio-recording in that case?

22      A.  I don't believe that there was audio-recording in

23  that case at all.

24      Q.  Professor, is there a difference between the

25  scope of the attorney-client privilege and a lawyer's

1    duty under the Rules of Professional Conduct to protect

2    confidential information?

3        A.   Yes.   There-- the duty of confidentiality, which

4    in Kansas is spelled out in Rule 1.6 of the Kansas Rules

5    of Professional Conduct, covers all information relating

6    to the representation of the client.   And so that would

7    include everything that's covered by attorney-client

8    privilege, but it would also include everything else the

9    lawyer learns during the representation of the client.

10            And so that would be, for example, interviewing

11   witnesses or doing records research or anything that the

12   lawyer learns.   And it also would cover things like the

13   temperament of the client.   That's information that one

14   learns.

15            And so confidentiality is much broader than

16   attorney-client privilege.   In fact, when I teach the

17   course, I draw a big circle for client confidentiality.

18   And inside that big circle, I have a smaller circle for

19   attorney-client privilege.   I find that's pretty

20   effective to-- to have students grasp what we're talking

21   about here.

22       Q.   Professor, you referred to a couple of Kansas

23   Rules of Professional Conduct.   Can you tell-- tell us

24   how those are impacted in terms of the processing of

25   confidential information by a visually-recorded

1  statement made by-- or a video of an attorney-client

2  meeting?

3     A.  Okay.  Well, again, I mentioned Rule 1.6.

4  There's another rule, which is Rule 8.4, which is one

5  that defines professional misconduct.  And an aspect of

6  professional misconduct is engaging in conduct that

7  tries to-- or attempts to or does violate one of the

8  Rules of Professional Conduct.

9          So an example that I sometimes use in teaching it

10  in a civil-- derives from a civil case where during a

11  deposition one attorney steps out in the hall to talk

12  with his client and leaves his folder on the table.  And

13  opposing counsel looks inside that folder.  In that

14  particular instance, opposing counsel was found to have

15  violated both the-- the ethics rule concerning

16  confidentiality, but also intruding into attorney-client

17  privilege for any privileged information that's there.

18  So that's Rule 8.4.

19          And another aspect of 8.4, based on at least my

20  initial understanding of the facts in this case, that

21  things were done surreptitiously or unknowingly or

22  secretly.  Rule 8.4 makes it an ethical violation to

23  engage in conduct involving dishonesty, fraud, deceit,

24  or misrepresentation.

25          And so a reasonable lawyer would assume that

 1  their meetings with their clients are ones that are not

 2  being recorded.  And absent a sign or some notice that

 3  it's being recorded, there's also this aspect of

 4  dishonesty, fraud, deceit, or misrepresentation taking

 5  place.

 6      Q.  Professor, my final question.  I'd like you to

 7  amplify your last answer a little bit, because we've

 8  been talking about how-- the impact of simply recording

 9  an attorney-client visit.  How is the attorney-client

10  privilege and the confidential-- the information

11  confidentiality, how is that affected by the further

12  action of turning that information over to a

13  prosecutor's office?

14      A.  Okay.  Well, in terms of attorney-client

15  privilege, even the Federal Rules of Evidence Rule 502

16  talks about disclosure being made in either a federal

17  proceeding or to a federal office or agency, so turning

18  over the recordings to a U.S. Attorney's Office or state

19  prosecutor's-- well, not state, but U.S. Attorney's

20  Office, at least in terms of the federal rules.

21          In terms of the ethics rule, by turning it over,

22  you know, if I was using this as a hypothetical in

23  class, I would say that-- that a prosecutor coming into

24  possession of these tapes and knowing that they were

25  being done secretly would've had both an obligation to

1    inform whoever was doing it that they should stop doing

2    it, would have an obligation not to look at them, and

3    then would have a further obligation to disclose to the

4    lawyers who had been filmed that they had been

5    surreptitiously filmed so that those lawyers could, you

6    know, take whatever action might be necessary to protect

7    their client's rights.

8            You know, every-- every lawyer, prosecutor and

9    defense lawyer, is also an officer of the court and has

10   an ethical obligation to try to promote justice.  And in

11   this instance where a Sixth Amendment right is involved

12   and also the ethics rules, promoting justice would mean

13   taking those kind of actions.  That concludes that

14   answer.

15           MR. REDMOND:  I appreciate your patience.

16   That's all I have, Professor.

17           THE WITNESS:  Okay.  Thank you.

18           THE COURT:  Do you have any questions, Ms.

19   Barnett?

20           MS. BARNETT:  No, Your Honor.  Thank you.

21           THE COURT:  All right.  I-- I have one

22   question, Professor Joy.  This is Judge Robinson.

23           Have you examined at all the intersection

24   between legal ethics, professional responsibility, and

25   the obligations under Rule 6(e) of the Federal Rules of

1    Criminal Procedure?

2              THE WITNESS:  I-- not in terms of Rule 6(e).

3    I have not looked into that.

4              THE COURT:  All right.  So you've spoken

5    about the obligations of a prosecutor who comes into

6    possession of attorney-client privileged information.

7    If they come into possession of that information by

8    virtue of a grand jury subpoena, such that it's Rule

9    6(e) information, and then use that information in an

10   unrelated case, sharing attorney-client privileged

11   information to an attorney or perhaps at least giving

12   that attorney access to their own privileged

13   information, but maybe-- maybe even access to other

14   attorney-client communications, but in an unrelated case

15   to the grand jury investigation, do you see a potential

16   Rule 6(e) violation as well?

17             THE WITNESS:  I-- as I mentioned, Your

18   Honor, I-- I have not examined that closely.  But based

19   on the scenario that-- that you've set forth, I would

20   say yes, because it's my understanding and it's-- you

21   know, it's been a while since I've looked at Rule 6(e),

22   but I believe that that is all supposed to be kept

23   confidential in connection with whatever the grand jury

24   was examining.

25             And so if it goes beyond the case or cases

 1    that the grand jury was examining, then I believe it

 2    would be a violation.  But I'm saying that based on my--

 3    my now somewhat dated recollection.  So I-- I say that

 4    with that qualification.

 5              THE COURT:  All right.  Thank you.  I don't

 6    have any other questions.  Does anybody else have any

 7    questions?

 8              MS. BARNETT:  No, Your Honor.  Thank you.

 9              MR. REDMOND:  No.  Thank you, Your Honor.

10              THE COURT:  All right.  Thank you, Professor

11    Joy, for your time.  We'll disconnect.

12              THE WITNESS:  Okay.  And thank you very much

13    for letting me testify via the telephone call.

14              THE COURT:  All right.  All right.  So, Ms.

15    Brannon, are you prepared now to play the videotapes or

16    at least some of them?  Obviously some of them.

17              MS. BRANNON:  Yes, Your Honor.  And I'm not

18    sure how the Court wants to set this up.  It's-- what we

19    think is that Ms. Rokusek, Mr. Bussell, the Court, and

20    the court reporter should be the ones to actually view

21    what is on there and to be shown how it works with the

22    index and so forth.

23              Anybody else viewing it I think would be a

24    violation and just compound the problems that we have.

25    So I-- I might leave it to the prosecution about how

 1    to-- how to set that viewing up, whether the Court wants

 2    to go in chambers or do it here.  Either way.

 3              THE COURT:  What-- what equipment?  I mean,

 4    is it on a PC that you can bring to my chambers or--

 5              MS. BARNETT:  I believe that we have a

 6    laptop here, Your Honor, that the Court can use, and the

 7    device that the-- I guess the DVRs go into.  I guess I

 8    would have to defer to Ms. Boyd for her expertise on

 9    what will be required then to set it up for the Court to

10    view it.

11              MS. BOYD:  All I need to do is reconnect it

12    back there for you and then they can take over and run

13    it.

14              THE COURT:  Okay.  Well, it probably would

15    be better to just stay in place and clear the courtroom.

16    Is this the last thing you intend to present?

17              MS. BRANNON:  It is, Your Honor.

18              THE COURT:  And do you all intend to present

19    any argument?

20              MS. BARNETT:  Your Honor, the only thing

21    that I was going to ask the Court was maybe to allow us

22    to have a recess to decide whether or not we have any

23    additional evidence that we would want to present on

24    this issue or whether we simply want to ask the Court to

25    allow us to present some briefs or memorandums, at least

 1    at this early juncture.

 2            But quite frankly, we feel from our position

 3    that until there's a review of these items and a

 4    determination made as to whether or not they are, in

 5    fact, privileged information, that that determination

 6    then will help guide us and then how to further brief

 7    and address issues that the Court may have.

 8            THE COURT:  All right.  So what I was

 9    intending to do is-- and I think it makes sense to give

10    you all time, and if we need to reconvene the hearing

11    before, for example, I issue a comprehensive order about

12    what relief and what to do next.  But at a minimum, my

13    intention was at the close of the hearing today, and I

14    could certainly do it now in everyone's hearing and

15    before we otherwise close the courtroom, is I wanted to

16    make sure that I have-- have the original and all copies

17    of the recordings at issue from CCA.

18            I heard something during the hearing, some

19    suggestion that perhaps an investigator still had a copy

20    or something and I just wanted assurance that what

21    you're prepared to present-- provide to the Court, Ms.

22    Barnett, is everything.  So there's no-- nothing else in

23    CCA's possession and nothing else in anyone's possession

24    at this point?

25            MS. BARNETT:  Your Honor, I've been told

1    that there is simply two sets.  One we received from CCA

2    and then I think a copy that was made.  And we have both

3    sets here.  What we believe in talking to the public

4    defender is that we are just confining this examination

5    or review to DVR 5 and DVR 6.  There are four other

6    DVRs.  But in looking at the index, we do not believe

7    that there are any questionable video-recordings on

8    them.  So we do have those two sets here and I am

9    prepared to turn those over to the Court.  Would you

10   like for me to mark them in any way?

11             THE COURT:  Yes.  I mean, identify them by 5

12   or 6.  And I think we should put an exhibit number on

13   them.

14             MR. SLINKARD:  They are marked.

15             THE COURT:  They are marked?

16             MS. BARNETT:  They are marked.  The first

17   set, two boxes marked or titled Seagate Desktop DVR 5,

18   DVR 6.  They are three-terabyte.  And that's how the

19   boxes are labeled.  And then there are two more boxes,

20   Seagate Expansion DVR 5, DVR 6.  And on the outside of

21   each of these it says, "May contain attorney-client

22   material," which is the way that the agent was

23   instructed to mark these.

24             THE COURT:  And from what I heard, I can't

25   review those unless I have the-- the reader that CCA

 1    has?

 2                    MS. BARNETT:  That is my understanding, Your

 3    Honor.

 4                    THE COURT:  And did they provide you with

 5    that?

 6                    MS. BOYD:  And I have it loaded on this

 7    computer and we can-- I can give you a copy if you'd

 8    like, too, Your Honor, to load on your own.  However you

 9    want to do it.

10                    THE COURT:  Okay.  Well, I don't know that

11    I'm going to review the entire things anyway.  I just

12    want to see what you have to show me, but-- so you're

13    providing them to me.  They're going to be in the

14    Court's custody.  I don't have access to them, in other

15    words.  I can't view them without getting equipment

16    either from the U.S. Attorney's Office or from CCA.  And

17    if I decide I need to do that, obviously I'll do that.

18                    The other concern I wanted to address this

19    evening, and that is that, you know, there's an exhibit

20    that is an e-mail I think from Mr. Saburling (phonetic),

21    I can't remember his name, but anyway, it lists a number

22    of jails, county jails in Missouri, as well as CCA, and

23    what those institutions have told you all about what

24    they do and don't record.

25                    There weren't any counties in Kansas, I

1    believe, that are used by our U.S. Marshal here in

2    Kansas, but I wanted to have some assurance going

3    forward that the U.S. Marshal would, if he hasn't

4    already, contact all of the jail-- all of the detention

5    facilities that are contracted in Kansas or contracted

6    with-- for Kansas defendants, that might include

7    Missouri counties as well, and assure that they are no

8    longer from this point forward doing any audio or

9    video-recording of any attorney-client visits or

10   communications.  And that would include jail calls of

11   attorney-clients.

12          Because that particular e-mail tends to

13   indicate that some of these institutions are doing-- are

14   audio-recording all jail calls, including attorney

15   clients.  And some of them are audio and video-recording

16   attorney-client visits.  CCA is-- has been, according to

17   this, video-- video-recording attorney-client visits but

18   not audio-recording.  And is audio-recording jail calls

19   between attorneys and clients if the call is initiated

20   by the-- by the detainee and the detainee doesn't tell

21   the jail that they're calling their attorney.  And I

22   don't know, maybe that's zero calls or maybe it's a lot

23   of calls, I don't know.

24          But in other words, a sort of injunction I

25   want to put into effect this evening that the U.S.

1    Marshals Service will tell all of these facilities they

2    are to cease to desist immediately from any audio or

3    video-recording of any attorney-client communications,

4    whether it's by phone or face-to-face, so that we can be

5    assured that there's no further violations of the Sixth

6    Amendment going forward.

7              And-- well, I had some other thoughts, but

8    at least for now, that's what I intended to orally say.

9    And I certainly can follow that up with a short order

10   tomorrow if there's any question about exactly what I'm

11   ordering the U.S. Marshal to do, as well as making sure

12   the U.S. Attorney's Office has provided all of the

13   copies of such recordings from CCA.

14             All right.  I'm prepared to clear the

15   courtroom.  The one other thing that I'll want to

16   address with you, and I think I will wait, though, until

17   you've had a chance to tell me whether you're going to

18   respond, Ms. Barnett, is appointment of a special

19   master.  And my initial thought at this point is I think

20   it's a good idea to appoint a special master, but not

21   just to start digging in and going through everything.

22             I first-- I think I would only authorize

23   appointment just for that person to tell us the scope of

24   the review and how much-- and I'm still real unclear

25   about this, maybe you can tell me, clarify this for me

1   now, but does this involve going through the whole

2   universe of recordings and segregating out all

3   attorney-client communications from that?  Or are they

4   already segregated on 5 and 6?

5            And in other words, I'm trying to get some

6   sense of how much work and how much money would be

7   involved in going through thousands of communications

8   and trying to segregate out attorney-client

9   communications in this case and other cases, I mean, any

10  that happened in the facility itself.  Mr. Slinkard?

11           MR. SLINKARD:  Your Honor, I don't know that

12  we can give you an exact estimate.  It's-- it's our

13  understanding DVR 5 is being included because it lists

14  on the index "Low Custody Attorney."

15           Now, we asked the question and the

16  information that we received from the security staff,

17  the same security staff at CCA that had spoken with

18  the-- with the defenders I believe yesterday at the

19  interview, was that that actually is just the hallway

20  outside the attorney visiting rooms.  Okay?  That's the

21  only camera depicted on DVR 5 that, because of its

22  labeling, had an arguable issue.  And for now, until

23  that can be run down, we've agreed to provide it to the

24  Court.

25           DVR 6 contains feeds from numerous other

1  cameras, and then includes one labeled Attorney Room,

2  Attorney Room 4, Attorney Room 5, 6, 7, 8 and 9 in

3  sequence.

4           THE COURT:  Okay.  So it does-- it does

5  include cameras in other areas of the jail--

6           MR. SLINKARD:  Yes.

7           THE COURT:  -- that would not presumably

8  have privileged communications?

9           MR. SLINKARD:  Yes.

10           THE COURT:  Okay.

11           MR. SLINKARD:  And based on what was-- was

12  described to us by-- by CCA, as we've continued to try

13  and inquire about this, it's our understanding that they

14  have-- you know, these digital video-recorders, not

15  these particular ones, but the digital video-recorders

16  at the facility are set up in such a way that it would

17  be recording feed automatically.  The machine is

18  recording feed.  And when it gets full, it starts over

19  at the beginning and it writes over.

20           So there's-- depending on the number of

21  cameras feeding in, the capacity of the DVR, they

22  suggested that there was something like a 30- to 60-day

23  window before data would be overwritten.  Now, of

24  course, if it starts overwriting with the oldest first -

25  and we don't know that 100 percent because, again, we

1   haven't-- don't want to look at these until we've-- the

2   Court has resolved whether there's a privilege issue -

3   there may be slightly more than that time period

4   because, you know, something that was recorded before--

5   right at the end of it starting over that it hasn't

6   gotten to erasing it yet.

7          THE COURT:  Okay.

8          MR. SLINKARD:  So that's sort of the-- the

9   landscape in terms of the actual volume of recordings

10  that are directly applicable to the camera feeds that

11  the Court may be concerned with.  That's about as exact

12  as we can be, not having reviewed them.

13         THE COURT:  All right.  So it sounds like at

14  the very least if we just talk about DVR 5, is you say

15  three terabytes of information somebody would have to go

16  through, plus what-- I guess the other one as well.

17         MR. SLINKARD:  Each DVR-- DVR 5 and DVR 6

18  are three-terabyte drives.  I don't know if we can say--

19         MS. BOYD:  They're not necessarily full.

20         MR. SLINKARD:  -- that they're full.

21         THE COURT:  Okay.  Potentially as much as

22  six terabytes between the two, but probably not that

23  much, in other words.

24         MR. SLINKARD:  And again, it's our belief--

25  but out of an abundance of caution, we're giving them

 1  both up.  It's our belief that DVR 5 doesn't actually

 2  contain any video from any feeds within an

 3  attorney-client meeting room at CCA.

 4          THE COURT:  Okay.

 5          MR. SLINKARD:  That those would all be on 6.

 6          THE COURT:  Okay.  And what does a-- one

 7  terabyte translate into in terms of time of a

 8  video-recording, any idea?

 9          MS. BOYD:  You can't really determine that.

10  It's multiple cameras, Your Honor, so there could just

11  be just a few minutes even because of it being a room

12  that's not used very often, as opposed to the rest of

13  the rooms that are on 5 that are representative of pods

14  or whatever.

15          THE COURT:  But essentially CCA has told you

16  that they video-record all these areas in the jail 24/7.

17  And depending on the capacity of the DVR, there's a sort

18  of overwrite every 30 days, so-- or more.  So it could

19  be that maybe, at a minimum, 30 days, 24/7 recordings of

20  many areas, the entire jail, in other words.  Correct?

21          MS. BOYD:  That's my understanding.  And

22  it's also my understanding that the original literally

23  was their original.  They removed them and gave them to

24  us as is because they didn't know how to segregate

25  anything out for us specifically.  So they just gave us

1    a whole dump of everything that they had.  So then they

2    put new drives in and started over.  That was my

3    understanding.

4              THE COURT:  All right.  Which again

5    illustrates why I need to make it clear that they are

6    not to have any recordings going on in those attorney

7    rooms from this point forward.  I'll issue a written

8    order tomorrow, but somebody needs to tell them that

9    tonight.

10             MS. BRANNON:  Your Honor, may I?  Regarding

11   the other facilities in Kansas, Exhibit I think 434 by

12   Mr. Thompson, he's tried to do a survey that should give

13   the Court some indication about what the practices are.

14   I think the parties would also-- may have a proposal for

15   the perhaps scope and scale and procedure that we think

16   might be helpful to any special master.  And we'll try

17   to provide that to the Court as soon as possible.

18             We-- I will tell the Court that there have

19   been times that we have received other attorney-client

20   phone calls in discovery.  So we know that this

21   happened.  Not, you know, in this case, but in other

22   cases where that happens.  So we know they are recorded

23   and provided and we don't know how, so that would

24   certainly be part of it.

25             And we did talk to the prosecution about

1    sequestering two of these, 5 and 6.  However, Ms.

2    Rokusek points out that we really don't know what's on

3    the other videotapes.  We have an index from the

4    prosecutor.  We know what CCA-- or we don't actually

5    know what CCA says exactly.  So all six of these boxes,

6    we believe, should be preserved right now, both copies

7    turned over to the Court, until we actually know what's

8    on them.  That doesn't mean that somebody is going to

9    have to go through everything on all of them, but at

10    least until we have some verification that it does not

11    include any attorney-client communication.  There's some

12    things listed on the index we simply don't know what

13    they are.

14         So as Ms. Rokusek points out, we're really

15    not in a position to say that the other four should be

16    left with the U.S. Attorney and be disseminated to

17    everybody else.  So we would ask that be taken in.  And

18    if we could have-- get some written confirmation from

19    CCA that they no longer have these copies, I think that

20    would be helpful.

21         MS. BARNETT:  Your Honor, I might also

22    clarify that Ms. Boyd has informed me that this index,

23    although there is an exhibit presented by the defense

24    that shows metadata that this document was created,

25    actually the index itself was provided by CCA.  So CCA

1    is the one that told us that DVR 1, the camera names

2    are... and lists.  And DVR 2, and the same for all of

3    them.

4              So this isn't a matter of our office or Ms.

5    Boyd actually looking at the tapes and creating this

6    index.  CCA provided that in a file format and then Ms.

7    Boyd took that and turned that into this document from

8    their information that they provided.

9              THE COURT:  And that was back in June that

10   CCA provided the index?

11             MS. BARNETT:  When did they provide the

12   index?

13             MS. BOYD:  I would have to look, Your Honor,

14   because they gave it to me in a spreadsheet format is

15   what they did, they e-mailed it to me, so-- because we

16   asked for it.  We were in the same position, we didn't

17   know what camera was what, so we asked for that and

18   that's what they sent me.

19             THE COURT:  All right.  So we want to secure

20   all original and all copies of recordings in the Court's

21   custody at this point of all six DVR boxes.  We want

22   written assurance from CCA that they have no additional

23   copies.  And I want the United States Marshal to contact

24   all detention facilities contracted with for Kansas

25   detainees and tell them the Court has ordered no further

1    audio or video-recordings of any attorney-client visits,

2    no recordings of any attorney-client phone calls, no

3    audio or visual recordings of video-conference calls.

4    Obviously those are videoed as they go, but no

5    recordings of such.  And a further order to follow on a

6    special master.

7            What I'll ask is after today, you all advise

8    the Court within seven days whether you intend to file

9    anything else or need an additional hearing.  And if you

10   all can stipulate as to some sort of process for a

11   special master or the scope of the special master

12   review, I'd ask you to submit that to me as well, and

13   then I'll do as quickly as I can an order appointing a

14   special master.

15           All right.  Anything else we need to talk

16   about before we clear the courtroom to look at these

17   videos?

18           MS. BARNETT:  The only other thing I would

19   tell the Court is that with regard to the copies of the

20   DVRs that we had in our office, we have all six and

21   we're prepared to turn those over to the Court today.

22   We had only asked the agent to provide us with DVR 5 and

23   6.  So we will get DVRs 1 through 4 from him as soon as

24   possible and provide those to the Court as well.

25           THE COURT:  Okay.

 1              MS. BARNETT:  Nothing else, Your Honor.
 2  Thank you.
 3              THE COURT:  All right.  You're ready, Ms.
 4  Brannon?
 5              MS. BRANNON:  Yes.  I didn't know if the
 6  Court expected or wants us to stay for the Court to
 7  adjourn the hearing after viewing this or--
 8              THE COURT:  It sounded like I'll need some
 9  assistance in playing them.  And I don't know if
10  everyone needs to stay or whether Ms. Boyd and Mr.
11  Bussell can help me enough.  If they can, then everyone
12  else can leave, including the parties.
13              MS. BRANNON:  Thank you, Judge.
14              THE COURT:  Okay.  So we'll recess and I'll
15  ask Ms. Boyd and Mr. Bussell to stay.  All right.
16              MR. SLINKARD:  Judge, I guess Ms. Boyd has
17  the equipment set up.  She believes it's working.  With
18  your permission, we'll just all withdraw and leave you
19  with Ms. Rokusek and her investigator and the--
20              THE COURT:  Okay.  Thank you, Mr. Slinkard.
21              MR. SLINKARD:  And I told Bonnie the-- the
22  drives are all over there.  The white box set are the
23  originals, as I understand it, from the agents.  And we
24  only have 5 and 6 at this time.  We'll work on getting 1
25  through 4 as soon as we can.

1          THE COURT:  Okay.  And the black are the

2     copies?

3          MR. SLINKARD:  The black are the copies from

4     our office and all 1 through 6 are there.

5          THE COURT:  Okay.  Got it.  All right.

6     Thank you.

7          (The remaining proceedings are sealed and

8     will require a Court order to be transcribed).

9          (4:33 p.m., proceedings recessed).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2

3

4      I, Kelli Stewart, a Certified Shorthand Reporter and

5   the regularly appointed, qualified and acting official

6   reporter of the United States District Court for the

7   District of Kansas, do hereby certify that as such

8   official reporter, I was present at and reported in

9   machine shorthand the above and foregoing proceedings.

10      I further certify that the foregoing transcript,

11   consisting of 117 pages, is a full, true, and correct

12   reproduction of my shorthand notes as reflected by this

13   transcript.

14      SIGNED August 11, 2016.

15

16

17

18          /s/ Kelli Stewart
                                    _____

19          Kelli Stewart, CSR, RPR, CCR, RMR

20

21

22

23

24

25