## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**
  *Plaintiff,*

  **v.**                                        Case No. **16-20032-JAR**

**LORENZO BLACK,** *et al.*
  *Defendants.*

---

## FEDERAL PUBLIC DEFENDER
## PROPOSED FINDINGS OF FACT
## and
## SUPPLEMENTAL REQUEST TO EXPAND THE
## SPECIAL MASTER'S INVESTIGATION

---

The defense asks the Court to find that the District of Kansas United States Attorney's Office (USAO) and its agents:

1. knowingly recorded, maintained, and procured privileged attorney-client communication recorded at CCA-Leavenworth;

2. relied on its possession of these privileged recordings to intentionally intrude upon defense attorney-client relationships; and

3. maintained a discovery practice that permitted the unchecked collection and publication of privileged defense material.

1

The record evidence and Special Master's Reports[1] support these and more specific findings listed below, without further inquiry. Findings of fact are ultimately necessary to support legal conclusions[2] and to grant relief.[3] To further support an expanded investigation, the defense proposes the following preliminary fact-findings.[4] The basis for each finding will be set out in detail in the Proposed Findings of Fact below.

---

[1] This submission supplements previous pleadings (D.E. 220 at n. 1; D.E. 224; D.E. 229) filed after the Special Master's March 16 Report (D.E. 214).

[2] *See Shillinger v. Haworth*, 70 F.3d 1132, 1143 (10th Cir. 1995) (remanding to district court for fact-finding procedures to determine the extent of the Sixth Amendment intrusion as well as the proper remedy).

[3] The exercise of this court's supervisory powers would be appropriate even if the cases of all defendants in the *Black* case were to resolve. *See United States v. Lilly*, 810 F.3d 1205, 1218 (10th Cir. 2016) ("The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury; and finally, as a remedy designed to deter illegal conduct.") (citations omitted); *see also United States v. Pederson, et.al.*, No. 3:12-cr-00431-AA (Doc. 475) (D. Or. Aug. 4, 2014) (Supervisory Opinion issued pursuant to Court's inherent supervisory powers to address government misconduct despite the resolution of both defendants' cases through plea agreement).

[4] These facts are not essential to the Court's expansion, but do provide additional record justification. The defense will propose further fact-findings and proposed conclusions of law, including remedies, after the investigation and Reports are complete.

2

1. The USAO procured, by grand jury subpoena, more than 700 video recordings of privileged attorney-client communications.

2. SAUSA Tomasic knew when she subpoenaed 22 months of "all video footage" at CCA-Leavenworth that this would include video recordings of attorney-client meetings; further, she did nothing to except those recordings from the grand jury subpoena or take any other protective measures that would have prevented the USAO from obtaining those privileged recordings.

3. The USAO, by SAUSA Erin Tomasic and Criminal Coordinator AUSA Kim Flannigan, relied on the existence of those privileged video recordings to attempt to disqualify a defense counsel from representing her client.

4. CCA falsely denied that video of attorney-client meetings at CCA was recorded.

5. The USAO obtained recorded attorney-client phone calls from CCA, at times without a subpoena or other written record, and with no judicial determination regarding the protected status of these communications. The USAO did not notify the affected attorneys or their clients that the USAO was in possession of these privileged calls.

6. The USAO discovery policy and practice allowed SAUSA Tomasic to procure and disseminate privileged attorney-client communications.

7. CCA and Securus still do not provide reliable means of privileged attorney-client telephonic communication.

3

These proposals do not resolve all of the outstanding concerns. Factual black holes remain unilluminated. More information is needed, *and more candid cooperation from the government should be required*, before the Court develops legal conclusions and addresses the spectrum of available remedies. We ask the Court to expand the Special Master's investigation to:

1. Determine the policies and practices of the USAO discovery policies that allowed SAUSA Tomasic to procure and then disseminate recordings of privileged attorney-client communications.

2. Determine whether the USAO listened to or relied on recorded attorney-client phone calls in this case or in other investigations or prosecutions.

3. Identify past occasions when CCA or other pretrial holding facilities have provided to the Government or any law enforcement agency recordings of protected communications.

4. Determine the actual warnings and signage associated with Securus phones calls from CCA *before* the Court's Order of August 10, 2016.

5. Determine whether the USAO has taken any corrective or remedial action in response to the litigation in *U.S. v. Black*.

## Status of the Litigation

The Court has already favorably resolved many concerns that animated this litigation. The defense's initial concerns—CCA recording attorney-client communications and the government possession of those recordings[5]—have been addressed. By the Court's cease-and-desist order, federal pretrial detention facilities in Kansas and Missouri no longer record video of attorney-client meetings;[6] because those meetings are no longer recorded, the government cannot again procure those recordings; and the government cannot again threaten to use the content of those recordings to disrupt attorney-client relationships. Because the government presumably provided all attorney-client video recordings to the Special Master, who will not release the video, the defense's request to return that property is satisfied.[7] Likewise, the attorney-client phone calls collected in this case by the Court's claw-back orders have been sequestered by the Special Master and actually returned to the attorneys.

---

[5] D.E. 85 (Amended Motion for Fed. R. Cri. P. 41(g) Return of Information).

[6] D.E. 102.

[7] Several other requests for relief, such as the collection and use of other privileged phone calls, remain unresolved. *See* D.E. 220. Moreover, Rule 41(g) motions were filed in a number of other cases; this motion does not purport to comment on the status of the motions in other cases.

CCA's refusal or inability to provide secure attorney-client phone communications has been confirmed but not cured.[8] The Special Master's Reports have described in detail CCA's current audio recording function,[9] without untangling why, for example, calls that should not be recorded are still recorded. Now, though, the government is on full notice that phone recordings provided by CCA may include privileged attorney-client phone communications, and that use of Securus phones is not a waiver of confidentiality.[10]

The defense asks the Court to focus now on the government's independent wrongdoing, apart from the misconduct, ineptitude, or negligence of its agents (CCA (CoreCivic) and Securus Technologies, Inc.), in support of an expanded investigation.

---

[8] D.E. 214 (Special Master's Report Regarding Other Issues Related to Recordings at CCA-Leavenworth).

[9] Despite that detail, the Reports have not directly answered whether the audio system that was removed from CCA attorney-client meeting rooms as a result of the Court's August 10, 2016 Order had the capacity to record audio. *See* Def. Exs. 403, 405, 407, 412, 413, 417, 420, 424, 427 (photographs showing as many as four separate speakers in meeting rooms; most rooms now have one speaker, except those noted on page 8 of the March 16 Report).

[10] The extent to which the government previously obtained and used attorney-client phone recordings is still unanswered.

## Proposed Findings of Fact

Below, the defense sets forth in bold the proposed findings, followed by the factual basis and argument. The proposals focus on matters either undisputed or credibly undisputable based on record evidence.

### 1. The USAO procured, by grand jury subpoena, more than 700 video recordings of privileged attorney-client communications.

The USAO's grand jury subpoena[11] sought 22 months of video footage and actually procured, *inter alia,* video recordings of attorney-client meetings at CCA spanning some 86 days and 14,000 hours.[12] The Special Master's review of visitation logs, in conjunction with the recordings, concluded that more than 700 attorney-client visits were recorded and produced to the government.[13]

The Court has held that video recordings of attorney-client visits, even absent audio, contained privileged communication.[14] While the government continues to balk at this characterization,[15] the evidence is clear: defense

---

[11] Def. Ex. 438.

[12] D.E. 193, Report,1.31.17 at 5. Our citation conviction for the Special Master's report are "Report" followed by the date of filing and a pinpoint page citation.

[13] D.E. 193, Report 1.31.17 at 5-6.

[14] D.E. 102 at 1.

[15] D.E. 197.

attorney Richard Ney and legal ethics professor Peter Joy both testified

before this Court that confidentiality is expected in this setting; about the

significance of non-verbal communication; and how the video (even absent

audio) was an intrusion into constitutionally and ethically protected attorney-

client communication.[16]

> **2. SAUSA Tomasic knew when she subpoenaed 22 months of "all video footage" at CCA that this would include video recordings of attorney-client meetings; further, she did nothing to except those recordings from the grand jury subpoena or take any other protective measure that would have prevented the USAO from obtaining those protected recordings.**

The grand jury subpoena was issued April 12, 2016 with a May 5, 2016

return date, and was signed by SAUSA Tomasic. She asked for: "All video

footage or still images currently retained by the Corrections Corporation of

America (CCA) depicting any internal or external surveillance video or still

image taken between July 2014 and April 12, 2016 at the CCA facility in

Leavenworth, Kansas."[17] The subpoena did not exclude video footage of the

attorney-client meeting rooms. The video was produced to the government on

---

[16] Tr. 8.9.16 at 62-64; 93-96. Our citation convention for transcripts is "Tr." followed by the date of the hearing, then a pinpoint page citation.

[17] Def. Ex. 438.

May 17, 2016, and it remained in the government's possession until after the August 9, 2016 hearing.[18]

SAUSA Tomasic knew before April 12, 2016 that the attorney-client rooms were included in subpoenaed video recordings. She explained to the Court, "[t]he government had a good faith basis to believe that the CCA video-recordings contained attorney-client meetings at the time the issue—the subpoena was issued."[19]

The government may continue to quibble about whether its collection of privileged communications was intentional or knowing (SAUSA Tomasic: "[W]hat I knew and my intent are [sic] completely different")[20] and the Special Master should pursue that distinction. But the record establishes

---

[18] The government apparently continues to maintain that it never reviewed the attorney-client video during that time. The Special Master tentatively accepts this position. Report 3.16.17 at n. 24. To the extent that this tentative finding is based on the government's uncorroborated denials, the defense objects. If the Special Master has identified independent reliable corroboration, such as review of computer systems, that should be identified. We know that the government had the means to review the tapes because Agent Stokes, Ms. Rokusek, and defense investigator Michael Bussell all did so on or before August 5, 2016, after the USAO informed Ms. Rokusek that its staff members knew how to operate the software. Def. Ex. 441.

[19] Tr. 9.7.16 at 13.

[20] Tr. 9.7.16 at 137.

that the procurement was knowing, and SAUSA Tomasic's persistent statements to the contrary defy credibility. For example,

- She planned in March 2016 to record a surreptitious meeting with a confidential informant in an attorney-client room.[21]

- She had, by June 10, a chart of the cameras that included the attorney-client meeting rooms.[22]

- She told this Court at the July 21, 2016 status conference that she had video recordings of those rooms.[23]

- She and AUSA Flannigan affirmatively relied on those recordings to threaten Ms. Rokusek, as confirmed by their email.[24]

Yet, at the very same time Ms. Rokusek was in the KC USAO watching video recordings of her meetings with her client—provided to her by the USAO and at their invitation to view them—SAUSA Tomasic emailed the

---

[21] Tr. 9.7.16 at 17-18 & 20.

[22] Def. Ex. 440 (index properties reflect USAO employee Pauletta Boyd had the index as of June 10, 2016); Tr. 7.21.16 at 5 (Tomasic: "Because I communicated directly with defense counsel to let them know there is, in fact, an index. We were not provided an index from CCA and the U.S. Attorney's Office worked with the marshals service and CCA and created an index, which is available to defense counsel and I believe is being provided apart from the surveillance footage to defense counsel. So we-- we actually created the index for defense counsel, and for some time defense counsel has been aware that there is an index."); *but see* Tr. 9.7.16 (Tomasic told the Court the first time she saw the index was either August 4 or 5, 2016).

[23] Tr. 7.21.16 at 11-12.

[24] Def. Ex. 441.

Court to say she was unaware of whether these recordings existed. She repeated CCA's false denials that it created and maintained these recordings. She also has claimed her knowledge of CCA's recording capabilities came exclusively from a proffer session with a cooperating witness.

When she emailed this Court claiming ignorance, SAUSA Tomasic knew those recordings existed and knew that she had them.[25] Her hollow denials, countered by the record evidence and weakened by her own inconsistency, cannot defeat this proposed fact-finding. Her words simply defy credibility.

### 3. The USAO, by SAUSA Erin Tomasic and Criminal Coordinator AUSA Kim Flannigan, relied on the existence of those privileged video recordings to attempt to force defense counsel to withdraw from representing her client.

SAUSAs Tomasic and AUSA Flannigan intended to review, or told defense counsel that their agent intended to review (at their direction), video recordings to identify documents that defense counsel Rokusek purportedly provided to her client while meeting at CCA.  The government has not denied this.

---

[25] Tr. 8.9.16 at 137 (SAUSA Tomasic: "I was aware, based on what a cooperator said in probably a three- to five-minute conversation out of two hours or more, that CCA was likely recording attorney-client meeting rooms. And I learned that information in early March."); Tr. 7.21.16 (The Court: "And there are cameras that are identified with particular- the visitor room and attorney/client room as well, or no?" SAUSA Tomasic: "Yes. Except that there is no- there are no audio in attorney/client unless someone at CCA, an employee, took it upon themselves to turn on the audio.").

11

Regardless whether the USAO actually had any such video recording between Ms. Rokusek and her client *and* regardless of whether the USAO or its agents ever viewed these recordings, SAUSA Tomasic and AUSA Flannigan still used the existence of these videos to threaten Ms. Rokusek in an attempt to force her off the case and prevent her from representing her client. This was neither the first nor the last effort targeting Ms. Rokusek or her client.[26]

### 4. CCA falsely denied that video of attorney-client meetings at CCA was recorded.

When the FPD first learned of the purported video recordings of attorney-client meetings at CCA, we immediately contacted CCA, the USAO, and the USMS to determine whether the attorney-client meeting rooms were recorded.[27] CCA denied any video recording, a denial then perpetuated by the government:

- CCA Chief of Security told the FPD that CCA's legal visitation rooms were not subject to video recording.[28]

---

[26] The USAO had previously asserted a conflict of interest against Rokusek based upon her husband's employment during a hearing on Feb. 9, 2016 (*United States v. Rapp, et. al.*, 14-cr-20067-CM (D.E. 283)) and again during a hearing on a motion to quash on Feb. 17, 2016 (*Rapp*, D.E. 288).

[27] Def. Ex. 453 (email from Brannon to Barnett and Slinkard).

[28] Def. Ex. 434 Memo Zay Thompson, FPD Investigator; Tr. 8.9.17 at 27.

- ■ The U.S Marshal and the USAO (who just forwarded the information to the defense from the USM) perpetuated CCA denials: "there is no way to record visual or audio" in the attorney visitation rooms.[29]

- ■ Again, from the USM: "I've just spoken to CCA Warden Linda Thomas. She advised me that the video from the camera in the attorney/inmate visitation room is not recorded."[30]

- ■ This denial was then disseminated throughout the USAO; SAUSA Tomasic did not, to our knowledge, correct this information.

- ■ The USAO then repeated the denials to the courts in this and other cases.[31]

In fact, CCA had been recording video of attorney-client meeting rooms for eight years.[32]

After CCA, the USAO, and the USMS all denied that there were any recordings, the defense next learned that the recordings did actually exist. The USMS from the Western District of Missouri advised that CCA did

---

[29] Def. Ex. 443, (8.4.16 email from Barnett to the defense, quoting DUSM Troy Oberly's report from the CCA Warden).

[30] Def. Ex. 458 (email from DUSM Craig Beam to FPD Melody Brannon).

[31] Def. Ex. 445 (AUSA Tomasic August 5 email to this Court); D.E. 130 at 11 and Tr. 8.9.16 at 37.

[32] Def. Ex. 434 (Thompson Memo).

record video.[33] AUSA Tomasic and Flannigan confirmed it in their email.[34] And at the invitation of the USAO Ms. Rokusek actually watched the recordings in the USAO KCK office. This directly impeached CCA's denials. Then, and only then did the defense bring this matter to the Court's attention. The Court responded immediately by ordering the federal detainee facilities to stop all recording, video or audio, of attorney-client communications.[35]

The USAO obtained recorded attorney-client phone calls from CCA, at times without a subpoena or other written record, and with no judicial determination regarding the protected status of these communications. The USAO did not notify the affected attorneys or their clients that the USAO was in possession of these calls.

As these are just proposed fact findings, we will not respond here to the government's legal waiver arguments. However, when the government collected recorded attorney-client phone calls, it made a unilateral and secret determination that there was no privilege in those communications.

---

[33] Def. Ex. 444.

[34] Def. Ex. 441.

[35] *Cf.* D.E. 229.

The government contacted none of the affected attorneys to notify them that their calls had been recorded, collected by the government, and published to other defense attorneys and law enforcement agencies.

Instead, SAUSA Tomasic told the Court that she had encountered an attorney-client phone call on only one other occasion, involving defense attorney Richard Johnson. She pursued guidance from the Department of Justice Professional Responsibility Advisory Office (PRAO):

> MS. TOMASIC: Prior to the August 9th hearing, the only instance I knew where an agent had encountered attorney-client video—or excuse me, attorney-client recordings, audio-recordings, inmate calls, he told me, I immediately contacted our professional responsibility point of contract. He e-mailed PRAO. PRAO gave an advisory opinion. And then in further discussion with our professional responsibility point of contact, I e-mailed the attorney, let him know we had encountered them, let him know that an agent had inadvertently listened to between 10 and 15 seconds and that we did not intend to listen to them anymore. And I have in evidence— the government can admit that e-mail to the defense attorney that was sent as part of this investigation.[36]

The content of that advisory opinion has not yet been revealed. But attorney-client phone calls were collected in this case and in others.[37] Despite the

---

[36] Tr. 9.7.16 at 25.

[37] *See United States v. Martin*, 16-cr-20005-JAR. There, the government provided discovery to the FPD that included CCA recorded telephone calls between Mr. Phommasang and his attorney at that time, Branden Bell. Mr. Bell was an attorney with the firm of Brown & Ruprecht. That firm had asked CCA, in writing, to exempt its telephone number from recording. Yet these recorded calls were to the exempt number.

apparent ethical directive of the Department of Justice, here USAO never notified affected defense counsel that it had collected— whether intentionally or inadvertently, privileged or not—attorney-client phone calls. The USAO manual directs that the attorney should be notified, a point former U.S. attorney Randy Rathbun confirmed.[38] Dr. Peter Joy also testified that this is the ethical protocol.[39]

---

[38] Tr. 8.9.16 at 85-86 (Mr. Rathbun: " . . . if we ever came into—into access of attorney-client privileged information, obviously we would've notified the Court. . . . MR. REDMOND: Okay. And so-- and is that true of all attorney-client privileged communications? There's a duty to notify the Court if you come into possession of them? MR. RATHBUN: Certainly." Compare, also, U.S. Attorney Manual CRM 1-99, 37: "Overhearings of attorneys and defense counsel staff involve Sixth Amendment, rather than Fourth Amendment rights, and should be handled somewhat differently. . . . .Although there is always an obligation to make complete, voluntary disclosure to the court when an overhearing of the defense staff concerning a trial is discovered, . . . ." and "In Black v. United States, 385 U.S. 26 (1966), and O'Brien v. United States, 386 U.S. 345 (1967), the United States recognized its affirmative obligation to bring to a court's attention any overhear of which it was aware that related to the defendant's case, whether or not a demand is made for such overhearings." (in context of Title III).

[39] Tr. 8.9.16 at 96-98.

16

The Special Master's investigation has not yet reported on the USAO's past practice regarding the collection of privileged communication. As stated by Professor Joy, the ethical obligation to notify opposing counsel and take remedial protective action, is clear:

> I would say that – that a prosecutor coming into possession of these tapes and knowing that they were being done secretly would've had both an obligation to inform whoever was doing it that they should stop doing it, would have an obligation to disclose to the lawyers who had been filmed that they had been surreptitiously filmed so that those lawyers could, you know, take whatever action might be necessary to protect their client's rights.[40]

The USAO did not comply with its ethical obligation to notify counsel. This issue came to light not through the government, but through defense counsel Rokusek. And only after the Court collected the calls and the Special Master identified them were more attorneys advised that their calls, too, had been recorded.

**5. The USAO discovery policy and practice allowed SAUSA Tomasic to collect and publish privileged attorney-client communications.**

SAUSA Tomasic obtained privileged attorney-client phone communications, both by grand jury subpoena[41] and by more informal and

---

[40] Tr. 8.9.16 at 98-99.

[41] Gov. Ex. 21.

undocumented means such as phone calls to CCA.[42] It was common practice for the USMS and other law enforcement agencies to simply request CCA to provide copies of phone calls, without court supervision or authority, without subpoena, and without a written record of the request.[43]

Here, privileged attorney-client phone calls, many wholly unrelated to *United States v. Black,* were disseminated to *Black* defense counsel, the USMS, the Kansas Bureau of Investigation, the Secret Service, Johnson County Sheriff's Office, and U.S. Probation.[44]

Moreover, SAUSA Tomasic was preparing to publish, with discovery disclosure, over 700 video recordings of privileged attorney-client communications. This was described to the Court at the July 21, 2016, discovery status conference in *U.S. v. Black.*[45]

The USAO grand jury practice, evidence collection protocol, and discovery review requirements in place before August 10, 2016, authorized breach into privileged defense communications. The USAO obtained and disseminated, or

---

[42] The Special Master has not yet reported whether this is still the practice by the USAO, USMS, CCA, or Securus.

[43] Tr. 8.9.16 at 55 (Testimony of Michelle Jensen-Schubert, CCA records clerk).

[44] D.E. 113 & 117, Court's Order; Def. Ex. 452 (email from USAO to Court reporting compliance with Court's claw-back order).

[45] Tr. 7.21.16 at 8-12.

attempted to do so, privileged communications, often without a record or means to track either the procurement or disbursement. The record supports this proposed finding without further inquiry.[46]

The USAO relies on a taint team, or filter team, to cabin privileged information. A filter team acts to screen out privileged material before the attorneys prosecuting the case are exposed to it and before it is disseminated to other government agencies or in discovery. The defense laid out the general inefficacy of filter teams, in D.E. 130 at 19 & section 2.2 ("And an internal 'taint team' is just another violation of attorney-client confidentiality, serving little purpose in the law."). Here, if this internal filter team was charged with identifying and excising privileged information, it failed.

Whether the government has taken any remedial measures to prevent this incursion into privileged defense communications, again, is still unknown. Undoubtedly, if the government has taken any public responsibility to address the breach or imposed any transparent measures to prevent it from ever happening again, this would count as a "global mechanism [that would]

---

[46] *See* DOJ Ogden Memo ("To ensure that all discovery is disclosed on a timely basis, generally all potentially discoverable material within the custody or control of the prosecution team should be reviewed."), available at https://www.justice.gov/usam/criminal-resource-manual-165-guidance-prosecutors-regarding-criminal-discovery

mitigate the underlying problem of mistrust between the prosecution and defense bars,"[47] but only if made know to the defense and the public. Accountability is key to credibility. To date, both the government and the Special Master have been silent on this point.

### 6. CCA and Securus still do not provide reliable means of privileged attorney-client communication.

CCA-Leavenworth is a remote detention facility, at least 40 miles from either the Topeka or Kansas City, Kansas federal courthouses. So access to confidential telephonic communications between counsel and the person detained is critical to effective representation. Both the attorney and client must be able to initiate confidential communications.

Even after the Court's August 10, 2016 Order and CCA's effort to comply, neither CCA nor Securus can ensure that counsel and detainees have access to confidential phone communication. The latest Special Master Report confirmed that phone calls on Securus lines from CCA are still subject to recording, even if everyone involved has followed the protocol to mark the calls as private.[48] And, as noted in the Report, CCA's phone policies are now

---

[47] D.E. 214 at 29.

[48] *Id.* at 22.

internally inconsistent and markedly different than information provided to defense counsel and to the Court.[49] Today, it is unclear:

- whether counsel must notify CCA to mark a number as private;

- whether each client must independently request that attorney's number to be marked as private;

- either; or

- both.

The option of calling from CCA phones[50] within an administrative office is not confidential, as a CCA employee remains physically present during the call. [51]The Report also does not address how often this option is requested; how often detainees' requests to use CCA phones are denied; whether the detainees are still told those lines are subject to recording (regardless of whether it is true); and what restrictions or limitations are in place due to limited staffing, hours of operation, and other security concerns. CCA phone lines are not a viable substitute for Securus lines.

The Polycom teleconferencing system is also not an adequate substitute for confidential attorney-client phone communications, as only the attorney

---

[49] Report 3.16.17 at 20-22.

[50] The Report distinguishes between CCA internal phone system and Securus phones located within the pods. *Id*. at 10-11.

[51] *Id*. at 12.

can initiate the call.[52] And, again, the Report did not compare how often this one teleconferencing station within CCA is used (compared to the 121 Securus lines) or how often this option been requested; whether an attorney's request is denied or delayed because of understaffing, scheduling, lock-downs; whether this option is published to counsel; or what other restrictions might inhibit attorney-client communication. Nor did it specify whether the system was altered after these issues were raised in August 2016.[53] Polycom is not a viable substitute for routine, confidential attorney-client telephone communication.

---

[52] D.E. 214, *passim*.

[53] On the same day that the defense raised questions about the security of attorney-client communications, the Polycom system was shut down in both Topeka and Kansas City, purportedly because of technical difficulties at CCA.

## Expanded Investigation

Pending before the Court is a defense request to expand the Special Master inquiry into whether there were any grand jury violations.[54] The defense also asks, based on the most recent Special Master Report, to expand the investigation to:

1. **Determine the policies and practices of the USAO discovery policies that allowed SAUSA Tomasic to procure and then disseminate recordings of privileged attorney-client communications.**

The Court should determine whether the USAO had sufficient measures in place to guard against the collection and identification of privileged information; and, if so, why those measures failed. This should include:

- the supervision, regulation, and accountability of individual AUSAs;[55]

- the use of grand jury investigations and subpoenas;[56]

- any policy and practice of identifying, cataloging, and reviewing information before disseminating to other government agencies or to defense counsel; and

---

[54] D.E. 202; D.E. 224.

[55] Tr. 9.7.16 at 137 (TOMASIC: "And I was overwhelmed by the quantity of information before me. At this point, I was working the case alone . . . I'm a fairly new attorney.").

[56] Tr. 9.7.16 at 146 (COURT: "I think what the master needs to start with is a determination of . . . . . whether there have been any other problematic violations in terms of Rule 6(e) or other ethical considerations.").

■ reliance on in-office filter teams.

The inquiry should also determine whether the USAO had been advised by the Department of Justice Office of Professional Responsibility about how to handle possession of attorney-client communications, regardless of whether (1) possession was intentional or inadvertent and (2) the government believed the communications were privileged. If such advice was sought and obtained, the Special Master should determine whether the USAO followed that advice or otherwise adhered to the DOJ directives on reporting and handling of privileged information.

## 2. Whether the USAO listened to or relied on recorded attorney-client phone calls.

The Special Master's December 21, 2016, Report concluded that, based on an "initial, partial analysis of the audio recordings," some attorney-client phone calls should not have been recorded and, furthermore, that "the Government may have listened to some of these attorney-inmate calls."[57] That Order further notes that the Court has directed an inquiry into whether these calls were listened to. The Special Master has yet to report on this point.

---

[57] D.E. 186 Order of Production Directed to CCA, at 1.

24

### 3. Identify past occasions when CCA or other pretrial holding facilities have provided to the Government or any law enforcement agency recordings of protected communications.

The Court listed this question in its initial order appointing the Special

Master. The question remains unanswered.[58]

### 4. Determine the actual warnings and signage associated with Securus phones calls from CCA before the Court's August 10 Order.

The Report details the current signage and pre-recorded audio messages

now in place on or near the Securus phones. This is helpful to know

prospectively, but the actual signage and prerecorded messages in place

before the Court's August 10 Order are still not known. CCA stated its intent,

as relayed to Marshal Miller,  that it planned to "place signage in all inmate

housing areas by August 18, 2016 reminding inmates that they must notify

CCA when they are placing phone calls to their attorneys."[59] The information

contemporaneous to the recorded phone calls may inform the government's

waiver defense. Likewise, if CCA destroyed or did not preserve that

information, this may inform the available remedies.

---

[58] D.E. 146, Order Appointing Special Master, at 8 (listed by the Court as a possible expanded duty).

[59] Court Ex. 1 (letter from USM Miller to the Court, 8.16.16).

**5. Whether the USAO has taken any corrective or remedial action in response to the litigation in *U.S. v. Black.***

The Court ordered all relevant parties to "provide full cooperation to the Special Master, and any staff or consultant employed by the Special Master, and observe faithfully the requirements of any orders of the Court and rulings by the Special Master," and to "make readily available to the Special Master any and all individuals, information, documents, materials, programs, files, databases, services, facilities, and premises under their control . . ."[60] While praising Securus and CCA's responses as "laudably cooperative," the Report reveals that the government has only "produced *some* of the requested information."[61] There have been other unexplained anomalies regarding the government's possession and production of information to the Special Master.[62]

By the Court's authority, the Special Master should require the government's full candor and cooperation, and ultimately determine whether

---

[60] D.E. 146, Order Appointing Special Master, at 13-14. The Special Master has authority to impose noncontempt sanctions and issue subpoenas and take sworn testimony, *id.*, but has not done so, to counsel's knowledge.

[61] D.E. 214 at 2 (emphasis added).

[62] *See* D.E.193, Special Master First Report on Video Recordings, ("It is unclear when the Government obtained possession of the 31 DVD disks, which it also delivered to the Court."). Further discrepancies appear in the various reports. *Compare* Report 12.6.16, (government produced 76 CDs and 2 thumb drives containing audio files from 50 inmates) *with* Report 12.21.16 (government produced 153 CDs and 5 thumb drives containing audio files from 58 inmates).

the government complied with the Court's orders to preserve and timely provide information to the Special Master.[63] The inquiry should also determine:

- whether the USAO has internally addressed the full extent and scope of its breach into privileged information;

- whether it continues to rely on a unilateral and secret waiver determination in handling privileged information;

- whether it had or has any pre-dissemination discovery review in place, including internal filter-team procedures; and

- whether it has taken any remedial or corrective actions in grand jury or discovery policy and practice because of this litigation.[64]

The Special Master should also determine whether the USAO monitors or reviews whether and how potential conflicts of interest are identified and used as an offensive tool to gain prosecutorial advantage. Specifically, whether the conduct of SASUA Tomasic and AUSA Flannigan toward Ms. Rokusek was approved, reviewed, or supported by the United States Attorney, by written policy, or by past practice.

---

[63] D.E. 146 at 13-14.

[64] *Id.* at 6 (The Special Master's duties include "make findings and recommendations on remedial action if required.").

## Conclusion

As detailed in a separate filing,[65] this litigation has followed where the evidence led. However, significant questions remained unanswered. The defense has outlined the next logical steps that should be taken to uncover facts that have so far escaped the light of day.  The defense asks this Court to make these preliminary fact findings to frame the Special Master's further inquiry and in preparation of legal conclusions and court-ordered remedial action. The defense also asks this Court to expand the Special Master's inquiry, with a renewed specific directive for the USAO to cooperate fully.

Respectfully submitted,

s/ Melody Brannon
MELODY BRANNON #17612
Federal Public Defender
for the District of Kansas
117 SW 6th Avenue, Suite 200
Topeka, Kansas 66603-3840
Phone: 785-232-9828
Fax: 785-232-9886
Melody_Brannon@fd.org

---

[65] D.E. 229.

28

s/ Kirk C. Redmond
KIRK C. REDMOND #18914
First Assistant Federal Public Defender
for the District of Kansas
117 SW 6th Avenue, Suite 200
Topeka, Kansas 66603-3840
Phone: 785-232-9828
Fax: 785-232-9886
Kirk_Redmond@fd.org

s/ Branden A. Bell
BRANDEN A. BELL #22618
Assistant Federal Public Defender
for the District of Kansas
117 SW 6th Avenue, Suite 200
Topeka, Kansas 66603-3840
Phone: 785-232-9828
Fax: 785-232-9886
Branden_Bell@fd.org

s/ Rich Federico
RICH FEDERICO, IN# 23818-89
Staff Attorney
for the District of Kanas
117 SW 6th Avenue, Suite 200
Topeka, Kansas 66603-3840
Phone: 785-232-9828
Fax: 785-232-9886
Rich_Federico@fd.org

## CERTIFICATE OF SERVICE

I certify that on March 30, 2017, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to:

David R. Cohen
David R. Cohen Co., LPA
Special Master
david@specialmaster.law

Donald Christopher Oakley
Assistant United States Attorney
Office of the United States Attorney – Kansas City
chris.oakley@usdoj.gov

Debra L. Barnett
Criminal Chief
Assistant United States Attorney
Office of the United States Attorney – Wichita
debra.barnett@usdoj.gov

Duston J. Slinkard
Assistant United States Attorney
Office of the United States Attorney- Topeka
duston.slinkard@usdoj.gov

John Jenab
Jenab Law Firm, PA
john.jenab@gmail.com

David J. Guastello
The Guastello Law Firm, LLC
david@guastellolaw.com

Jason P. Hoffman
Hoffman & Hoffman
jphoffman@sbcglobal.net

Kathleen A. Ambrosio
Ambrosio & Ambrosio Chtd.
kaambrosio@yahoo.com

Michael M. Jackson
jacksonmm@aol.com

Cynthia M. Dodge
Cynthia M. Dodge, LLC
cindy@cdodgelaw.com

Shazzie Naseem
Berkowitz Oliver LLP - KCMO
snaseem@berkowitzoliver.com

Erin C. Thompson
Foland, Wickens, Eisfelder, Roper, Hofer, PC
ethompson@fwpclaw.com

Jacquelyn E. Rokusek
Rokusek Law, LLC
rokuseklawoffice@yahoo.com

Jonathan L. Laurans
jlaurans@msn.com

Melanie S. Morgan
Morgan Pilate LLC
mmorgan@morganpilate.com

s/ Melody Brannon
Melody Brannon

31