IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 16-20032-JAR |
| LORENZO BLACK, | ) | |
| KARL CARTER, | ) | |
| ANTHON AIONO, | ) | |
| ALICIA TACKETT, and | ) | |
| CATHERINE ROWLETTE, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

<u>MEMORANDUM AND ORDER DIRECTING PHASE III INVESTIGATION</u>

Before the Court is the March 16, 2017 Report of the Special Master (Doc. 214), to which the Federal Public Defender ("FPD") has filed a Response (Doc. 220) and Objections to Report of Special Master (Doc. 229). The FPD has also filed a related Proposed Findings of Fact and Supplemental Request to Expand the Special Master's Investigation (Doc. 230). The government has filed a consolidated Response (Doc. 237) to the FPD's filings; the FPD has filed a Reply (Doc. 240); and the government filed a Motion for Leave to File a Surreply (Doc. 247), which the Court granted (Doc. 248). The government has filed its Surreply (Doc. 250), which the Court has fully considered. The FPD has also filed a Motion to Compel Production of Grand Jury Materials to Special Master (Doc. 202), to which the government has filed a Response in opposition (Doc. 218), and the FPD a Reply (Doc. 224). Also pending are numerous related

motions for relief filed by Defendants in this case[1] and in other cases assigned to the undersigned, as well as by defendants in cases assigned to other judges in the District of Kansas.

## I.    Procedural History

On May 4, 2016,  the Grand Jury returned an Indictment charging the Defendants with various crimes stemming from their alleged involvement in a conspiracy to smuggle and distribute contraband inside the Corrections Corporation of America, now known as Core Civic (referred to as "CCA" in this Order), Detention Center in Leavenworth, Kansas.  On July 21, 2016, this Court held a discovery and status conference in this case.[2]   On August 5, 2016, the FPD filed a Motion for Fed. R. Crim. P. 41(g) and a Motion for Access to Visitation Rooms at CCA, based on information and belief that the government was in possession of video recordings of the attorney client conference rooms at CCA that intruded into the privileged, confidential communications of attorneys and clients housed at CCA.

The Court conducted an emergency hearing on these motions (and numerous motions to join or intervene)  on August 9, hearing evidence presented by the FPD and various Defendants. Based on the evidence presented at the hearing, the FPD and the government agreed that the Court should appoint a special master, though the FPD and government disagreed about the scope of the special master's investigation.  In short, the FPD urged a special master investigation of how and why these video recordings had been made, how and why these recordings were in the possession of the government, and whether the government had viewed

---

[1]Docs. 82, 85.

[2]The Court had previously entered an Order designating this a complex case under the Speedy Trial Act. Doc. 64.

the recordings or otherwise engaged in misconduct violative of the parties' attorney-client privilege and Sixth Amendment rights. The government wanted the special master's work to be limited to acting as a taint team or privilege master, culling the video recordings of attorney-client conferences from the video recordings of all other recorded activity throughout the CCA facility.

On August 10, this Court ordered the government to produce all originals and copies of video recordings of attorney-client communications in its possession or in the possession of law enforcement agencies.[3] The Court further ordered CCA to immediately cease and desist from recording of attorney-client communications inside the detention facility, attorney client phone calls and attorney-client video conference calls.[4] The Court later ordered CCA to produce to the United States Marshals Service ("USMS") any and all video recordings of attorney-client conference rooms for the time period May 1, 2016 through the date of production.[5]

On August 16, 2016, the Court held a second evidentiary hearing on these matters. The government did not offer evidence at the August 9 or August 16 hearings. In fact, the government attorneys of record in this case at that time did not appear at the August 9 or August 16 hearings to answer the Court's and parties' many questions about video and audio recordings of attorney client communications.[6] Thus, the Court scheduled a third evidentiary hearing for

---

[3]Doc. 102.

[4]The Court also ordered all detention facilities in Kansas and Missouri housing defendants charged in the District of Kansas to cease and desist recording. Doc. 102.

[5]Doc. 114.

[6]The August 9 hearing focused upon video recordings; at the August 16 hearing, the FPD and other defense counsel presented evidence that attorney-client phone calls at CCA had been audio recorded.

September 7, 2016, this time ordering the attorneys of record, Special Assistant United States

Attorney ("SAUSA")[7] Erin Tomasic  and Assistant United States Attorney ("AUSA") Chris

Oakley to appear, and further ordering AUSA Kim Flannigan to appear, as the evidence

suggested that Flannigan had personal knowledge with respect to some of the events in this

matter.

After the September 7 hearing, based on the record developed in the three evidentiary

hearings, and informed by the parties' flurry of submissions, the Court entered an order[8] on

October 11 appointing David R. Cohen as Special Master in this case.  The Court ordered Mr.

Cohen to conduct an investigation into matters related to the government having obtained video

recordings of attorney-client meetings at CCA, and audio recordings of telephone calls from

CCA inmates to their attorneys.   The Special Master has since conducted an extensive

investigation, interviewed dozens of affected or knowledgeable people, ordered the preservation

and/or production of various types of evidence, and filed status reports to this Court,[9] completing

what the Court has denominated as Phase I and Phase II of the investigation.[10]

Both Phase I and Phase II of the Special Master's investigation were within the scope of

the investigation to which the government consented.  And, the Special Master's fees and

expenses for Phase I and II were paid by the Department of Justice.

---

[7]A SAUSA is a Special Assistant United States Attorney appointed for a certain term of service and detailed to a United States Attorney's Office ("USAO") or the Department of Justice.

[8]Doc. 146.

[9]Docs. 176, 177, 182, 183, 186, 187, 193, 214.

[10]The Court expanded the investigation into Phase II matters in a Minute Order on November 16, 2016 (Doc. 179).

## II.     Scope of Phase III of Special Master investigation

In his March 16, 2017 Status Report, the Special Master made certain findings of fact, including tentative findings, and recommended that the Court authorize him to proceed with a third phase of the investigation.[11]  The FPD objects in part to the Status Report, in particular to certain tentative findings made by the Special Master, and the FPD further urges a broader scope of future investigation than the Special Master recommends.  The government apparently does not object to some components of the Special Master's findings of fact, but expressly objects to others; and the government expressly objects to some, but not all of the FPD's requests for further investigation.  The Court has considered all of these filings.  Of course the Special Master's findings of fact, whether final or tentative, are not the findings of the Court unless the Court adopts them.  In fact, the Court is charged to do a *de novo* review of the Special Master's findings.

Moreover, the Court had commenced an investigation before appointing the Special Master, conducting three evidentiary hearings.  The Court makes a number of findings of fact in this Order, informed by the evidentiary record before the Special Master was appointed and informed by the Special Master's extensive investigation.  Based on the Court's findings of fact, it now authorizes a Phase III investigation by the Special Master.

While this order will detail the parameters of Phase III of the investigation, in short, the Court directs the Special Master to investigate the actions and conduct of the government, the USAO attorneys and staff, and the participating investigative agencies (hereinafter, collectively

---

[11]Doc. 214.

the "government"), in procuring, obtaining and perhaps using video and audio recordings of attorney-client meetings and phone calls at CCA. While Phases I and II focused on CCA and its contractor Securus,[12] to determine how the recording systems worked in design and practice, and to determine the scope of recordings made and the scope of recordings produced to the government, Phase III will focus on the government itself. In Phase III, the Court directs the Special Master to investigate whether or not the government intentionally and purposefully procured and obtained recordings of attorney-client communications, and whether intentionally, or not, the government listened, viewed and/or used such recordings. This investigation is necessary to the Court's analysis of whether there were violations of the attorney-client privilege, prejudice to the affected clients, and Sixth Amendment violations. And, if the Court concludes there were any such violations or any such government misconduct, the Phase III investigation will inform the Court's decision about appropriate relief and remedies.

To be clear, the Phase III investigation will focus on the government's conduct relative to all recordings it obtained in connection with the CCA investigation. There are grave concerns about government intrusion into attorney-client communications, spawning motions filed not only by the defendants in this case, but by CCA inmates charged in other cases in this court. SAUSA Tomasic stated that the CCA investigation continues, and that as many as 95 persons inside and outside the walls of CCA may be implicated and ultimately charged. Thus, other CCA inmates may also be affected by these matters. Although the investigation focuses on the defendants in this case and the defendants with pending motions for relief in other cases, the

---

[12]Securus is the third-party contractor that owns and administers the pay phone system installed at CCA that allows inmates to place outgoing phone calls.

Special Master's Phase III investigation will focus on all of the recordings procured and obtained by the government in connection with this case, including defendants in this case, defendants in other cases who have moved for relief, and CCA inmates who are subjects or targets of the ongoing CCA investigation.

While this Order expands and directs the Special Master's duties in going forward with a Phase III investigation, this Order does not otherwise modify the Court's Appointment Order,[13] including those portions of the Appointment Order that: (1) set forth the Rule 53(b)(2)[14] authority for the appointment; (2) detail the Special Master's "Complementary Duties;" (3) direct the parameters of the Special Master's "Communications with the Parties and the Court;" (4) pertain to the "Special Master's Record;" (5) pertain to the Court's "Review of the Special Master's Rulings;" (6) require that "All Relevant Parties" provide full cooperation to the Special Master;  and (7) require "All Relevant Parties" to provide the Special Master with "Access to Information."

With respect to the Special Master's compensation, this Order does not modify the "Compensation" section of the Court's Appointment Order *except* that for all Phase III investigation, the ***government will not bear the cost***; rather, the Special Master's compensation shall be paid by Timothy J. O'Brien, the Clerk of Court, up to $350,000.00,  from funds appropriated for this specific purpose.

## III.     Phase III Investigation will not Include Certain Fully Investigated Matters

---

[13]Doc. 146.

[14]Fed. R. Civ. P. 53(b)(2).

The Special Master's investigation to date, which has primarily focused upon CCA and Securus' actions relative to video and audio recording of attorney-client communications, has put to rest some concerns about the privacy of attorney-client communications. The investigation has shown that attorney-client communications over the video conferencing equipment installed at CCA have not been compromised and will not be compromised in the future. The video conferencing equipment has never had monitoring or recording capability. As the Special Master's report details, although there is a panic button system currently installed in the attorney-client conference rooms, that system does not allow for audio or video recording in those rooms.

Further, pursuant to this Court's cease and desist order, all video cameras have been removed from the attorney-client conference rooms at CCA.[15] Thus, attorney-client communications in those rooms are no longer video recorded; and there never was audio recording of communications in those conference rooms. And, pursuant to this Court's order, all video recordings of attorney-client conference rooms have been impounded by the Court; the government thus has no access to past video recordings.

Furthermore, although CCA personnel have an intercom system throughout the CCA facility, that system has no recording capability and is not used to monitor conversations. And, although there are separate intercom systems in the attorney-client conference rooms, making it theoretically possible for CCA guards to monitor conversations, there is no practical way for CCA personnel to monitor live conversations given the scope of their duties, which include

---

[15]They were also removed from the attorney-client conference rooms in all county jails in Kansas that currently house detainees charged in the District of Kansas.

visually monitoring the entire facility (except for attorney-client conference rooms), and granting visitors and CCA personnel ingress and egress to areas of the facility. Further, as the Special Master report details, if the guard in the main lobby attempted to monitor live conversations, this would be within earshot of visitors and everyone else passing through the main access point of the facility. No one interviewed by the Special Master indicated that such live monitoring had ever occurred.

Thus, the Court concludes that there is no need for further investigation concerning the audio or video recording systems in the attorney-client conference rooms. Nor is there any need for further investigation of the video conferencing system.

But, as the Special Master's reports detail and as this Order further details, the problems with the Securus system employed by CCA to audio record inmates' outgoing phone calls have not been addressed. The evidence to date demonstrates that despite the procedures CCA has employed in the past, attorney-client telephone calls are still recorded. CCA has inadequate procedures to apprise inmates and instruct attorneys how to arrange for their calls to not be recorded. Moreover, even when phone numbers are input into the Securus system as "Private" numbers, meaning numbers that should not be recorded, at times the system nonetheless records telephone calls placed to those numbers. The Phase III investigation will inform the Court's determination of the appropriate prospective remedies for these problems.

Moreover, the Phase III investigation must focus on two key questions about the conduct of the USAO: (1) has the government listened to audio recordings of any attorney-client telephone calls of defendants charged in this case, defendants in other cases who have filed

9

motions for relief, or CCA inmates who are subjects or targets of the ongoing investigation?; and (2) has the government viewed any video recordings of communications in the attorney-client conference rooms at CCA of any of the above described defendants or inmates? The Phase III investigation will allow the Court to fashion individual and/or global remedies to address any and all intrusions into privileged attorney-client communications, and any and all corresponding violations of the Sixth Amendment rights of defendants.[16]

## IV.     Audio Recordings

After the Court conducted the emergency hearing on August 9, on August 15, the FPD filed a Motion for Court to Impound Additional Government Evidence, namely audio recordings of certain inmates' phone calls that included calls between those inmates and their attorneys.[17] The government did not bring to the Court's attention that there were audio recordings of attorney-client calls; the FPD did.[18]

At the August 16 hearing, the FPD and defendants presented evidence about audio recordings. The government, appearing by AUSA Debra Barnett (not by the prosecutors

---

[16]As the Tenth Circuit stated in *Schillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995), "[A]prosecutor's intentional intrusion into the attorney-client relationship constitutes a direct interference with the Sixth Amendment rights of a defendant, and because a fair adversary proceeding is a fundamental right secured by the Sixth and Fourteenth Amendments, we believe that absent a countervailing state interest, such an intrusion must constitute a per se violation of the Sixth Amendment. In other words, we hold that when the state becomes privy to confidential communications because of its purposeful intrusion into the attorney-client relationship and lacks a legitimate justification for doing so, a prejudicial effect on the reliability of the trial process must be presumed. In adopting this rule, we conclude that no other standard can adequately deter this sort of misconduct. We also note that prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost." *Id.*

[17]Doc. 105.

[18]*See Black v. United States*, 385 U.S. 26 (1966) and *O'Brien v. United States*, 386 U.S. 345 (1967) (explaining that United States has an affirmative obligation to bring to the court's attention any overhearing of attorney-client communications, whether or not the defendant demands such).

assigned to this case at that time), responded that it did not know how the government came into possession of these audio recordings.  In fact, the government provided no explanation until SAUSA Tomasic addressed the matter in a brief she filed on September 6, and answered the Court's questions during the September 7 hearing.  Based on this evidentiary record, and based on the evidence developed by the Special Master in Phases I and II of his investigation, the Court makes the following findings of fact concerning the audio recordings.

### Findings of Fact Concerning Audio Recordings and Directives to Special Master

The Grand Jury issued a subpoena to CCA dated March 28, 2016 for production of all "inmate recorded calls" for twelve named inmates[19] for the time period from July 1, 2014 "until notified recorded calls are no longer needed."  The subpoena further directed CCA to conduct reverse searches of all CCA-Leavenworth inmate calls for certain numbers listed in the subpoena and to provide copies of all recorded conversations associated with those numbers from July 1, 2014 until notified these recorded calls are no longer required.  Later, at the request of the USMS, CCA supplemented its production with audio recordings for the entire time period of the identified detainees' custody at CCA.  To date, the investigation has revealed that CCA-Leavenworth has produced audio recordings of telephone calls dating back to at least 2011.

But it is unclear whether the USMS's request was documented in an email or other writing.  In Phase III, the Special Master will investigate who requested the USMS to obtain these additional audio recordings, when the request was made, and what were the parameters

---

[19]The subpoena is admitted under seal because it names these 12 inmates, some of whom are still under investigation; an unsealed, redacted form of the subpoena with the inmate names excised is also admitted into evidence.  Def. Ex. 438.

(including the names and dates of the caller or recipient of the call) of such request. The Special Master will further investigate when the government became aware of the audio recordings of attorney client calls, and what actions it took in response to that knowledge.

By the time of the August 16 evidentiary hearing, the government had provided all Defendants in this case, as well as some defendants in unrelated cases,[20] with audio recordings of inmate telephone calls from CCA. These audio recordings included some attorney-client phone calls. In producing audio recordings of phone calls, the government did not advise the defendants that there were audio recordings of attorneys and their clients. The Court subsequently issued a clawback order directing the government to gather and surrender to the Court all audio recordings in its possession, in the possession of investigative agencies, and in the possession of other defendants who had received them in discovery.

At the August 16 hearing, Michael Jackson, counsel for Defendant Cathleen Rowlette, presented evidence that he received discovery that included audio recordings of phone calls of nine different CCA inmates and their respective attorneys. Jackson explained that the audio recordings were produced in a format that allowed one to search for calls by inputting the last four digits of a particular attorney's phone number. Jackson input the last four digits of the phone numbers of several defense counsel whose phone numbers he knew, and thereby retrieved attorney-client phone calls of the aforementioned nine inmates. One of these inmates' phone calls dated back to 2011.

---

[20]The government represented that the defendants in other cases were provided with this discovery because it was relevant to sentencing issues in those defendants' cases.

It is unclear when the government became aware that the CCA audio recordings included recordings of attorney-client telephone calls.  At the September 7 hearing, SAUSA Tomasic stated that in January 2016 she had learned from Secret Service Agent Stokes that he had inadvertently listened to an attorney-client phone call.[21]  Tomasic offered that,

> the only instance I knew where an agent had encountered attorney-client video—or excuse me attorney-client recordings, audio-recordings, inmate calls, he told me, I immediately contacted our professional responsibility point of contact.  He emailed PRAO.  PRAO gave an advisory opinion...I emailed the attorney, let him know we had encountered them, let him know that an agent had inadvertently listened to between 10 and 15 seconds and that we did not intend to listen to them anymore.[22]

In response to the PRAO advisory opinion, the government took the following steps.  Agent Stokes advised CCA about the recording, in an email on January 22, 2016.[23]  Tomasic notified the affected attorney, Rick Johnson, by email on  January 22 as well.  Moreover, Tomasic acknowledged that after learning this from Agent Stokes, she spoke with other agents working on this investigation, who advised her that they had also encountered some additional attorney-client calls, but that they did not listen to them and had "minimized immediately."[24]

While notifying Rick Johnson and CCA, Tomasic admittedly never informed the defendants in this case, nor the Court, because she assumed that it was "an exceptional

---

[21]Sept. 7, 2016, Hr'g Tr., Doc. 135, at 30–31.

[22]*Id.* at  25.

[23]*Id.* at  32.

[24]*Id.* at 46.

circumstance."[25]   Notably, in managing the CCA investigation, Tomasic organized a "taint team" comprised of IRS agents and an AUSA in the Topeka division of the USAO, to review various materials seized from CCA, determine whether there were attorney-client privileged materials, and segregate and withhold those privileged materials from Tomasic and the other attorneys of record in this case.  Tomasic anticipated using the taint team to review materials on the computers seized from the CCA law library, as well as materials seized from inmates' cells during the execution of a search warrant at CCA.  But inexplicably, she did not employ the taint team to review recorded telephone calls after she became aware of the instances described above.[26]  Instead, Tomasic proceeded to disseminate the audio recordings indiscriminately to all Defendants in this case.

Tomasic further stated at the September 7 hearing that her management of the CCA investigation and her judgment was impaired by her lack of experience and exceptional family circumstances.  This was a complex and wide-ranging investigation.  The Court finds it surprising that Tomasic, a relatively inexperienced prosecutor, was the lead attorney on this case, rather than a more senior AUSA.  At the same time, Tomasic was aware that there were audio recordings of some attorney-client conversations included in the audio recordings from CCA, yet she did not take steps to further investigate this, nor to submit the recordings to the taint team.

Moreover, despite the earlier PRAO opinion, at some point in this case, the government made the unilateral decision that the audio-recordings of attorney client telephone calls in this

---

[25]*Id.* at 50–51.

[26]The Court recognizes that the FPD takes the position that employing a taint team would not cure a privilege violation or a Sixth Amendment violation with respect to audio recordings of attorney-client telephone conversations.  The Court does not rule upon this legal issue at this time.

investigation were *not* privileged; and they made the decision to neither notify the Court nor the Defendants nor affected CCA inmates that they were in possession of such recordings. That, in fact, is the litigation posture the government has taken in this case, that the attorney-client telephone calls are not privileged.[27]  The government essentially argues that the inmates waived any privilege, because when an inmate places a phone call on the Securus pay telephones at CCA, they hear a pre-recorded warning that all calls are recorded or monitored. According to the government, this warning, coupled with signage on and around the Securus phones, placed the inmates on notice that their calls were recorded, and constituted a waiver of their attorney-client privilege.

The fact that the government takes this litigation posture, coupled with the fact that the government unilaterally decided the telephone calls were not privileged, and did so without notice to the Court or the parties, leads this Court to direct the Special Master to conduct a Phase

---

[27]Relying upon *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977),  the government argues that intrusions into the attorney-client relationship are not per se violations. *Weatherford* illustrates the weakness in the government's argument, for in *Weatherford* there was no evidence that the informant, who was present during two attorney-client meetings, had conveyed information about defense strategy to the government. *Id.* There, the court had the ability to isolate what meetings and communications were had between the attorney and client, had the ability to determine whether the informant even communicated these to the prosecution, and given the stage of the proceeding, had the ability to conclude that none of the information gleaned was used at trial. Here, the Court operates in an environment of many unknowns.  What communications if any did the government listen to?  For there is no intermediary, such as an informant or undercover agent, who can testify that they did or did not share information with the government.  Here the attorney-client communications were recorded, indicating that if the government listened, it may have heard the entire communication, not just an account of the communication by an ear-witness informant.  Moreover, here, if the government listened to the recordings, they may have listened pre-indictment and used the information to foster their ongoing investigation of the detainee or other, as yet unindicted targets of the ongoing investigation.  Or, the government may have listened post-indictment and used the information to further their ongoing pre-trial investigation, or used the information tactically in their plea negotiations, if any, with the indicted detainee.  In other words, under the circumstances in this case, there is a real and likely possibility of prejudice *if* the government listened to recorded attorney-client phone calls and/or watched recorded attorney-client visits, under the four-factor test for prejudice in *Weatherford*:  (1) whether the government purposely intruded into the attorney-client relationship; (2) whether any evidence offered at trial was obtained directly or indirectly from the intrusion; (3) whether the prosecutor obtained any details of the defendant's trial preparation or defense strategy; and (4) whether overheard conversations had been used in any other way to the substantial detriment of the defendant.  *Id.* at 552–57.

III investigation into the government's conduct concerning these audio recordings.   While the

Court does not rule in this Order upon the issues of privilege, waiver, and Sixth Amendment

violations, the Court notes that any waiver must be done knowingly and intelligently.[28]

Furthermore, based on the evidentiary record developed thus far, there are serious

questions about whether any or all inmates waived their attorney-client privilege knowingly and

intelligently.  In that regard, the Court finds that CCA employed a procedure to inform inmates

how to shield their attorney-client calls from monitoring or recording.   At the time a person is

first taken into custody at CCA, or within a few days of arrival, they receive a thirty-page inmate

handbook[29] and a counseling session reviewing substantial information, including information

about their right to private communications with their attorneys.   The inmates are required to

sign a form acknowledging that they have been advised that

> Corrections Corporation of America reserves the authority to monitor (this
> includes recording) conversations on any telephone located within its institutions,
> said monitoring to be done to preserve the security and orderly management of
> the institution and to protect the public.  An inmate's use of institutional
> telephones constitutes consent to this monitoring.  A properly placed phone call to
> an attorney is not monitored.  You must contact your unit team to request an
> unmonitored call.[30]

---

[28]*Patterson v. Illinois*, 487 U.S. 285, 292 (1988) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)) ("In the past, this Court has held that a waiver of the Sixth Amendment right to counsel is valid only when it reflects 'an intentional relinquishment or abandonment of a known right or privilege.'"); *see United States v. Ary*, 518 F.3d 775 (10th Cir. 2008) (explaining that attorney-client privilege is waived when disclosure of communication is voluntary).

[29] Gov. Ex. 2.

[30]Gov. Ex. 11 is a sample of these signed acknowledgement forms.

Despite this language, if an inmate contacts their unit team to request an unmonitored call, CCA allows them to place the call from their counselor or unit team's office, but only in the presence of the counselor or unit team leader.  In other words, their call is not private, it is monitored.

In fact, the only way attorney-client calls are *not* recorded or monitored is if the inmate places the call from one of the 121 Securus pay phones installed at CCA, *and* all calls to that attorney's phone number have previously been designated as "private" within the Securus system.  And the only way calls are designated as private, is if the inmate's attorney has initiated the CCA phone call procedure.  The procedure requires that an inmate's attorney, and no one else, initiates this "private" designation by faxing a letter to CCA, on the attorney's letterhead, directing CCA to block all calls to the attorney at the phone number(s) identified in the letter. Upon receipt of such a letter,  CCA personnel input the attorney's phone number(s) into the Securus system  such that all calls placed from Securus phones at the CCA-Leavenworth location[31] to that attorney's phone number(s) are rendered private and are not recorded by the Securus system.

But this procedure is inadequate for several reasons.   First, the only notice or explanation of the procedure is buried in the inmate handbook, provided to inmates at the time of their admission.[32]  CCA does not inform attorneys of the procedure, yet CCA requires that the

---

[31]As the Special Master found, if an attorney's phone number is input into the Securus system at CCA-Leavenworth, that will not result in that phone number being treated as "private" at other jails or detention facilities serviced by the Securus company.

[32]The handbook states, "Your attorney may request of our facility that calls to their office not be recorded to ensure Attorney/Client privilege.  They may request this by way of sending CCA/LDC a fax on their office letterhead.  This request must include contact information and signature.  They may fax it to (913)727-2231. **IT IS YOUR RESPONSIBILITY TO ENSURE THAT YOUR ATTORNEY IS AWARE OF THIS PROCEDURE: THEIR TELEPHONE CALLS ARE SUBJECT TO BEING RECORDED IF THEY DO NOT REQUEST**

17

attorney initiate the procedure.   The thirty-page inmate handbook covers a lot of information,

including information about visitation, and personal safety, as well as the many rules and

regulations inmates must abide by to avoid disciplinary action.  It is not surprising that someone

newly detained, someone lacking the legal education to fully  understand their rights, and

someone who is absorbing a volume of information all at once, might not remember to convey to

their attorney, the need for the attorney to initiate the phone call procedure.  Indeed, some of

those newly detained inmates may not yet have an attorney, may not know the name of their

attorney and likely have not yet met with their attorney.  And, one can imagine the concerns that

might eclipse the inmate's focus at their first or next meetings with their attorney—can they get

bond, what are the charges, what are the penalties, how soon will they see the evidence and how

long it might be before trial.

   CCA provides no other notice to inmates, other than the information in the inmate

handbook and the acknowledgment form.  To be sure, there are signs on and near the Securus

phones that warn that all calls are monitored or recorded; but there are no signs on or near the

Securus phones that provide further notice or instruction about the CCA phone call procedure.

There is also a prerecorded message at the beginning of some outgoing calls that advises the

inmate that their call is being recorded or monitored.  But, as the Special Master's report details,

it is unclear whether this message is never played for calls that have been duly designated as

"private;" it is unclear whether this message is always played for calls that have not been

designated as "private," and it is unclear what message is played when the call has been

---

**THAT THEY BE RESTRICTED."**  Gov. Ex. 2.

designated as "private" but the Securus system fails to block recording of that particular call.
Furthermore, there is no indication in the inmate handbook, nor on the signage on or near the
Securus phones, that if the inmate hears the prerecorded message it means their call will be
recorded, but if they do not hear a prerecorded message it means their call will not be recorded.

Moreover, even if an inmate remembers and understands the importance of taking
affirmative action to protect their attorney client communications, an inmate cannot initiate the
phone call procedure; only their attorneys can initiate it. Inmates are not allowed to provide to
CCA their attorney's name and phone number at the time of the intake and orientation, nor at
any time thereafter.[33]

Further, despite touting their policy to protect attorney-client communications, CCA
does not post this phone call procedure on its website or otherwise communicate this procedure
to inmates' attorneys.[34] This surely explains the many affidavits of seasoned, experienced,
highly competent counsel, who are members of the Court's selective panel of court-appointed
lawyers, who aver that they were never aware of CCA's procedure for blocking calls to

_____

[33]Undoubtedly in response to this Court's Orders and this ongoing investigation, in early 2017
CCA-Leavenworth amended its procedures to now provide to detainees an "Attorney Verification Form," on which
they can list their attorneys' names, addresses, and telephone numbers. The Form explains: "Attorney telephone calls
can be placed through the inmate telephone system. Telephone calls between inmates and their attorneys are
privileged and should not be recorded or monitored. To ensure attorney telephone calls placed on the inmate
telephones in the units are not recorded and monitored, inmates must submit all attorney telephone numbers for
authorization. The attorney information will be verified for accuracy. If the attorney telephone number is verified as
a valid attorney, the attorney telephone number will be marked within the inmate telephone system as 'privileged/do
not record.'" As the Special Master found, it is unclear to what extent the newer "Attorney Verification Form"
procedure supercedes the requirements set out in the Inmate Handbook. Furthermore, this procedure still places the
onus on the detainee to advise their attorney of the procedure.

[34]Attorneys routinely visit their clients at CCA and CCA should at least then, if not before, notify and
instruct attorneys about the phone call procedure. CCA could easily accomplish this by providing clear and obvious
notice on CCA's website, by posting signs in the attorney client conference rooms, and by posting signs, and/or
providing written instructions as well as the "Attorney Verification" form at the time the attorney signs the visitation
log at CCA. Doc. 214 at 21–23.

attorneys, and who gave credence to CCA's website and published policies that tout its commitment to protect Sixth Amendment rights.   Other attorneys stated that although they were not aware of CCA's phone call procedure, out of an abundance of caution, they notified CCA by letter that they wanted their numbers blocked.

The inadequacy of CCA's notice and instruction on its phone call procedure is demonstrated by the Special Master's analysis of how many phone numbers have been designated as "private" in the Securus system at CCA-Leavenworth.  CCA maintains a list of only 528 "private" attorney phone numbers, although there are approximately 18,500 attorney phone numbers identified for attorneys practicing in the areas (Kansas, Missouri and Nebraska) where federal detainees at CCA are under prosecution.  In other words, only a small fraction of attorney phone numbers are designated as private and blocked from recording by the Securus system at CCA-Leavenworth.  This suggests that CCA's phone procedure has not been adequately communicated to inmates or their attorneys.  This raises a serious question as to whether there was any knowing and intelligent waiver of attorney-client privilege.

As troubling is the fact that the Securus system has not blocked phone calls to all numbers that attorneys have duly designated as private through the CCA phone procedure.  Both anecdotal evidence and the Special Master's analysis demonstrates that the Securus system has failed to block recording of calls to all "private" numbers.  Gary Hart, an experienced CJA panel attorney in this Court, submitted an affidavit detailing how he had followed CCA's phone procedure.  He not only submitted an initial letter to CCA identifying his phone numbers that should be designated as private, Hart also followed up with annual letters to CCA confirming the same.  Nonetheless, the Securus system recorded calls from Hart's clients at CCA.  Hart

20

subpoenaed from Securus recordings from January 1, 2000 to the present. Securus provided Hart with Call Detail Reports for 2005–2007 and 2009–2013 that included numerous recordings of attorney-client calls placed by his client, Domingo Uriarte. The Call Detail Report evidenced that calls from Uriarte to Hart were recorded as were calls from Uriarte to two attorneys who had previously represented him, Assistant Federal Public Defender Tom Bartee, and attorney Tricia Bath. Bartee understood that no calls to FPD attorneys were recorded by Securus. And Tricia Bath, like Hart, had duly followed the CCA phone procedure.

The Special Master's investigation further revealed that Securus' recording of inmate calls designated as "private" is not a rare occurrence. For the time period from November 26, 2012 to December 15, 2016, in connection with the CCA investigation, the government obtained audio recordings of 182,084 inmate outgoing phone calls from the 121 Securus pay telephones installed at CCA. Of those recorded calls, more than 700 were calls from inmates to their attorneys. And of those more than 700 calls, 188 were calls from inmates to attorney phone numbers that had been duly designated as "private" in the Securus system. Neither Securus nor CCA have explained how or why this happened.[35]

This evidence informs the Court's finding that the operational and systemic issues with CCA's procedure and Securus's system have not been cured at this time. The evidence also suggests that even for those attorneys who have now followed CCA's phone procedure, their earlier recorded calls have not been erased by the Securus system, and are still accessible to the

---

[35]Of the 188 calls, 134 were deemed "inmate status change calls," 17 were to numbers designated as "private for all," and 37 were inexplicably to numbers designated as private for only "inmate subgroups." As the Special Master's report explains, Securus and CCA have not explained why these private calls were classified in this manner. *Id.* at 21–23.

government.  Absent clear evidence that these problems are cured, this Court will fashion prospective relief that recognizes that attorney-client phone calls are likely still being recorded.

Moreover, while the Phase III investigation will not focus on the actions of CCA or Securus, CCA's procedures, and the deficiencies in the Securus system, informs the Court's decision that a Phase III investigation of the government's conduct is warranted.  The evidence suggests that a significant number of attorney-client calls have been recorded, and given the government's practice of obtaining inmates' phone calls in this, and in other investigations, there are serious concerns about whether the government has at least inadvertently, if not intentionally, obtained attorney-client phone calls in this investigation and in other cases in which defendants have moved for relief.  Needless to say, there are concerns about whether the government has listened to any attorney-client phone calls.  Even though the audio recordings in this case have been impounded by the Court, the defendants in this case are understandably concerned that the government listened to those recordings before impoundment.

The government's denials that it listened to any attorney-client phone calls does not obviate the need for a Phase III investigation into their conduct.  To be sure, with respect to the audio recordings, the government's conduct has encouraged such suspicion.  Before the Special Master was appointed, the government was not forthcoming about how it procured all of the audio recordings in its possession, for some of the recordings were subpoenaed, some were not.  And, the government's litigating posture, as well as its past practices in obtaining jail calls, has fueled other defendants' suspicion that the government has listened to their audio recordings as well.

The Phase III investigation will further focus on whether the government's conduct in obtaining attorney-client calls was intentional and purposeful, or inadvertent and unintentional. Although any intrusion into attorney-client communications is of grave concern, the government's intent or lack of intent will inform the Court as to the type and extent of appropriate remedial action the Court will order.   Thus, the Court directs the Special Master to investigate the intent of the USAO's attorneys and staff as well as the intent of investigative agents.[36]

The Court also directs the Special Master to investigate how the government used the information, if at all.  Did the government use any such information in its investigative strategy, in its charging decisions, in its litigation posture on bond, or in defending motions filed by the defendant?  Did the government obtain information, directly or indirectly, that it has or could use at trial, in plea negotiations, or in any other way?

Here, the ways a defendant is potentially prejudiced are too numerous to catalogue.  But, examples of the types of information the government might glean says it all: admissions, confessions, inculpatory evidence, exculpatory evidence, defense witnesses, alibis, defense strategy, attorney advice on sentencing, attorney mental impressions on strengths and weaknesses of evidence, and negotiating strategy and posture.

## V.    Video Recordings

---

[36]For example, there is a question as to who, what, when and how certain calls were "selected" for downloading in the Securus system and provided to the government.

Based on the evidence presented before the Court appointed the Special Master, and based on the evidence the Special Master gathered during Phases I and II of his investigation, the Court makes the following findings of fact concerning the video recordings. Based on the evidence gathered to date, there is evidence suggesting that the government procured, viewed and used video recordings of an attorney-client meeting of at least one CCA inmate, Richard Dertinger. This justifies a Phase III investigation into the government's use of video recordings of Dertinger's attorney-client meetings, as well as the government's procurement and use, if any, of any other video recordings of attorney-client meetings.

At the conclusion of the August 9 hearing, the Court viewed *in camera*, a video recording of a meeting between inmate Richard Dertinger and his attorney, Jacqueline Rokusek, in one of the attorney-client conference rooms at CCA-Leavenworth. In viewing this recording, the Court could easily observe non-verbal communications, including the communicants' use of their hands, fingers, and other body language. Communication, needless to say, can be verbal and non-verbal; and non-verbal communication is at times highly communicative and easily subject to understanding through observation.

As several witnesses testified at the August 9 hearing, non-verbal communication can provide an observer a wealth of information about the communicants. Is their relationship strong, positive, collaborative, collegial? Or is their communication troubled, tense, unproductive? In the context of representation in a criminal case, non-verbal communication might include the inmate re-enacting an event, such as a shooting, for the benefit of the attorney's understanding. Non-verbal communication might include the attorney and/or inmate using a map or a schematic to illustrate where something happened. Non-verbal communication

24

might also include an inmate pointing to photographs or otherwise identifying places or participants in an activity. For this reason, all communication, verbal and non-verbal, falls within the ambit of privileged, confidential attorney-client communications.

Moreover, non-verbal communication between the inmate and investigators or other professionals retained by the defense may be highly communicative. These same attorney-client rooms at CCA are utilized by defense investigators, psychologists, and polygraphers retained by the defense. Non-verbal communication between an inmate, his or her counsel, and/or psychologists retained to evaluate him or her, might be highly communicative about the inmate's competence and state of mind. Non-verbal communication between a polygrapher, who typically first interviews the inmate to ferret out admissions and/or confessions, might be highly communicative. And, one observing a video recording of a polygrapher using a polygraph machine might well be able to ascertain the results of the polygraph. All of these examples illustrate that confidential non-verbal communications between an inmate and the defense team must be protected just as much as verbal communications.

### Findings of Fact Concerning Video Recordings and Directives to Special Master

As the following findings of fact detail, there is evidence that the government has demonstrated a lack of transparency to the Court and counsel about its possession, knowledge and use of video recordings. The government has made inconsistent, inaccurate or misleading statements to the Court about the video recordings. There is also a troubling development that may constitute either an intentional or an inadvertent spoliation of evidence concerning the video recordings. Thus, based on the following findings of fact the Court concludes that the Phase III

investigation should include an investigation into the conduct of the USAO attorneys and staff, and into investigative agencies concerning their procurement, knowledge, and use of video recordings of attorney-client communications in the conference rooms at CCA-Leavenworth.

**Government's Lack of Transparency**

The subject of video recording of attorney-client conference rooms at CCA-Leavenworth first arose during the July 21 discovery conference conducted by the Court. At that hearing, the government did not mention the reality or even possibility that there were video recordings of the attorney-client conference rooms. Instead, in the midst of the government speaking about having obtained voluminous video surveillance footage from video cameras stationed throughout the CCA facility, the Court posed this question, "[A]nd there are cameras that are identified with particular—the visitor room and the attorney/client room as well, or no?"[37]  SAUSA Tomasic responded, "Yes. Except that there is no—there are no audio in attorney/client unless someone at CCA, an employee, took it upon themselves to turn on the audio. But I don't believe it's recorded. It's just that it would allow a particular CCA employee to listen in without recording if—if the employee believes something was afoot that he needed to be aware of."[38]

During the July 21 hearing, Tomasic offered no further explanation or information about video cameras or video recording in the attorney-client conference rooms. Yet, she later claimed, in a brief filed on September 6 and orally during a hearing on September 7, that she had placed this Court and counsel on notice during the July 21 hearing that there was video recording

---

[37]July 21, 2016, Hr'g Tr., Doc. 75, at 11.

[38]*Id.* at 11–12.

of the attorney-client conference rooms.[39]  As the above-quoted colloquy demonstrates, Tomasic instead stressed that there was only monitoring, not recording, of the attorney client rooms;  she certainly did not clearly express that there was video recording in the rooms.

Moreover, Tomasic did not share with the Court or counsel during the July 21 hearing, other information she had about video recording of attorney-client rooms at CCA.  Just four months earlier, in March 2016, Tomasic now acknowledges that she had learned from a cooperating individual detained at CCA that there were video cameras that recorded the attorney-client conference rooms.  Tomasic found this information so significant that she explored the possibility of conducting a controlled buy of controlled substances inside one of the attorney client conference rooms.[40]  Although Tomasic decided not to conduct a controlled buy in an attorney-client conference room, she gave the cooperating individual's information sufficient credence to at least consider conducting a controlled buy in March or April of 2016. But Tomasic did not mention this at the July 21 hearing.   Nor did Tomasic mention that on April 12, 2016, within a few weeks after receiving this information from the cooperating individual, she drafted a broad grand jury subpoena for "all video footage or still images

---

[39]Doc. 133 at 12 ("During the status hearing on July 21st when SAUSA Tomasic publicly stated to the Court that the 18 terabytes of surveillance footage received from CCA contained recordings of attorney-client meeting rooms and visitation rooms . . ."); *Id.* at 13 ("On July 21, 2016, SAUSA Tomasic stated to the Court, the FPD, Ms. Rokusek, and all parties in this case that the government had the recordings."); Sept. 7, 2016, Hr'g Tr., Doc. 135, at 21–22 (testimony of SAUSA Tomasic that she "made a clear representation" to the Court at the July 21, 2016, hearing "[t]hat the government–that the CCA video-recordings included attorney-client video-recordings based on what the cooperator had told me").

[40]In law enforcement parlance, a controlled buy is a law enforcement sponsored purchase of a controlled substance by a cooperating individual.  The buy is controlled in the sense that law enforcement is able to audio and/or video record the transaction,  which allows law enforcement to ensure that the putative seller in fact supplied the controlled substance to the cooperating individual; and if law enforcement is able to simultaneously audio and or video monitor the transaction, it allows them to provide some measure of security to the cooperating individual during the transaction as well.

currently retained by Corrections Corporation of America (CCA) depicting any internal or external surveillance video or still image taken between July 2014 and April 12, 2016 at the CCA facility in Leavenworth, Kansas." This subpoena did not expressly exclude video footage of attorney-client rooms. Tomasic stated that by then she had forgotten about what the cooperating individual said, not recalling it until the Court raised the question during the July 21 hearing.

On the other hand, by the time of the July 21 hearing, Tomasic had access to other information that there were in fact video recordings of attorney client rooms. In response to the April 12 subpoena, on May 17 CCA produced voluminous video recordings from the entire facility, including the attorney-client rooms.[41] CCA produced the recordings on six hard drives, each with a three-terrabyte capacity. Each of the six hard drives was produced in a separate box. Two of the six boxes were clearly labeled, "[m]ay contain attorney/client material." While the United States Secret Service took initial custody of the video recordings on May 17, it provided a copy of six hard drives to the USAO on June 1 and on June 6 advised the USAO what equipment it would need to play the recordings. Further, although the video recordings were voluminous, on June 10, CCA produced an index to the six hard drives[42] which itemized the location situs of each of the six hard drives. This one-page index clearly identified that included on DVR #5 was the "Low Custody Attorney" room and included on DVR #6 were seven attorney rooms. Tomasic did not share any of this information during the July 21 hearing.

---

[41]Even before CCA produced the video recordings, apparently based on information from CCA, Tomasic was emailing defense counsel to advise that they needed to procure sufficient DVR drives to store the 18 terrabytes of information that comprised the video recordings from CCA. Gov. Ex. 8.

[42]Def. Ex. 439.

During the September 7 hearing, Tomasic described being overwhelmed by the scope and complexity of the CCA investigation. The Court does not doubt that, particularly given that Tomasic was a relatively inexperienced prosecutor, hired for a term as a SAUSA, who seemingly handled the CCA investigation alone, although by the time the charges were filed, other AUSAs were counsel of record. It is possible that Tomasic, who had the foresight to assemble a taint team for review of seized computers and materials seized from inmate cells, did not have the foresight to assemble a taint team to review the video recordings, and particularly the video recordings on DVR #5 and DVR #6, which the index clearly identified as including recordings of attorney-client rooms.[43]

At the same time, lack of foresight or not, Tomasic's actions during and after the July 21 hearing, and the actions of other AUSAs who represented the government in the August 9, August 16, and September 7 hearings, demonstrated a troubling lack of transparency about the government's knowledge, procurement, and use of the video recordings.

The government did not advise the Court that there were video recordings; the FPD and defense counsel Jacqueline Rokusek did. This prompted the Court to conduct an emergency hearing on August 9, followed by a second evidentiary hearing on August 16. The government was not forthcoming with information at either hearing, for SAUSA Tomasic, the lead prosecutor on this case who had the most information about the video recordings,[44] did not appear at either hearing. Instead, the government was represented by USAO Criminal Chief,

---

[43]As previously discussed, Tomasic also failed to use the taint team to review the audio recordings despite the PRAO opinion.

[44]Tomasic also had the most information about the audio recordings, which first came to light during the August 9 hearing.

AUSA Debra Barnett,  as well as by other AUSAs who had no personal knowledge of the video and audio recordings and thus had little substantive information to offer at either hearing. Frustrated by the government's failure to answer the Court's questions, the Court scheduled an evidentiary hearing on September 7, specifically ordering that Tomasic and others with personal knowledge appear to answer the Court's questions.  The night before the September 7 hearing, Tomasic filed an extensive brief; and the brief as well as Tomasic's colloquy with the Court at the September 7 hearing was the first time the government offered direct answers to the Court's many questions.

This lack of transparency, coupled with the actions of Tomasic, AUSA Kim Flannigan and others in the interim between July 21 and September 6, as more fully detailed below, warrant a Phase III investigation into the government's knowledge, procurement, intent and use concerning the video recordings.

### Inconsistent, Inaccurate, or Misleading Statements

In addition to the lack of transparency described above, the government has offered a number of inconsistent, inaccurate, or misleading statements about their knowledge of the existence of the video recordings and whether they viewed or otherwise used any of the video recordings.  These statements have clouded the issues, as has the government's lack of transparency, thereby warranting a  Phase III investigation.

First, with respect to the government's knowledge of the existence of the video recordings, at the July 21 hearing, SAUSA Tomasic stated that the attorney-client rooms had cameras but stressed that there was no recording, only monitoring.  She did not advise the Court

30

of the information she had learned from a cooperating individual, nor advise the Court that CCA

had produced six hard drives of video recordings in boxes, two of which bore a label "[m]ay

contain attorney/client material," as well as a one-page index that clearly showed that there were

recordings of attorney-client rooms.   Yet Tomasic later characterized her July 21 colloquy with

the Court as placing the Court and counsel on notice that there were video recordings.[45]

Regardless of Tomasic's assertion that she placed the Court on notice of the video

recordings at the July 21 hearing, by August 5 Tomasic was no longer representing that she had

placed the Court and counsel on notice of the existence of the video recordings.  Rather, on

August 5 Tomasic sent an email to the Court and counsel claiming that she was uncertain

whether there were video recordings of the attorney-client rooms.  Tomasic's email stated in

pertinent part,

> Since our status hearing in *US v. Black* (16-20032-JAR) on July 21, 2016, two
> issues have arisen that need to be addressed with the parties and the Court:
>
>        ...      ...      ...      ...      ...
>
>  2)   During the hearing, the Court asked, "And there are cameras that are
> identified with particular—the visitor room and the attorney/client room as well,
> or no?"  Counsel for the government responded, "Yes.  Except that there is
> no—there are no audio in attorney/client unless someone at CCA, an employee,
> took it upon themselves to turn on the audio.  But I don't believe it's recorded.
> It's just that it would allow a particular CCA employee to listen in without
> recording if—if the employee believes something was afoot that he needed to be
> aware of."  At the time of the hearing, counsel for the government believed that
> CCA's system operated in that manner based on descriptions provided by a
> cooperating inmate and his attorney during the course of the investigation.

---

[45]Tomasic further asserted in the September 6 brief, that "[n]o one in the courtroom asked for clarification following this statement by SAUSA Tomasic regarding the video recordings available from CCA," suggesting that she had placed the Court and counsel on notice, and that their lack of clarity was because of their failure to further inquire of Tomasic during the July 21 hearing.  Doc. 133 at 12–13.

Since the hearing, defense counsel has expressed concerns that the government may be in possession of video footage of attorney/client interactions at CCA, and that footage may contain privileged communications. In response to those concerns, USAO supervisors reached out to the Warden of CCA via the US Marshals Service. The Warden provided the following information:

"In visitation rooms, where attorneys meet with their clients, there is a button (I will call it the panic button) that can be pushed in order to contact "control" if there is an issue and the attorney or client needs help from prison personnel. If the panic button is activated, there is a camera in the visitation room that "control" can activate to see what is going on in the room. There is no recording function associated with this camera or the panic button. To be more clear, there is no way to record visual or audio with this camera. So, if someone is assaulted in the visitation room, the contact will not be captured on video."

Defense counsel has concerns that CCA's former surveillance system, which was in place prior to the new Warden's tenure, may have captured video and/or audio recordings in attorney/client rooms. As such, one defense attorney requested in writing that counsel for the government, nor any party acting on the government's behalf, view any attorney/client footage provided by CCA until the issue is resolved. Counsel for the government agreed that no one acting on behalf of the government will view the footage until the matter is resolved. This same defense attorney is beginning review of the CCA surveillance footage today.

Thus, the government is not certain at this point whether any of the surveillance footage turned over by CCA in response to a subpoena by the government issued in *US v. Black* contains video footage of the attorney/client rooms, but, based on the Warden's statements, counsel for the government now believes the information provided by the cooperator was incorrect. Further, because the government has agreed not to review that footage, this matter will not be resolved until defense counsel has completed their review of the surveillance footage.

If, in fact, the government is not in possession of any surveillance footage in the attorney/client rooms, then the government will resume its review of the surveillance footage and any concerns by defense counsel should be alleviated. If, however, the government is in possession of such footage, counsel for the government intends to coordinate with defense counsel to identify whether use of a taint team to review any such footage would alleviate their concerns. I apologize for my misunderstandings, and I hope these matters can be resolved quickly to move this case along in an efficient manner.[46]

---

[46]Def. Ex. 445 at 2–3.

Similarly, the day before, on August 4, AUSA Deb Barnett, who was not personally involved in the CCA investigation, responded to an email from FPD, advising that a deputy United States Marshal had learned from CCA's warden that the cameras in the attorney-client rooms are activated by a panic button, but there is no audio or video recording of the attorney-client rooms.

Despite Tomasic's expressions of uncertainty in the August 5 email, from late July through August 5, Tomasic and AUSA Kim Flannigan had engaged in multiple conversations with Jacqueline Rokusek in which they discussed the existence of video recordings. Rokusek represented CCA inmate Richard Dertinger in an unrelated case filed in this Court. Beginning in late July, Tomasic and Flannigan, the attorneys of record in the Dertinger case, started calling Rokusek to set up a meeting. They finally reached Rokusek on August 2 and demanded that she present herself to the USAO to discuss a matter they would not discuss with her by phone. So, Rokusek met with Tomasic and Flannigan on August 2 in the USAO.

According to Rokusek's testimony, in the August 2 meeting, Tomasic and Flannigan told her that they were holding the meeting instead of filing a motion for Rokusek to withdraw from representing Dertinger. They represented that based on information they had, they knew Rokusek had a conflict of interest in representing Dertinger. Tomasic told Rokusek that she knew that Rokusek had perceived that some of Tomasic's actions in the past were intended to conflict Rokusek off of the Dertinger case, such as when she alleged Rokusek's attorney fee had

been improper.[47]  Tomasic then accused Rokusek of improperly distributing protected

discovery[48] to Dertinger and suggested that Rokusek seek an opinion from the Kansas

disciplinary administrator.  According to Rokusek, Flannigan stated that they had a case agent

who was reviewing attorney-client meetings from CCA to determine whether this document had

been provided to Dertinger, and so far the agent had seen Rokusek walking down the hall, but he

was continuing to review the videos.

     Rokusek attempted to view the videos on August 4, but could not view them because

USAO Litigation Support Specialist Pauletta Boyd was not available.  Rokusek did view the

videos on August 5, with the assistance of Pauletta Boyd, who showed Rokusek how to open the

videos on Boyd's computer, demonstrating how to input a date and time to find a particular

meeting and also demonstrating how the split screen function would allow Rokusek to view

multiple attorney-client rooms at once.   Rokusek, armed with information about the dates and

times of her meetings with Dertinger, attempted to find the video of their meeting, as Tomasic

and Flannigan had suggested.  In the process, Rokusek inadvertently opened multiple windows

at one point that exposed her to video recordings of attorney-client meetings between other

attorneys and inmates.

     The fact that on August 2, 3, and 4, Tomasic and/or Flannigan discussed Rokusek

viewing video recordings and the fact that on August 5 at approximately 2:30 p.m. Rokusek was

---

[47]Indeed, from the Court's review of the Richard Dertinger docket sheet and filings, Case No. 14-cr-20067-CM-6, Tomasic and Flannigan, who are co-counsel on the Dertinger case, attempted, to no avail,  to force Rokusek's withdrawal with an alleged conflict of interest based on Rokusek's husband being a deputy Johnson County sheriff. They next sought, to no avail, to investigate her for the attorney fee Dertinger paid her during the two months she was retained counsel before she was appointed to represent Dertinger.

[48]Aug. 9, 2017, Hr'g Tr., Doc. 104, at 34–35.

viewing a video recording of her attorney-client meeting with Dertinger illustrates a number of

misrepresentations or inconsistencies in Tomasic's August 5 email to the Court and counsel in

this case.  In fact, *while* Rokusek, at Tomasic's bidding, was in the USAO's office viewing

video recordings, Tomasic transmitted the above-quoted email at 2:57 p.m. on August 5.[49]

Notably, Tomasic's email to Court and counsel begins by quoting what Tomasic said during the

July 21 hearing, then explains that on July 21 she believed that CCA's system operated in the

manner she had described, i.e., without recording video of attorney-client communications.

Tomasic went on to say that since the July 21 hearing, "defense counsel" has expressed concerns

about video footage of privileged attorney/client interactions, and in response "USAO

supervisors reached out to the Warden of CCA" and learned that there is "no recording function"

associated with the cameras or panic buttons in the attorney client rooms.  Tomasic went on to

state that the "government is not certain at this point" whether the CCA surveillance footage

contains any footage of attorney-client rooms.[50]  Tomasic also notes that the same defense

counsel who had expressed concerns about video recording, "is beginning review of the CCA

surveillance footage today," and that the government had agreed not to review the footage until

the defense counsel had completed their review and the matter was resolved.

Tomasic's email represents that she is uncertain whether video recordings exist, and

suggests that it was an (unnamed) defense counsel who first raised the issue of the existence of

video recordings.  Tomasic's email leaves the impression that the defense counsel was

investigating to see whether video recordings existed, at the initiation of the defense counsel.

---

[49]Def. Ex. 445.

[50]Def. Ex. 445 at 3.

Tomasic's email omits that she and AUSA Flannigan demanded that this defense counsel come view the videos as evidence that the defense counsel had improperly shared discovery with her client.

The Court recognizes that the government's version of the conversations between Rokusek, Tomasic and Flannigan is quite inconsistent with Rokusek's version.[51]  Rokusek's version is that Tomasic and/or Flannigan told her that the agent was reviewing videos of attorney-client meetings to find the meeting where Rokusek allegedly provided discovery to her client.  The government's version, which Tomasic offered in her September 6 brief, is that she and Flannigan merely told Rokusek that the agent was viewing the videos to see what Dertinger's actions were *outside of the attorney-client rooms* and in his residential pod, after his meeting with Rokusek.  Tomasic's brief further asserts that she and Flannigan neglected to tell Rokusek that the agent would not view the videos but would immediately turn them over to a taint team.

These highly disputed versions of the critical events warrant a Phase III investigation. For if Rokusek's version is correct, then it is clear that government counsel have made misrepresentations to the Court, have acted with a lack of transparency and candor, and have, at least through their investigative agent, viewed a recording of Rokusek and Dertinger.  If the government's version is correct, the government has not engaged in misconduct and has not viewed any video recording of Rokusek and Dertinger.  Resolving these controverted facts is

---

[51]Consistent with its avoidance and lack of transparency on this issue, the Court did not learn the government's version until Tomasic's September 6 brief, and her explanatory statements during the September 7 hearing.  In contrast, Rokusek's version was offered by sworn affidavit as well as testimony.

critical not only to the question of whether the government intruded on Rokusek and Dertinger's attorney-client communication by watching a recording of the same, but may be relevant to the concerns of the defendants in this case and in other cases in the District of Kansas that there has been a similar intrusion on their attorney-client communications.

The Court directs the Special Master to investigate the credibility of these two versions of the events, particularly in the light of other credible evidence.  Among the many questions to be explored are these.  If Tomasic and Flannigan did not know about the existence of video recordings, why would they demand that Rokusek view video recordings as proof that she handed certain documents to Dertinger?  Why did Flannigan suggest to Rokusek that there was urgency in Rokusek viewing the videos?   If the agent was not going to view the videos but was going to turn them over to a taint team, why was that not already accomplished, given that: Tomasic had information from a cooperator that there were video cameras in the attorney-client rooms; the videos were in boxes, two of which were labeled "[m]ay contain attorney/client material;" the USAO had received a one-page index showing attorney-client rooms were included on two of the six hard drives; and on August 5, the USAO litigation support specialist, Pauletta Boyd, directed Rokusek to the recordings of the attorney-client rooms?

Further, if Tomasic and Flannigan's version of the events is accurate, why on August  3 did Rokusek tell the FPD that there were video recordings of the attorney-client rooms, prompting the FPD to contact USAO management in an email at 10:36 p.m. on August 3? Moreover, if Tomasic and Flannigan's version of the events is accurate, what explains their response to Rokusek's August 3 email to them?

On August 3, Rokusek emailed Tomasic and Flannigan and asked to view the video before making a decision on how to proceed with the case.  Rokusek's email stated, "[y]ou mentioned that you were reviewing video of my visits with [my client] at CCA. I would like an opportunity to review the same video footage . . . ."[52]  Neither Tomasic nor Flannigan challenged Rokusek's statement that they told her they were reviewing video of her visits with her client. Instead, Tomasic replied that the videos were available for Rokusek's viewing, and that "the agent looking through the video for your visits said he has locate the time/date of your visits but has not paired those dates up to the video yet.  That agent is on vacation this week and is preparing for a hearing next week.  If you want him to pull the video for you, it might take a while, but we are willing to do so."[53]  In a separate email Flannigan responded, urging Rokusek to come soon to "try to find the video" before a deadline in some other case.[54]  In Tomasic and Flannigan's responses to Rokusek's August 3 email, there was no mention of a taint team, and no denial that the government was going to view the video of Rokusek's meeting with her client.

**Spoliation of Evidence**

Did the government view video recordings of any attorney-client communications at CCA?  This is one of the critical questions raised by defendants in this case and by movants in other cases.  As detailed above, the Phase III investigation will focus on this and related questions, as the evidence suggests that there is a good-faith basis for suspicion and concern that

---

[52]Def. Ex. 441.

[53]*Id.*

[54]*Id.*

the government has viewed and/or used video recordings, not only of Richard Dertinger, but of others.

But there is yet another reason justifying a Phase III investigation into the government's conduct. As detailed above, when CCA produced six hard drives of video recordings of its entire facility, the Secret Service quickly advised the USAO of the software it would need to play the videos. The USAO procured the necessary software, and its litigation support specialist, Pauletta Boyd, possessed the computer and the knowledge to run the software necessary to play the videos. This is evidenced by the fact that Rokusek was not able to view the videos on August 4 because Pauletta Boyd was out of the office. And on August 5, when Rokusek viewed the videos, it was Pauletta Boyd who showed her how to use the computer and software and who directed her to the hard drive(s) that included video recordings of the attorney-client rooms. Boyd showed Rokusek how to input a date and time to pinpoint recordings made at the time Rokusek believed she was visiting with Dertinger.

On August 10, the Court issued a cease and desist order to CCA, ordering CCA to not video record the attorney-client rooms and further ordering CCA to produce originals and all copies of video recordings within the scope of the grand jury subpoena. The Court followed with an order on August 18 that directed CCA to produce all video recordings made after the time period of the grand jury subpoena, that is from May 1, 2016 to August 18, 2016. The USAO took possession of the recordings and delivered them to the Court on or about August 25; the Court then impounded the recordings.

At the September 7 hearing, the government advised that it was going to commence a cyclical replacement of all hard drives for personal and laptop computers for its attorneys and staff throughout the District of Kansas.  The Court orally ordered the government to produce all hard drives, for personal and laptop computers assigned to attorneys and staff in the Kansas City, Kansas division of the USAO.  The government advised at the hearing that all hard drives had been removed, labeled and secured.  The Court ordered the government to retain and preserve all of the hard drives as well as all of the hardware necessary to access the information on the hard drives.  Although the Court was not explicit, its order necessarily included the computer that was regularly used by Pauletta Boyd and was dedicated to playing the video recordings that Rokusek accessed on August 5.

After his appointment, the Special Master directed the USAO to produce all of the hard drives and necessary hardware for his inspection and analysis.  The USAO responded that it was able to produce all of the hardware except for one computer, that is, the very computer used by Pauletta Boyd to play the video recordings.  That computer had not been preserved.  Instead, its hard drive had been wiped clean.  Needless to say, this precluded the Special Master from examining and analyzing the one computer that could have provided meta data and information revelatory of when video recordings were played, perhaps by whom, and perhaps what video recordings were played.  This critical evidence has been destroyed despite the Court's order on September 7.   While the Court has no evidence that this happened intentionally or inadvertently, the fact that it happened serves as one more basis for a Phase III investigation into the government's conduct.

## VI.    Culture of Distrust

The Special Master's report voiced how the revelation that the government had obtained video and audio recordings of attorney-client communications was a "spark [that] lit a flame" of contentiousness between the USAO and the defense bar and demands by the defense bar for investigation.[55]  Indeed, from this Court's observations and experiences, and the observations and experiences of the other judges on this Court, there has been a long-simmering culture of distrust occasioned by the prosecutorial practices of several prosecutors in the Kansas City, Kansas division of the USAO.   The FPD objects to the Special Master's characterization that the discord and mistrust is borne out of mutual conduct, and argues that it is borne out of the unilateral conduct of some prosecutors in the USAO.

While this Court is certainly not privy to all of the behaviors the defense bar complained to the Special Master about, it is essential that prosecutors comport themselves with the civility and professionalism that all attorneys are expected to adhere to.  In fact, prosecutors are expected to adhere to even higher standards.  As the Supreme Court long ago recognized in *Berger v. United States*,[56]

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor–indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to

---

[55]Doc. 214 at 25.

[56]295 U.S. 78 (1935).

41

refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.[57]

Indeed, the power and grave responsibilities society places on those who investigate and prosecute others is quite high, and must be tempered with the highest standards of professionalism and civility. In the Court's view, the defense bar's negative perceptions are not unfounded with respect to the practices of some, and probably a minority, of prosecutors. For example, the Court recently adopted a new criminal pretrial order, designed to encourage reasonably early and reasonably complete discovery. The new criminal pretrial order was the product of a lengthy, collaborative bench-bar project to address repeated complaints from the defense bar about late disclosure of *Brady* and *Giglio* materials, complaints about "protected discovery" practices,[58] and prosecutors' practice of encouraging defendants to plead early, with more favorable plea agreements, before the defendant has the benefit of a strong bargaining position informed by having access to discovery materials. Notably, the long-standing prosecutorial discovery practices addressed by the PTO are the genesis of much of the discord

---

[57]*Id.* at 88.

[58]Protected discovery refers to a number of discovery practices followed by some of the prosectors in the USAO. Some discovery documents can only be viewed by defense counsel within the confines of the USAO. This means defendants who are detained never see those documents. Defense counsel are not allowed to make copies, but can only take notes in order to share information about the content of these documents with their clients. Defense counsel may be allowed to possess some discovery documents, but may never leave those documents with their detained clients. Still other documents may be possessed by defendants and/or defense counsel, but only in redacted form, such that the defense cannot identify the witness who has made inculpatory statements about the defendant. These protected discovery practices are most often used to "protect" proffer statements from cooperating individuals. Needless to say, these proffer statements are sometimes the most inculpatory evidence against the defendant. Yet the custodial defendant is expected to trust and rely on their defense counsel to deliver a summary of the proffer statement to them, from the counsel's memory or notes. Often the identity of the cooperator is redacted until shortly before trial as well, so that a defendant does not know until shortly before trial *who* is making these inculpatory statements about him. If the defendant pleads, the defendant may *never* know who inculpated him. This is a practice about which this Court has expressed great reservation. So has the Tenth Circuit. *See United States v. Woods*, -- F. App'x --, No. 15-3304, 2016 WL 3457754, at *3 (10th Cir. June 23, 2016) (Holmes, J., concurring).

and mistrust the Special Master recognized after interviewing many defense counsel who practice in the Kansas City division of this Court.

## VII.  Conclusion

The focus of this Court's attention at this time is to direct the Special Master to turn his investigation in a different direction.  The Special Master's investigation has focused on the conduct, process and procedures of CCA and Securus, in an effort to determine how audio and video recordings were made and then accessed by the government.  The investigation has also focused on culling privileged from non-privileged evidence for purposes of the CCA investigation.  The investigation has further focused on how the Court might fashion an order that prospectively cures any problems, that is, precludes the audio and/or video recording of attorney-client conversations in the future.  To be clear, there remains a problem that is as yet not addressed by CCA and Securus.  CCA needs to establish a better procedure to provide detainees and their attorneys with clear, easily-received notice of how to ensure their calls are not recorded.  And CCA needs to work with Securus to ensure the system *always* blocks recording of calls to numbers marked private, and gives clear notice to attorneys and detainees whether their call is or is not being recorded, and identifies detainees' calls to attorneys that were recorded.

As the FPD posits, the Special Master's investigation has not focused on the government's conduct.  This Order directs a Phase III investigation of the government's knowledge and intent, the government's procurement of the recordings, and whether the

43

government listened to, watched, or otherwise used the audio and video recordings of attorney-client communications.

The Court recognizes that no matter the outcome of this investigation, and no matter the outcome of this Court's de novo review of the Special Master's future reports and this Court's own findings and conclusions, the long-simmering culture of distrust may not cool upon the filing of this Court's final order. If the Court ultimately finds that the government has engaged in misconduct, or has wilfully violated detainees' Sixth Amendment rights, the Court will issue a remedial order. But curative action will have to occur in the USAO and may need to go beyond the bounds of what this Court may properly order. If the Court ultimately finds that the government has not engaged in misconduct, or if the Court finds that the investigation is inconclusive, there may still be a need for remedial and curative action.

The Court is aware that United States Attorney Tom Beall has advised the Special Master that he has already made some procedural changes that address some of the issues raised in this investigation. The Court or the Special Master will detail any internal changes the USAO has or will make in a later order. The Court trusts that Mr. Beall and his upper management have been and will continue to demonstrate their commitment to curing problems that preceded the CCA investigation and problems that arose during it as well.

Furthermore, no matter the outcome of the investigation, the Court has in mind certain steps it will take that will hopefully encourage a cultural change, and hopefully restore, particularly in the Kansas City  division, an environment of mutually earned respect, understanding, trust and even appreciation, of the critical and admirable roles that defense

44

counsel and prosecutors both play in our exemplary and well-respected system of criminal justice.

## VIII.    Order: Scope of Phase III Investigation and Compensation

The Court ORDERS the Special Master to conduct a Phase III investigation, including:

(1)    Determine how and when the USAO and investigative agencies (and which individual prosecutors, USAO staff and/or investigative agents) came into possession of audio and video recordings of attorney-client communications of defendants in this case, inmate targets and subjects of the CCA investigation, and defendants with pending motions for relief in the District of Kansas based on allegations of such;

(2)    Determine whether the USAO and investigative agencies (and which individual prosecutors, USAO staff and/or investigative agents) watched video recordings of attorney-client communications at CCA-Leavenworth or any other detention facilities housing the defendants in this case, targets and subjects of the CCA investigation, and defendants with pending motions for relief in the District of Kansas based allegations of such;

(3)    Determine whether the USAO and investigative agencies (including individual prosecutors, USAO staff and/or investigative agents) purposefully, intentionally, unintentionally or inadvertently,  procured, obtained, relied upon, used in any manner, and/or disseminated to anyone, video and/or audio recordings of attorney client communications as described above, or attempted to do so;

(4)     Determine whether and how the USAO and investigative agencies (including individual prosecutors, USAO staff and/or investigative agents) used or attempted to use the substance of attorney-client communications in any investigation, grand jury proceeding, or litigation, regardless of whether the use or attempted use was disclosed to the Court or to the parties;

(5)     Determine whether the USAO and investigative agencies (including individual prosecutors, USAO staff and/or investigative agents) interfered or attempted to interfere with a defendant's attorney-client relationship, such as investigating or seeking forfeiture of attorney fees or alleging conflicts of interest.

(6)     Identify, by using visitation logs and other facility records, the attorneys and clients who met during the time span covered by the audio and/or video recordings that are the subject of the Special Master's investigation;

(7)     Identify, by using Securus and CCA records, and other evidence, the attorneys and clients who communicated by phone during the time span covered by the audio and/or video recordings that are the subject of the Special Master's investigation;

(8)     Direct Securus and/or CCA to cease any routine purging of inmate calls until further order of the Court;

(9)     Inspect and copy files, documents, communication, and electronic data of any pretrial holding facility, the USMS, and the government as necessary to complete the above duties;

46

(10)    Report to the Court the identity of parties affected by any breaches of privilege, confidence, constitutional rights, statutory rights, or ethical obligations, and recommend available remedies, in this case or others, if appropriate; and

(11)    Determine what remedial measures, if any, have been taken and/or planned by the USAO in the District of Kansas  and/or investigative agencies to address the inadvertent, unintentional, purposeful, and/or intentional procurement, dissemination and/or use in any manner of video and/or audio recordings of attorney-client communications in any investigations and/or cases now and prospectively

IT IS FURTHER ORDERED, that while this Order expands and directs the Special Master's duties in going forward with a Phase III investigation, this Order does not otherwise modify the Court's Appointment Order,[59] including those portions of the Appointment Order that: (1) set forth the Rule 53(b)(2)  authority for the appointment; (2) detail the Special Master's "Complementary Duties;" (3) direct the parameters of the Special Master's "Communications with the Parties and the Court;" (4) pertain to the "Special Master's Record;" (5) pertain to the Court's "Review of the Special Master's Rulings;" (6) require that "All Relevant Parties" provide full cooperation to the Special Master;  and (7) require "All Relevant Parties" to provide the Special Master with "Access to Information."

IT IS FURTHER ORDERED that with respect to the Special Master's compensation, this Order does not modify the "Compensation" section of the Court's Appointment Order *except*

---

[59]Doc. 146.

that for all Phase III investigation, the ***government will not bear the cost***;[60] rather, the Special

Master's compensation and the costs for third-party assistance (such as American Discovery)

shall be paid by Timothy J. O'Brien, the Clerk of Court, up to $350,000, from funds appropriated

for this specific purpose.

IT IS SO ORDERED.

Dated: May 17, 2017

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[60]Although the Court relieves the government from bearing the cost of the Special Master's investigation going forward, there is one exception.  If the government does not cooperate regarding the inspection and copying described in Section VIII. (9) above, or otherwise litigates the production of materials and information necessary for the Special Master to pursue his investigation, then the fees, costs, and expenses associated with that noncooperation will be paid by the government.